# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
## NASHVILLE DIVISION

LOREN L. CASSELL, PAMELA M.
STEELE, JOHN E. RICE, PENELOPE A.
ADGENT, IAN SALTER, MICHELLE N.
WRAY, DAWN E. CRAGO, AND LYNDA
PAYNE, individually and as representatives
of a class of participants and beneficiaries
on behalf of the Vanderbilt University
Retirement Plan and the Vanderbilt
University New Faculty Plan,

*Plaintiffs*,

v.

VANDERBILT UNIVERSITY,
VANDERBILT RETIREMENT PLAN
OVERSIGHT COMMITTEE, DONALD
BRADY, ANDERS HALL, ERIC
KOPSTAIN, JOHN MANNING, TRACI
NORDBERG, BRETT SWEET, AND
RICHARD WILLIS,

*Defendants*.

Civil Action No.

COMPLAINT—CLASS ACTION

JURY TRIAL DEMANDED

1.      Plaintiffs Loren L. Cassell, Pamela M. Steele, John E. Rice, Penelope

A. Adgent, Ian Salter, Michelle N. Wray, Dawn E. Crago, and Lynda Payne,

individually and as representatives of a class of participants and beneficiaries in the

Vanderbilt University Retirement Plan and the Vanderbilt University New Faculty

Plan (collectively the "Plan"),[1] bring this action under 29 U.S.C. §1132(a)(2) and (3)

on behalf of the Plan against Defendants Vanderbilt University, the Vanderbilt

Retirement Plan Oversight Committee, Donald Brady, Anders Hall, Eric Kopstain,

---

[1] The Plan is also referred to as the Vanderbilt University 403(b) Retirement Plan.

John Manning, Traci Nordberg, Brett Sweet, and Richard Willis for breach of fiduciary duties under ERISA.[2]

2. The duties of loyalty and prudence are the "highest known to the law" and require fiduciaries to have "an eye single to the interests of the participants and beneficiaries." *Donovan v. Bierwirth,* 680 F.2d 263, 271, 272 n.8 (2d Cir. 1982). As fiduciaries to the Plan, Defendants are obligated to act for the exclusive benefit of participants and beneficiaries and to ensure that Plan expenses are reasonable and the Plan's investments are prudent. The marketplace for retirement plan services is established and competitive. Billion dollar defined contribution plans, like the Plan, have tremendous bargaining power to demand low-cost administrative and investment management services. Instead of using the Plan's bargaining power to benefit participants and beneficiaries, Defendants allowed unreasonable expenses to be charged to participants for administration of the Plan and retained high-cost and poor-performing investments compared to available alternatives.

3. To remedy these fiduciary breaches, Plaintiffs, individually and as representatives of a class of participants and beneficiaries of the Plan, bring this action on behalf of the Plan under 29 U.S.C. §1132(a)(2) and (3) to enforce Defendants' personal liability under 29 U.S.C. §1109(a) to make good to the Plan all losses resulting from each breach of fiduciary duty and to restore to the Plan any profits made through Defendants' use of Plan assets. In addition, Plaintiffs seek such other equitable or remedial relief for the Plan as the Court may deem appropriate.

[2] The Employee Retirement Income Security Act, 29 U.S.C. §§1001–1461.

2

## JURISDICTION AND VENUE

4.     This Court has exclusive jurisdiction over the subject matter of this action under 29 U.S.C. §1132(e)(1) and 28 U.S.C. §1331 because it is an action under 29 U.S.C. §1132(a)(2) and (3).

5.     This District is the proper venue for this action under 29 U.S.C. §1132(e)(2) and 28 U.S.C. §1391(b) because it is the district in which the subject Plan is administered, where at least one of the alleged breaches took place, and where at least one defendant resides.

## PARTIES

### The Plan

6.     The Vanderbilt University Retirement Plan and the New Faculty Plan, which are referred to by Defendants in their filings as "the Plan", are defined contribution, individual account, employee pension benefit plans under 29 U.S.C. §1002(2)(A) and §1002(34).

7.     The Plan is established and maintained under a written document in accordance with 29 U.S.C. §1102(a)(1). The Plan was adopted on July 1, 1989.

8.     The Plan is comprised of the "Vanderbilt University Retirement Plan" and the "Vanderbilt University New Faculty Plan". The Plan has actually two plans within it, and each of these plans requires mandatory participation for eligible employees. The Vanderbilt University Retirement Plan provides for retirement income for all employees of Vanderbilt University except for: employees that work less than 20 hours per week; students, post-doctoral fellows, trainees performing services and who are exempt from social security taxes; newly hired faculty who are

3

not highly compensated and who are eligible to participate in the Vanderbilt University New Faculty Plan; and any person not classified by the University as an employee. The Vanderbilt University New Faculty Plan covers all newly hired faculty who are not highly compensated.

9.    A participant's retirement income depends upon mandatory contributions from each employee, employer matching contributions, employee supplemental contributions, and from the performance of investment options, net of fees and expenses.

10.    As of December 31, 2014, the Plan had $3.4 billion in net assets and 41,863 participants with account balances. As such, it is one of the largest defined contribution plans in the United States, ranking it in the top 1% of all defined contribution plans based on total plan assets that filed a Form 5500 with the Department of Labor. Plans of such great size are commonly referred to as "jumbo plans".

<center>Plaintiffs</center>

11.    Loren L. Cassell resides in Hendersonville, Tennessee, and is a "participant" in the Plan under 29 U.S.C. §1002(7) because he and his beneficiaries are or may become eligible to receive benefits under the Plan.

12.    Pamela M. Steele resides in White House, Tennessee, and is a participant in the Plan under 29 U.S.C. §1002(7) because she and her beneficiaries are or may become eligible to receive benefits under the Plan.

<center>4</center>

13.     John E. Rice resides in Nashville, Tennessee, and is a participant in the Plan under 29 U.S.C. §1002(7) because he and his beneficiaries are or may become eligible to receive benefits under the Plan.

14.     Penelope A. Adgent resides in Nashville, Tennessee, and is a participant in the Plan under 29 U.S.C. §1002(7) because she and her beneficiaries are or may become eligible to receive benefits under the Plan.

15.     Ian Salter resides in Madison, Tennessee, and is a participant in the Plan under 29 U.S.C. §1002(7) because he and his beneficiaries are or may become eligible to receive benefits under the Plan.

16.     Michelle N. Wray resides in Nashville, Tennessee, and is a participant in the Plan under 29 U.S.C. §1002(7) because she and her beneficiaries are or may become eligible to receive benefits under the Plan.

17.     Dawn E. Crago resides in Joelton, Tennessee, and is a participant in the Plan under 29 U.S.C. §1002(7) because she and her beneficiaries are or may become eligible to receive benefits under the Plan.

18.     Lynda Payne resides in Nashville, Tennessee, and is a participant in the Plan under 29 U.S.C. §1002(7) because she and her beneficiaries are or may become eligible to receive benefits under the Plan.

## Defendants

19.     Vanderbilt University is a non-profit corporation organized under Tennessee law with its principal place of business in Nashville, Tennessee. Vanderbilt University is the plan sponsor and plan administrator under 29 U.S.C. §1002(16)(A)(i), and, upon information and belief, has exclusive responsibility and

5

complete discretionary authority to control the operation, management and administration of the Plan, with all powers necessary to enable it properly to carry out such responsibilities, including the selection and compensation of the providers of administrative services to the Plan and the selection, monitoring, and removal of the investment options made available to participants for the investment of their contributions and provision of their retirement income.

20. Vanderbilt University is a fiduciary to the Plan because it exercised discretionary authority or discretionary control respecting the management of the Plan or exercised authority or control respecting the management or disposition of its assets, and has discretionary authority or discretionary responsibility in the administration of the Plan. 29 U.S.C. §1002(21)(A)(i) and (iii).

21. The Vanderbilt Retirement Plan Oversight Committee ("Committee") was established only in August 2012 and was delegated fiduciary responsibility over the administration and investment of Plan assets, including: selecting and monitoring Plan investment options; selecting vendors and implementing contractual service arrangements; developing investment objectives, policies, and procedures for the Plan; and monitoring and controlling investment and administrative fees paid from the Plan to ensure those fees are reasonable for the services provided.

22. Current members of the Committee include: Donald Brady, Anders Hall, Eric Kopstain, John Manning, Traci Nordberg, Brett Sweet, and Richard Willis.

6

23.     The Committee and its individual members are fiduciaries to the Plan because they exercised discretionary authority or discretionary control respecting the management of the Plan or exercised authority or control respecting the management or disposition of its assets, and have discretionary authority or discretionary responsibility in the administration of the Plan. 29 U.S.C. §1002(21)(A)(i) and (iii).

24.     Because the Vanderbilt University entities or individual committee members described above have acted as alleged herein as the agents of Vanderbilt University, all defendants are collectively referred to hereafter as "Defendants".

## FACTS APPLICABLE TO ALL COUNTS

### I.     The Plan's investment structure

25.     Defendants select investment options into which participants' investments are directed, including those investment options that are removed from the Plan. These investments are designated by Vanderbilt University as available investment alternatives offered under the Plan.

26.     Prior to April 2015, Defendants selected and retained approximately *340* investment options, which included mutual funds, insurance pooled separate accounts, and insurance company fixed and variable annuity products. The mutual fund options included *retail* share class mutual funds, despite the massive size of the Plan. These retail share class mutual funds are designed for small individual investors and are identical in every respect to institutional share class funds, except for much higher fees.

7

27.     The Plan's investment options were offered by four separate recordkeepers to the Plan. These recordkeepers included Fidelity Investments Institutional Operations Company ("Fidelity"), the Vanguard Group, Inc. ("Vanguard"), Teachers Insurance and Annuity Association of America and College Retirement Equities Fund ("TIAA-CREF"), and the Variable Life Insurance Company ("VALIC"). With the exception of approximately six investments, all investments were proprietary investments of these four recordkeepers.

28.     The Plan's TIAA-CREF investments consist of fixed and variable annuity products, an insurance separate account, and mutual funds. The Plan's CREF Stock Account, CREF Global Equities Account, CREF Equity Index Account, CREF Growth Account, CREF Social Choice Account, CREF Money Market Account, and CREF Bond Market Account are variable annuities, which invest in underlying securities for a given mandate. The value of each participant's investment in the variable annuity changes over time based on investment experience and the expenses of the account.

29.     The expense ratio of the CREF variable annuity accounts is made up of multiple layers of expense charges called:

    a.  an "administrative expense" charge (24 bps);[3]

    b.  "distribution expense" charge (9.5 bps);

    c.  "mortality and expense risk" charge (0.5 bps); and

    d.  "investment advisory expense" charge (ranging from 4 to 12.5 bps).

---

[3] One basis point is equal to 1/100th of one percent (or 0.01%). Expenses as of May 1, 2014.

8

30.     The TIAA Real Estate Account is an insurance separate account maintained by TIAA-CREF. An insurance separate account is an investment vehicle that aggregates assets from more than one retirement plan for a given investment strategy, but those assets are segregated from the insurance company's general account assets. The expense ratio of the TIAA Real Estate Account is made up of multiple layers of expense charges. As of May 1, 2013, these charges were called:

    a. "administrative expense" charge (26.5 bps);

    b. "distribution expense" charge (8 bps);

    c. "mortality and expense risk" charge (0.5 bps);

    d. "liquidity guarantee" (18 bps); and

    e. "investment management expense" charge (36.5 bps).

31.     The TIAA Traditional Annuity offered in the Plan is a fixed annuity contract that guarantees principal and a contractually specified minimum interest rate. Assets invested in the TIAA Traditional Annuity are held in the general account of Teachers Insurance and Annuity Association of America and depend upon the claims-paying ability of Teachers Insurance and Annuity Association of America.

32.     The TIAA Traditional Annuity has severe restrictions and penalties for withdrawal if participants wish to change their investments in the Plan. For example, some participants who invest in the TIAA Traditional Annuity may withdraw or change their investment in a single lump sum within 120 days of termination of employment, but, to do so, such participants must pay a 2.5%

surrender charge. Rather than being available to participants if they wish to liquidate their funds earlier, the only way for participants to withdraw or change their TIAA Traditional Annuity investment is to spread withdrawal over a *ten-year period,* unless a substantial penalty is paid. Thus, participants who wish to withdraw their investment without penalty can only do so over ten years.

33.     The remaining TIAA-CREF funds are registered investment companies under the Investment Company Act of 1940, known as mutual funds, which charge varying amounts for investment management, distribution, marketing, and other expenses, depending on the investment at issue and share class.

34.     The Vanguard and Fidelity investment options offered to Plan participants are exclusively mutual funds that charge varying amounts for investment management, distribution, marketing, and other expenses, depending on the investment at issue and share class.

35.     Mutual funds have shareholders who are not participants in the Plan, or any retirement plan, and who purchase shares as a result of marketing the fund. However, all shareholders in mutual funds, including participants in the Plan, pay the expenses set forth in ¶¶33–34.

36.     VALIC issued a fixed and variable insurance annuity program to the Plan, referred to as the Portfolio Director, from which participants can direct their contributions among various fixed and variable account options. The value of each participant's investment in these variable accounts will change over time based on investment experience and expenses of the account. The variable accounts include

10

insurance company pooled separate accounts that invest in underlying mutual funds advised by VALIC or other mutual fund companies, such as Vanguard. For these options, VALIC charges fees *in addition to* the expense ratio of the underlying mutual funds, which can reach *multiples* of the total fees charged by the mutual funds. For instance, VALIC charged 140 bps for the VALIC Vanguard Lifestrategy Conservative Growth Fund when the underlying Vanguard Lifestrategy Conservative Growth Fund (VSCGX) charged 15 bps, an increase of *over 833%*. See infra ¶67.

37.    The VALIC fixed accounts invest in the general account of VALIC and depend upon the claims-paying ability of VALIC. These options offer a fixed rate of return to participants.

38.    In April 2015, Defendants eliminated hundreds of mutual funds provided to Plan participants and selected a tiered structure comprised of a limited core set of 14 investment options.[4]

39.    Tier 1 consists of Vanguard target date mutual funds. Target date funds automatically rebalance their portfolios to become more conservative as the participant gets closer to retirement. The "target date" refers to the participant's expected retirement date, and is often part of the name of the fund. For instance, "2030" target date funds are designed for individuals who intend to retire in the year 2030.

---

[4] The Plan's target date funds are counted as a single investment option.

11

40.     Tier 2 includes only 12 mutual fund options among various asset classes and investment styles, and an insurance stable value option called the Principal Fixed Account.

41.     Tier 3 consists of a self-directed brokerage window.

42.     Regardless of this "tiered" structure, Defendants did not remove the fixed and variable annuity options provided by TIAA-CREF and VALIC. These options are still provided in the Plan, but are frozen to new participant contributions.

## II.     Defendants' actions caused Plan participants to pay excessive administrative and recordkeeping fees in violation of ERISA's requirement that fees be reasonable.

43.     Recordkeeping is a service necessary for every defined contribution plan. The market for recordkeeping services is highly competitive. There are numerous recordkeepers in the marketplace who are equally capable of providing a high level of service to a large defined contribution plan like the Plan. These recordkeepers primarily differentiate themselves based on price, and vigorously compete for business by offering the best price.

44.     To ensure that plan administrative and recordkeeping expenses are and remain reasonable for the services provided, prudent fiduciaries of large defined contribution plans put the plan's recordkeeping and administrative services out for competitive bidding at regular intervals of approximately three years.

45.     The cost of recordkeeping services depends on the number of participants, not on the amount of assets in the participant's account. Thus, the cost of providing recordkeeping services to a participant with a $100,000 account

12

balance is the same for a participant with $1,000 in her retirement account. For this reason, prudent fiduciaries of defined contribution plans negotiate recordkeeping fees on the basis of a fixed dollar amount for each participant in the plan rather than as a percentage of plan assets. Otherwise, as plan assets increase through participant contributions or investment gains, the recordkeeping compensation increases without any change in the recordkeeping and administrative services.

46. Jumbo defined contribution plans, like the Plan, experience economies of scale for recordkeeping and administrative services. As the number of participants in the plan increases, the per-participant fee charged for recordkeeping and administrative services declines. These lower administrative expenses are readily available for plans with a greater number of participants.

47. Some investments engage in a practice known as revenue sharing. In a revenue sharing arrangement, a mutual fund or other investment vehicle directs a portion of the expense ratio—the asset-based fees it charges to investors—to the plan's recordkeeper putatively for providing recordkeeping and administrative services for the investment. Because revenue sharing arrangements provide asset-based fees, prudent fiduciaries monitor the total amount of revenue sharing a recordkeeper receives to ensure that the recordkeeper is not receiving unreasonable compensation. A prudent fiduciary must ensure that the recordkeeper rebates to the plan all revenue sharing payments that exceed a reasonable, negotiated recordkeeping fee. Because revenue sharing payments are asset-based, they often bear no relation to a reasonable recordkeeping fee and can provide excessive

13

compensation, or may be used as kickbacks to induce recordkeepers to have their high-priced funds included as plan investment options.

48.     Prudent fiduciaries of similarly sized defined contribution plans use a single recordkeeper rather than hiring multiple recordkeepers and custodians or trustees. This leverages plan assets to provide economies of scale and ensures that plan participants pay only reasonable recordkeeping fees, while also simplifying personnel and payroll data feeds, reducing electronic fund transfers, and avoiding duplication of services when more than one recordkeeper is used.

49.     According to a 2013 survey of 403(b) plans, over 90% of plans use a single recordkeeper to provide administrative and recordkeeping services to participants. See LIMRA Retirement Research, *403(b) Plan Sponsor Research* (2013).[5]

50.     It is well known in the defined contribution plan industry that plans with dozens of choices and multiple recordkeepers "fail" as a model based on two primary flaws:

> 1. **The choices are overwhelming**. Numerous studies have demonstrated that when people are given too many choices of anything, they lose confidence or make no decision.
> 2. **The multi-recordkeeper platform is inefficient**. It does not allow sponsors to leverage total plan assets and receive appropriate pricing based on aggregate assets.

---

[5] Available at http://www.limra.com/uploadedFiles/limracom/LIMRA_Root/Secure_Retirement_Institute/News_Center/Reports/130329-01exec.pdf.

14

The Standard Retirement Services, *Fixing Your 403(b) Plan: Adopting a Best Practices Approach,* at 2 (Nov. 2009)(emphasis in original).[6]

51.     The benefits of using a single recordkeeper are clear.

By selecting a single recordkeeper, plan sponsors can enhance their purchasing power and negotiate lower, transparent investment fees for participants. Participants will benefit from a more manageable number of institutional-quality investment options to choose from. Participants will also benefit from customized and consistent enrollment, education and ongoing communication materials.[7]

52.     In a study titled "How 403(b) Plans Are Wasting Nearly $10 Billion Annually, and What Can Be Done to Fix It", AonHewitt, an independent investment consultant, similarly recognized:

403(b) plan sponsors can dramatically reduce participant-borne costs while improving employees' retirement readiness by:

   – Reducing the number of investment options, utilizing an "open architecture" investment menu, and packaging the options within a "tiered" structure.

   – Consolidating recordkeepers to improve efficiencies and reduce compliance-related risks.

   – Leveraging aggregate plan size and scale to negotiate competitive pricing.[8]

53.     Another independent investment consultant, Towers Watson, also recognized that using multiple recordkeepers has caused:

---

[6] Available at https://www.standard.com/pensions/publications/14883_1109.pdf.

[7] *Id.*

[8] AonHewitt, *How 403(b) Plans Are Wasting Nearly $10 Billion Annually, and What Can Be Done to Fix It* (Jan. 2016), available at https://retirementandinvestmentblog.aon.com/getattachment/36ff81a4-db35-4bc0-aac1-1685d2a64078/How_403(b)_Plans_are_Wasting_Nearly_$10_Billion_Annually_Whitepaper_FINAL.pdf.aspx.

high investment and administrative costs, and complex choices for plan participants in terms of the number of vendors and the array of investment options. Additionally, this complexity has made it difficult for employers to monitor available choices and provide ongoing oversight…Such designs typically are expensive and fail to leverage plan size. They can also be confusing to the average plan participant, who is likely to fall short of achieving retirement readiness and would benefit from more guidance.

Peter Grant and Gary Kilpatrick, *Higher Education's Response to a New Defined Contribution Environment*, TOWERS WATSON VIEWPOINTS, at 2 (2012).[9]

54.     Other industry literature makes the same points. See, e.g., Kristen Heinzinger, *Paring Down Providers: A 403(b) Sponsor's Experience,* PLANSPONSOR (Dec. 6, 2012)("One advantage of consolidating to a single provider was an overall drop in administrative fees and expenses. Recordkeeping basis points returned to the plan sponsors rather than to the vendor. All plan money aggregated into a single platform, and participants were able to save on fee structure. This also eliminated the complications and confusion of having three different recordkeepers.");[10] Paul B. Lasiter, *Single Provider, Multiple Choices*, BUSINESS OFFICER (Mar. 2010)(identifying, among other things, the key disadvantages of maintaining a multi-provider platform including the fact that it is "cumbersome and costly to continue overseeing multiple vendors.").[11]

---

[9] Available at https://www.towerswatson.com/DownloadMedia.aspx?media=%7B08A2F366-14E3-4C52-BB78-8930F598FD26%7D.

[10] Available at http://www.plansponsor.com/paring-down-providers-a-403b-sponsors-experience/?fullstory=true.

[11] Available at http://www.nacubo.org/Business_Officer_Magazine/Magazine_Archives/March_2010/Single_Provider_Multiple_Choices.html.

16

55.     Use of a single recordkeeper is also less confusing to participants and avoids excessive recordkeeping fees charged to the Plan. *Vendor Consolidation in Higher Education: Getting More from Less*, PLANSPONSOR (July 29, 2010) (recognizing the following benefits, among others: "The plan participant experience is better" because "employees are benefiting from less confusion as a result of fewer vendors in the mix"; "Administrative burden is lessened" by "bringing new efficiencies to the payroll"; and "Costs can be reduced" because "[w]ith a reduced number of vendors in the equation, plan sponsors are better able to negotiate fees" and many are "reporting lower overall cost resulting in an improved cost-per-participant ratio").[12]

56.     Despite the long-recognized benefits of a single recordkeeper for a defined contribution plan, Defendants continued to contract with *four* separate recordkeepers for the Plan for many years (TIAA-CREF, Fidelity, Vanguard, and VALIC). This inefficient and costly structure caused the Plan to pay excessive and unreasonable administrative and investment fees.

57.     Only in April 2015 did Defendants consolidate the Plan's recordkeeping and administrative services to a single primary service provider (Fidelity). There was no loyal or prudent reason that Defendants failed to engage in such process long before April 2015, and before 2009. TIAA-CREF and VALIC continue to provide recordkeeping services for the TIAA-CREF and VALIC

---

[12] Available at http://www.plansponsor.com/vendor-consolidation-in-higher-education/?fullstory=true.

annuities. Even after the recordkeeping change, the Plan continues to pay unreasonable recordkeeping and administrative fees.

58.     The Plan's *four* recordkeepers prior to April 2015 (TIAA-CREF, Fidelity, Vanguard, and VALIC) received compensation for providing recordkeeping services through per-participant fees and/or revenue sharing payments from the Plan's investments.

59.     Prior to April 2015, Fidelity was compensated based on revenue sharing payments from the Fidelity mutual fund investment options. Fidelity received between 20 and 35 bps on actively managed Fidelity mutual funds provided in the Plan. Similarly, Vanguard was compensated based on internal revenue sharing it received from the Vanguard Investor share class mutual funds for recordkeeping services, a higher priced share class than institutional rates readily available to a jumbo plan such as the Plan.

60.     Because VALIC continues to recordkeep the VALIC annuity options, VALIC was paid and continues to be paid uncapped and undisclosed revenue sharing payments from the VALIC annuity options that were closed to new participant contributions in April 2015.

61.     Upon information and belief and industry experts, the amount of revenue sharing kicked back to the TIAA-CREF recordkeeping entity for the Plan's TIAA-CREF investments is set forth below.

| TIAA-CREF Investment | Revenue Share |
|---|---|
| CREF variable annuity contracts | 24 bps |
| Premier share class of TIAA-CREF mutual funds | 15 bps |

18

| TIAA-CREF Investment | Revenue Share |
|---|---|
| Retirement share class of TIAA-CREF mutual funds | 25 bps |
| TIAA Real Estate Account | 24–26.5 bps |
| TIAA Traditional Annuity | 15 bps |

62. Because the TIAA-CREF annuities were not formally removed from the Plan but merely closed to new participant contributions, TIAA-CREF still receives uncapped revenue sharing from the CREF variable annuity contracts and the TIAA Traditional Annuity.

63. In addition, the Plan's recordkeepers receive additional indirect compensation, including float, revenue derived from securities lending, distribution fees, mortality and expense charges, surrender charges, spread, and redemption fees.

64. Effective April 2015, Defendants negotiated a $32 per participant recordkeeping fee with Fidelity for recordkeeping and administrative services. Upon information and belief, in addition to this per-participant fee, Fidelity also receives revenue sharing from one or more investment options provided to Plan participants. Despite this new arrangement with Fidelity, the Plan continues to pay additional and excessive amounts of uncapped revenue sharing to TIAA-CREF and VALIC for the annuity products that is not rebated back to the Plan for recordkeeping services.

65. Based on the Plan's features, the nature of the administrative services provided by the Plan's recordkeepers, the Plan's participant level (roughly 40,000), and the recordkeeping market, the outside limit of a reasonable recordkeeping fee

19

for the Plan would have been a fixed $1.2 to $1.3 million (or $30 per participant with an account balance).

66.     Based on the direct and indirect compensation levels shown on the Plan's Form 5500s filed with the Department of Labor, and on the internal revenue share allocated to Vanguard, TIAA-CREF and Fidelity for recordkeeping services, the Plan paid at least $4.1 to $6 million (approximately $100 to $145 per participant) per year from 2010 to 2014, over 383% higher than a reasonable fee for these services, resulting in millions of dollars in excessive recordkeeping fees each year.

67.     The Plan continues to pay excessive fees for recordkeeping services based on the combination of a fixed fee and revenue sharing paid to Fidelity, VALIC, and TIAA-CREF.

68.     This is a *very* conservative total because this amount excludes asset-based revenue sharing payments VALIC received for recordkeeping and administrative services on over $250 million invested in VALIC variable and fixed accounts. This information was not disclosed to Plan participants. These asset-based payments are substantial. For instance, on each of the variable accounts, VALIC charged fees *66% to 833%* higher than the fees actually charged by the underlying mutual funds, and received additional compensation through revenue sharing payments from the underlying proprietary mutual funds and other third-party mutual funds. Based on information presently available to Plaintiffs, as of

20

2014, the amounts charged by VALIC on its variable annuity products and the expenses of the underlying mutual funds are set forth below.

| VALIC Variable Annuity | Plan Fee | Underlying Mutual Fund | Underlying Mutual Fund Fee | Percentage Added by VALIC Above Mutual Fund Fee |
|---|---|---|---|---|
| VALIC Dividend Value | 182 bps | VALIC Company I Dividend Value Fund (VCIGX) | 82 bps | 121.95% |
| VALIC American Beacon Holland Large Cap Growth | 227 bps | American Beacon Holland Large Cap Growth Fund (Inv) (LHGFX) | 121 bps | 87.60% |
| VALIC Mid Cap Value | 180 bps | VALIC Company II Mid Cap Value Fund (VMCVX) | 105 bps | 71.43% |
| VALIC Ariel Appreciation | 213 bps | Ariel Appreciation Fund (Inv) (CAAPX) | 112 bps | 90.18% |
| VALIC Ariel Fund | 203 bps | Ariel Fund (Inv) (ARGFX) | 103 bps | 97.09% |
| VALIC Asset Allocation | 171 bps | VALIC Company I Asset Allocation Fund (VCAAX) | 69 bps | 147.83% |
| VALIC Blue Chip Growth | 183 bps | VALIC Company I Blue Chip Growth Fund (VCBCX) | 84 bps | 117.86% |

| VALIC Variable Annuity | Plan Fee | Underlying Mutual Fund | Underlying Mutual Fund Fee | Percentage Added by VALIC Above Mutual Fund Fee |
|---|---|---|---|---|
| VALIC Broad Cap Value Income | 185 bps | VALIC Company I Broad Cap Value Income Fund (VBCVX) | 85 bps | 117.65% |
| VALIC Capital Conservation | 164 bps | VALIC Company I Capital Conservation Fund (VCCCX) | 64 bps | 156.25% |
| VALIC Core Equity | 180 bps | VALIC Company I Core Equity Fund (VCCEX) | 80 bps | 125.00% |
| VALIC Emerging Economies | 195 bps | VALIC Company I Emerging Economies Fund (VCGEX) | 95 bps | 105.26% |
| VALIC Foreign Value | 180 bps | VALIC Company I Foreign Value Fund (VCFVX) | 80 bps | 125.00% |
| VALIC Global Social Awareness | 164 bps | VALIC Company I Global Social Awareness Fund (VCSOX) | 64 bps | 156.25% |
| VALIC Global Strategy | 164 bps | VALIC Company I Global Strategy Fund (VGLSX) | 64 bps | 156.25% |
| VALIC Government Securities | 165 bps | VALIC Company I Government Securities Fund (VCGSX) | 65 bps | 153.85% |

| VALIC Variable Annuity | Plan Fee | Underlying Mutual Fund | Underlying Mutual Fund Fee | Percentage Added by VALIC Above Mutual Fund Fee |
|---|---|---|---|---|
| VALIC Growth | 181 bps | VALIC Company I Growth Fund (VCULX) | 81 bps | 123.46% |
| VALIC Growth & Income | 185 bps | VALIC Company I Growth & Income Fund (VCGAX) | 85 bps | 117.65% |
| VALIC Health Sciences | 211 bps | VALIC Company I Health Sciences Fund (VCHSX) | 111 bps | 90.09% |
| VALIC Inflation Protected | 159 bps | VALIC Company I Inflation Protected Fund (VCTPX) | 59 bps | 169.49% |
| VALIC International Equities Index | 146 bps | VALIC Company I International Equities Index Fund (VCIEX) | 46 bps | 217.39% |
| VALIC International Government Bond | 165 bps | VALIC Company I International Government Bond Fund (VCIFX) | 65 bps | 153.85% |
| VALIC International Growth | 201 bps | VALIC Company I International Growth Fund (VCINX) | 101 bps | 99.01% |
| VALIC Large Cap Core | 184 bps | VALIC Company I Large Cap Core Fund (VLCCX) | 83 bps | 121.69% |

Case 3:16-cv-02086   Document 1   Filed 08/10/16   Page 23 of 89 PageID #: 23

| VALIC Variable Annuity | Plan Fee | Underlying Mutual Fund | Underlying Mutual Fund Fee | Percentage Added by VALIC Above Mutual Fund Fee |
|---|---|---|---|---|
| VALIC Large Capital Growth | 176 bps | VALIC Company I Large Capital Growth Fund (VLCGX) | 76 bps | 131.58% |
| VALIC Mid Cap Index | 136 bps | VALIC Company I Mid Cap Index Fund (VMIDX) | 36 bps | 277.78% |
| VALIC Mid Cap Strategic Growth | 182 bps | VALIC Company I Mid Cap Strategic Growth Fund (VMSGX) | 81 bps | 124.69% |
| VALIC Money Market I | 151 bps | VALIC Company I Money Market I Fund (VCIXX) | 51 bps | 196.08% |
| VALIC NASDAQ-100 Index | 153 bps | VALIC Company I NASDAQ-100 Index Fund (VCNIX) | 53 bps | 188.68% |
| VALIC Science & Technology | 199 bps | VALIC Company I Science & Technology Fund (VCSTX) | 98 bps | 103.06% |
| VALIC Small Cap | 193 bps | VALIC Company I Small Cap Fund (VCSMX) | 93 bps | 107.53% |
| VALIC Small Cap Aggressive Growth | 199 bps | VALIC Company I Small Cap Aggressive Growth Fund (VSAGX) | 99 bps | 101.01% |

Case 3:16-cv-02086   Document 1   Filed 08/10/16   Page 24 of 89 PageID #: 24

| VALIC Variable Annuity | Plan Fee | Underlying Mutual Fund | Underlying Mutual Fund Fee | Percentage Added by VALIC Above Mutual Fund Fee |
|---|---|---|---|---|
| VALIC Small Cap Index | 140 bps | VALIC Company I Small Cap Index Fund (VCSLX) | 40 bps | 250.00% |
| VALIC Small Cap Special Value | 188 bps | VALIC Company I Small Cap Special Value Fund (VSSVX) | 88 bps | 113.64% |
| VALIC Small-Mid Growth | 200 bps | VALIC Company I Small-Mid Growth Fund (VSSGX) | 100 bps | 100.00% |
| VALIC Stock Index | 135 bps | VALIC Company I Stock Index Fund (VSTIX) | 35 bps | 285.71% |
| VALIC Value | 185 bps | VALIC Company I Value Fund (VAVAX) | 85 bps | 117.65% |
| VALIC Aggressive Growth Lifestyle | 163 bps | VALIC Company II Aggressive Growth Lifestyle Fund (VAGLX) | 86 bps | 89.53% |
| VALIC Capital Appreciation | 160 bps | VALIC Company II Capital Appreciation Fund (VCCAX) | 84 bps | 90.48% |

Case 3:16-cv-02086   Document 1   Filed 08/10/16   Page 25 of 89 PageID #: 25

| VALIC Variable Annuity | Plan Fee | Underlying Mutual Fund | Underlying Mutual Fund Fee | Percentage Added by VALIC Above Mutual Fund Fee |
|---|---|---|---|---|
| VALIC Conservative Growth Lifestyle | 163 bps | VALIC Company II Conservative Growth Lifestyle Fund (VCGLX) | 87 bps | 87.36% |
| VALIC Core Bond | 152 bps | VALIC Company II Core Bond Fund (VCCBX) | 77 bps | 97.40% |
| VALIC High Yield Bond | 171 bps | VALIC Company II High Yield Bond Fund (VCHYX) | 96 bps | 78.13% |
| VALIC International Opportunities | 175 bps | VALIC Company II International Opportunities Fund (VISEX) | 100 bps | 75.00% |
| VALIC Large Cap Value | 156 bps | VALIC Company II Large Cap Value Fund (VACVX) | 80 bps | 95.00% |
| VALIC Mid Cap Growth | 160 bps | VALIC Company II Mid Cap Growth Fund (VAMGX) | 84 bps | 90.48% |
| VALIC Moderate Growth Lifestyle | 162 bps | VALIC Company II Moderate Growth Lifestyle Fund (VMGLX) | 85 bps | 90.59% |

| VALIC Variable Annuity | Plan Fee | Underlying Mutual Fund | Underlying Mutual Fund Fee | Percentage Added by VALIC Above Mutual Fund Fee |
|---|---|---|---|---|
| VALIC Money Market II | 130 bps | VALIC Company II Money Market II Fund (VIIXX) | 55 bps | 136.36% |
| VALIC Small Cap Growth | 191 bps | VALIC Company II Small Cap Growth Fund (VASMX) | 115 bps | 66.09% |
| VALIC Small Cap Value | 170 bps | VALIC Company II Small Cap Value Fund (VCSVX) | 94 bps | 80.85% |
| VALIC Socially Responsible | 131 bps | VALIC Company II Socially Responsible Fund (VCSRX) | 56 bps | 133.93% |
| VALIC Strategic Bond | 164 bps | VALIC Company II Strategic Bond Fund (VCSBX) | 88 bps | 86.36% |
| VALIC SunAmerica 2020 High Watermark | 223 bps | SunAmerica 2020 High Watermark Fund (I) | 89 bps | 150.56% |
| VALIC Vanguard LifeStrategy Conservative Growth | 140 bps | Vanguard LifeStrategy Conservative Growth Fund (Inv) (VSCGX) | 15 bps | 833.33% |
| VALIC Vanguard LifeStrategy Growth | 142 bps | Vanguard LifeStrategy Growth Fund (Inv) (VASGX) | 17 bps | 735.29% |

27

Case 3:16-cv-02086   Document 1   Filed 08/10/16   Page 27 of 89 PageID #: 27

| VALIC Variable Annuity | Plan Fee | Underlying Mutual Fund | Underlying Mutual Fund Fee | Percentage Added by VALIC Above Mutual Fund Fee |
|---|---|---|---|---|
| VALIC Vanguard LifeStrategy Moderate Growth | 141 bps | Vanguard LifeStrategy Moderate Growth Fund (Inv) (VSMGX) | 16 bps | 781.25% |
| VALIC Vanguard Long-Term Investment-Grade | 122 bps | Vanguard Long-Term Investment-Grade Fund (Inv) (VWESX) | 22 bps | 454.55% |
| VALIC Vanguard Long-Term Treasury | 120 bps | Vanguard Long-Term Treasury Fund (Inv) (VUSTX) | 20 bps | 500.00% |
| VALIC Vanguard Wellington | 151 bps | Vanguard Wellington Fund (Inv) (VWELX) | 26 bps | 480.77% |
| VALIC Vanguard Windsor II | 161 bps | Vanguard Windsor II Fund (Inv) (VWNFX) | 36 bps | 347.22% |

69.     The impact of excessive fees on employees' and retirees' retirement assets is dramatic. The U.S. Department of Labor has noted that a 1% higher level of fees over a 35-year period makes a 28% difference in retirement assets at the end of a participant's career. U.S. Dep't of Labor, *A Look at 401(k) Plan Fees,* at 1–2 (Aug. 2013).[13]

70.     Defendants also failed to control recordkeeping costs as Plan assets grew. From the beginning of 2009 to the end of 2014, the Plan's assets increased

---

[13] Available at http://www.dol.gov/ebsa/pdf/401kfeesemployee.pdf.

from $1.6 billion to over $3.4 billion, an increase of *113 percent.* Because revenue sharing payments are asset-based, the already excessive compensation paid to the Plan's recordkeepers became even more excessive as the Plan's assets grew, even though the administrative services provided to the Plan remained the same. Defendants could have capped the amount of revenue sharing to ensure that any excessive amounts were returned to the Plan as other plans do, but failed to do so.

71.     Upon information and belief, Defendants also failed to conduct a competitive bidding process for the Plan's recordkeeping services. A competitive bidding process for the Plan's recordkeeping services would have produced a reasonable recordkeeping fee for the Plan. This competitive bidding process would have enabled Defendants to select a recordkeeper charging reasonable fees, to negotiate a reduction in recordkeeping fees, and to rebate any excess expenses paid by participants for recordkeeping services.

72.     Defendants failed to prudently monitor and control the compensation paid for recordkeeping and administrative services, particularly the asset-based revenue sharing received by the Plan's recordkeepers, and therefore caused the Plan participants to pay unreasonable expenses for administering the Plan.

73.     Had Defendants monitored the compensation paid to the Plan's recordkeepers and ensured that participants were only charged reasonable fees for administrative and recordkeeping services, Plan participants would not have lost in

excess of $25 million of their retirement savings through unreasonable recordkeeping fees.[14]

### III. Defendants have admitted that the prior Plan structure was imprudent and caused unreasonable fees to be charged to the Plan.

74. Defendants expressly recognized that the Plan's multiple recordkeeper structure and *hundreds* of investment options caused the Plan to pay unreasonable recordkeeping and investment fees. When describing the April 2015 Plan changes, Vanderbilt stated:

> **Reduced expenses**
> Vanderbilt's consolidated administration platform and new investment options were selected to be **cost effective**. Therefore, **the expenses and fees associated with investing in the 403(b) Plan will be considerably lower for participants. Lower fees and expenses can increase the return on your investment**. A separate notice will be provided in February regarding the expenses and fees associated with the 403(b) Plan.[15]

75. A description of the fiduciary process conducted by Defendants in the selection of the recent 2015 investment lineup makes abundantly clear that they failed to provide investment options that were solely in the interest of Plan participants. In an article, "New Retirement Plan Structure Offers Best-in-Class Funds Independent of Administrative Services Provider", Vanderbilt's Senior Director of Compensation and Benefits noted, in relevant part:

---

[14] Plan losses have been brought forward to the present value using the investment returns of the S&P 500 index to compensate participants who have not been reimbursed for their losses. This is because the excessive fees participants paid would have remained in Plan investments growing with the market.

[15] Vanderbilt University 403(b) Retirement Plan Transition Guide (emphasis added), available at https://workplacecontent.fidelity.com/bin-public/070_NB_PreLogin_Pages/documents/Vanderbilt_Transition_Guide.pdf.

30

Our new plan structure separates the funds offered in our core investment lineup from the administrative services provider. **We can choose the funds and provider we think meet employees' needs based on their own merits...**This means that we aren't tied to offering funds managed only by the company providing administrative services for the plan. **We can choose the funds that we feel are best in different asset classes, no matter which company manages them.**

**The funds we selected are the ones we felt had the strongest performance, managers and stability, as well as the most competitive management expenses....We didn't limit ourselves to funds offered by one or two companies**. We wanted to offer different types of funds, including small-, mid- and large-cap; international; and bonds, so participants could build a diverse portfolio from a manageable set of options. That's why you see funds managed by several companies in the core lineup.[16]

76.    Only in April 2015 was the monitoring of Plan investment options a claimed "top priority" for the Plan.[17] For the first time, apparently since the Plan's inception, Defendants set as a standard that they would evaluate investment options based on specific quantitative and qualitative factors as prudent investment managers do:

In selecting core lineup funds, the committee considered several characteristics for each one, including:
- Expense ratio, or the measure of what it costs for an investment company to run a fund relative to the total value of its assets;
- Performance, including the average rate of return of the fund over time;
- The management team's experience and track record in selecting the stocks or other assets within a fund; and
- Size and stability.[18]

---

[16] Vanderbilt News, *New Retirement Plan Structure Offers Best-in-Class Funds Independent of Administrative Services Provider* (Feb. 20, 2015)(emphasis added), available at http://news.vanderbilt.edu/2015/02/new-structure-offers-best-in-class-funds/.

[17] Vanderbilt News, *Retirement Plan Fund Selectin and Monitoring is Top Priority* (Mar. 6, 2015), available at http://news.vanderbilt.edu/2015/03/vanderbilt-retirement-plan-fund-selection-and-monitoring-is-top-priority-of-retirement-plan-oversight-committee/.

[18] *Id.*

31

77.     Had Defendants conducted a prudent analysis of the Plan's administrative services and investment options at least by 2009, Plan participants would have avoided paying millions of dollars in unreasonable investment and administrative fees, and millions of dollars in performance losses.

**IV.     Defendants failed to prudently consider or offer dramatically lower-cost investments that were available to the Plan, including identical mutual funds in lower-cost share classes.**

78.     Nobel Prize winners in economics have concluded that virtually no investment manager consistently beats the market over time after fees are taken into account. "Properly measured, the average actively managed dollar must underperform the average passively managed dollar, net of costs." William F. Sharpe, *The Arithmetic of Active Management,* 47 FIN. ANALYSTS J. 7, 8 (Jan./Feb. 1991);[19] Eugene F. Fama & Kenneth R. French, *Luck Versus Skill in the Cross-Section of Mutual Fund Returns*, 65 J. FIN. 1915, 1915 (2010)("After costs…in terms of net returns to investors, active investment must be a negative sum game.").

79.     To the extent managers show any sustainable ability to beat the market, the outperformance is nearly always dwarfed by mutual fund expenses. Fama & French, *Luck Versus Skill in the Cross-Section of Mutual Fund Returns*, at 1931–34; see also Russ Wermers, *Mutual Fund Performance: An Empirical Decomposition into Stock-Picking Talent, Style, Transaction Costs, and Expenses*, 55 J. FIN. 1655, 1690 (2000)("on a net-return level, the funds underperform broad market indexes by one percent per year").

---

[19] Available at http://www.cfapubs.org/doi/pdf/10.2469/faj.v47.n1.7.

80.     If an individual high-cost mutual fund exhibits market-beating performance over a short period of time, studies demonstrate that outperformance during a particular period is not predictive of whether a mutual fund will perform well in the future. Laurent Barras et al., *False Discoveries in Mutual Fund Performance: Measuring Luck in Estimated Alphas*, 65 J. FIN. 179, 181 (2010); Mark M. Carhart, *On Persistence in Mutual Fund Performance*, 52 J. FIN. 57, 57, 59 (1997)(measuring thirty-one years of mutual fund returns and concluding that "persistent differences in mutual fund expenses and transaction costs explain almost all of the predictability in mutual fund returns"). However, the *worst-performing* mutual funds show a strong, persistent tendency to continue their poor performance. Carhart*, On Persistence in Mutual Fund Performance,* at 57.

81.     Accordingly, investment costs are of paramount importance to prudent investment selection, and a prudent fiduciary will not select higher-cost actively managed funds without a documented process to realistically conclude that the fund is likely to be that extremely rare exception, if one even exists, that will outperform its benchmark index over time, net of investment expenses.

82.     Moreover, jumbo retirement plans have massive bargaining power to negotiate low fees for investment management services.

> The fiduciaries also must consider the size and purchasing power of their plan and select the share classes (or alternative investments) that a fiduciary who is knowledgeable about such matters would select under the circumstances. In other words, the 'prevailing circumstances'—such as the size of the plan—are a part of a prudent decision-making process. The failure to understand the concepts and to know about the alternatives could be a costly fiduciary breach.

33

Fred Reish, *Class–ifying Mutual Funds*, PLANSPONSOR (Jan. 2011).[20]

83.     Apart from the fact that a prudent fiduciary will carefully weigh whether an actively managed fund is likely to outperform an index over time, net of fees, academic and financial industry literature demonstrates that high expenses are not correlated with superior investment management. Indeed, funds with high fees on average perform worse than less expensive funds even on a *pre-fee basis*. Javier Gil-Bazo & Pablo Ruiz-Verdu, *When Cheaper is Better: Fee Determination in the Market for Equity Mutual Funds*, 67 J. ECON. BEHAV. & ORG. 871, 873 (2008); *see also* Jill E. Fisch, *Rethinking the Regulation of Securities Intermediaries*, 158 U. PA. L. REV. 1961, 1993 (2010)(summarizing numerous studies showing that "the most consistent predictor of a fund's return to investors is the fund's expense ratio").

> [T]he empirical evidence implies that superior management is not priced through higher expense ratios. On the contrary, it appears that the effect of expenses on after-expense performance (even after controlling for funds' observable characteristics) is more than one-to-one, which would imply that low-quality funds charge higher fees. Price and quality thus seem to be inversely related in the market for actively managed mutual funds.

Gil-Bazo & Ruiz-Verdu, *When Cheaper is Better*, at 883.

84.     Lower-cost institutional share classes of mutual funds compared to retail shares are available to institutional investors, and far lower-cost share classes are available to jumbo investors like the Plan. In addition, insurance company pooled separate accounts are available that can significantly reduce investment fees charged on mutual fund investments to defined contribution plans.

---

[20] Available at http://www.plansponsor.com/MagazineArticle.aspx?id=6442476537.

34

85. Minimum investment thresholds for institutional share classes are routinely waived by the investment provider if not reached by a single fund based on the retirement plan's total investment in the provider's platform. Therefore, it is commonly understood by investment managers of large pools of assets that, for a retirement plan of the Plan's size, if requested, the investment provider would make available lower-cost share classes for the Plan, if there were any fund that did not individually reach the threshold.

86. Despite these far lower-cost options, Defendants selected and continue to provide Plan investment options with far higher costs than were and are available for the Plan based on its size. For the *exact same mutual fund option*, Defendants provided higher-cost share classes of identical mutual funds than were available to the Plan. Further, after April 2015, Defendants continue to provide higher-cost Vanguard mutual funds than are available for the Vanguard Total Bond Market Fund, the Vanguard Total International Stock Index Fund, and the Vanguard Institutional Index Fund.

87. Lower-cost share class *identical* alternatives to the Plan's mutual funds are set forth below:

35

| Plan Mutual Fund | Plan Fee | Identical Lower-Cost Mutual Fund | Identical Lower-Cost Mutual Fund Fee | Plan's Excess Cost |
|---|---|---|---|---|
| Aberdeen US Equity I (IS) (GXXIX) | 96 bps | Aberdeen US Equity I (Inst) (GGLIX) | 90 bps | 6.67% |
| Alger Mid Cap Growth (I) (ALMRX) | 117 bps | Alger Mid Cap Growth (I-2) (AMGOX) | 98 bps | 19.39% |
| Fidelity Balanced (FBALX) | 68 bps | Fidelity Balanced (K) (FBAKX) | 50 bps | 36.00% |
| Fidelity Blue Chip Growth (FBGRX) | 76 bps | Fidelity Blue Chip Growth (K) (FBGKX) | 52 bps | 46.15% |
| Fidelity Capital Appreciation (FDCAX) | 78 bps | Fidelity Capital Appreciation (K) (FCAKX) | 54 bps | 44.44% |
| Fidelity China Region (FHKCX) | 98 bps | Fidelity Advisor China Region (I) (FHKIX) | 93 bps | 5.38% |
| Fidelity Conservative Income Bond (FCONX) | 40 bps | Fidelity Conservative Income Bond (Inst) (FCNVX) | 30 bps | 33.33% |
| Fidelity Contrafund (FCNTX) | 101 bps | Fidelity Contrafund (K) (FCNKX) | 85 bps | 18.82% |
| Fidelity Disciplined Equity (FDEQX) | 83 bps | Fidelity Disciplined Equity (K) (FDEKX) | 60 bps | 38.33% |
| Fidelity Diversified International (FDIVX) | 99 bps | Fidelity Diversified International (K) (FDIKX) | 76 bps | 30.26% |
| Fidelity Dividend Growth (FDGFX) | 62 bps | Fidelity Dividend Growth (K) (FDGKX) | 39 bps | 58.97% |

Case 3:16-cv-02086   Document 1   Filed 08/10/16   Page 36 of 89 PageID #: 36

| Plan Mutual Fund | Plan Fee | Identical Lower-Cost Mutual Fund | Identical Lower-Cost Mutual Fund Fee | Plan's Excess Cost |
|---|---|---|---|---|
| Fidelity Emerging Europe, Middle East, Africa (EMEA) (FEMEX) | 125 bps | Fidelity Emerging Europe, Middle East, Africa (EMEA) (I) (FIEMX) | 119 bps | 5.04% |
| Fidelity Emerging Markets (FEMKX) | 110 bps | Fidelity Emerging Markets (K) (FKEMX) | 84 bps | 30.95% |
| Fidelity Equity Income II (FEQTX) | 74 bps | Fidelity Equity Income II (K) (FETKX) | 56 bps | 32.14% |
| Fidelity Equity-Income (FEQIX) | 71 bps | Fidelity Equity-Income (K) (FEIKX) | 53 bps | 33.96% |
| Fidelity Export & Multinational (FEXPX) | 91 bps | Fidelity Export & Multinational (K) (FEXKX) | 67 bps | 35.82% |
| Fidelity Freedom 2000 (FFFBX) | 51 bps | Fidelity Freedom 2000 (K) (FFKBX) | 43 bps | 18.60% |
| Fidelity Freedom 2005 (FFFVX) | 64 bps | Fidelity Freedom 2005 (K) (FFKVX) | 52 bps | 23.08% |
| Fidelity Freedom 2010 (FFFCX) | 67 bps | Fidelity Freedom 2010 (K) (FFKCX) | 53 bps | 26.42% |
| Fidelity Freedom 2015 (FFVFX) | 68 bps | Fidelity Freedom 2015 (K) (FKVFX) | 54 bps | 25.93% |
| Fidelity Freedom 2020 (FFFDX) | 74 bps | Fidelity Freedom 2020 (K) (FFKDX) | 57 bps | 29.82% |
| Fidelity Freedom 2025 (FFTWX) | 76 bps | Fidelity Freedom 2025 (K) (FKTWX) | 59 bps | 28.81% |
| Fidelity Freedom 2030 (FFFEX) | 79 bps | Fidelity Freedom 2030 (K) (FFKEX) | 61 bps | 29.51% |
| Fidelity Freedom 2035 (FFTHX) | 81 bps | Fidelity Freedom 2035 (K) (FKTHX) | 61 bps | 32.79% |
| Fidelity Freedom 2040 (FFFFX) | 81 bps | Fidelity Freedom 2040 (K) (FFKFX) | 62 bps | 30.65% |

Case 3:16-cv-02086   Document 1   Filed 08/10/16   Page 37 of 89 PageID #: 37

| Plan Mutual Fund | Plan Fee | Identical Lower-Cost Mutual Fund | Identical Lower-Cost Mutual Fund Fee | Plan's Excess Cost |
|---|---|---|---|---|
| Fidelity Freedom 2045 (FFFGX) | 82 bps | Fidelity Freedom 2045 (K) (FFKGX) | 62 bps | 32.26% |
| Fidelity Freedom 2050 (FFFHX) | 84 bps | Fidelity Freedom 2050 (K) (FFKHX) | 63 bps | 33.33% |
| Fidelity Freedom 2055 (FDEEX) | 78 bps | Fidelity Freedom 2055 (K) (FDENX) | 64 bps | 21.88% |
| Fidelity Freedom Income (FFFAX) | 50 bps | Fidelity Freedom Income (K) (FFKAX) | 42 bps | 19.05% |
| Fidelity Fund (FFIDX) | 64 bps | Fidelity Fund (K) (FFDKX) | 45 bps | 42.22% |
| Fidelity Global Commodity Stock (FFGCX) | 109 bps | Fidelity Advisor Global Commodity Stock (I) (FFGIX) | 107 bps | 1.87% |
| Fidelity Growth & Income (FGRIX) | 78 bps | Fidelity Growth & Income (K) (FGIKX) | 55 bps | 41.82% |
| Fidelity Growth Company (FDGRX) | 93 bps | Fidelity Growth Company (K) (FGCKX) | 72 bps | 29.17% |
| Fidelity Growth Discovery (FDSVX) | 89 bps | Fidelity Growth Discovery (K) (FGDKX) | 67 bps | 32.84% |
| Fidelity Growth Strategies (FDEGX) | 85 bps | Fidelity Growth Strategies (K) (FAGKX) | 58 bps | 46.55% |
| Fidelity Independence (FDFFX) | 91 bps | Fidelity Independence (K) (FDFKX) | 72 bps | 26.39% |
| Fidelity International Discovery (FIGRX) | 107 bps | Fidelity International Discovery (K) (FIDKX) | 83 bps | 28.92% |
| Fidelity International Growth (FIGFX) | 104 bps | Fidelity International Growth (Z) (FZAJX) | 88 bps | 18.18% |

38

| Plan Mutual Fund | Plan Fee | Identical Lower-Cost Mutual Fund | Identical Lower-Cost Mutual Fund Fee | Plan's Excess Cost |
|---|---|---|---|---|
| Fidelity International Real Estate (FIREX) | 114 bps | Fidelity International Real Estate (Inst) (FIRIX) | 109 bps | 4.59% |
| Fidelity International Small Cap (FISMX) | 144 bps | Fidelity International Small Cap (Inst) (FIXIX) | 137 bps | 5.11% |
| Fidelity Japan (FJPNX) | 80 bps | Fidelity Advisor Japan (I) (FJPIX) | 75 bps | 6.67% |
| Fidelity Large Cap Growth (FSLGX) | 80 bps | Fidelity Advisor Large Cap Growth (Inst) (FLNOX) | 68 bps | 17.65% |
| Fidelity Latin America (FLATX) | 103 bps | Fidelity Latin America (Inst) (FLFIX) | 101 bps | 1.98% |
| Fidelity Leveraged Company Stock (FLVCX) | 92 bps | Fidelity Leveraged Company Stock (K) (FLCKX) | 71 bps | 29.58% |
| Fidelity Low-Priced Stock (FLPSX) | 98 bps | Fidelity Low-Priced Stock (K) (FLPKX) | 81 bps | 20.99% |
| Fidelity Magellan (FMAGX) | 71 bps | Fidelity Magellan (K) (FMGKX) | 55 bps | 29.09% |
| Fidelity Mega Cap Stock (FGRTX) | 68 bps | Fidelity Mega Cap Stock (Z) (FZALX) | 54 bps | 25.93% |
| Fidelity Mid Cap Growth (FSMGX) | 67 bps | Fidelity Advisor Mid Cap Growth (Inst) (FGCOX) | 59 bps | 13.56% |
| Fidelity Mid-Cap Stock (FMCSX) | 72 bps | Fidelity Mid-Cap Stock (K) (FKMCX) | 52 bps | 38.46% |
| Fidelity OTC (FOCPX) | 113 bps | Fidelity OTC (K) (FOCKX) | 92 bps | 22.83% |
| Fidelity Overseas (FOSFX) | 98 bps | Fidelity Overseas (K) (FOSKX) | 74 bps | 32.43% |

Case 3:16-cv-02086   Document 1   Filed 08/10/16   Page 39 of 89 PageID #: 39

| Plan Mutual Fund | Plan Fee | Identical Lower-Cost Mutual Fund | Identical Lower-Cost Mutual Fund Fee | Plan's Excess Cost |
|---|---|---|---|---|
| Fidelity Puritan (FPURX) | 67 bps | Fidelity Puritan (K) (FPUKX) | 50 bps | 34.00% |
| Fidelity Real Estate Income (FRIFX) | 92 bps | Fidelity Real Estate Income (I) (FRIRX) | 89 bps | 3.37% |
| Fidelity Select Gold (FSAGX) | 94 bps | Fidelity Advisor Gold (I) (FGDIX) | 91 bps | 3.30% |
| Fidelity Select Materials (FSDPX) | 94 bps | Fidelity Advisor Materials (I) (FMFEX) | 93 bps | 1.08% |
| Fidelity Spartan 500 Index (Adv) (FUSVX) | 7 bps | Fidelity Spartan 500 Index (Adv Inst) (FXAIX) | 3 bps | 133.33% |
| Fidelity Spartan Extended Market Index (Adv) (FSEVX) | 7 bps | Fidelity Spartan Extended Market Index (Adv Inst) (FSMAX) | 6 bps | 16.67% |
| Fidelity Spartan Inflation-Protected Index (Adv) (FSIYX) | 10 bps | Fidelity Spartan Inflation-Protected Index (Adv Inst) (FIPDX) | 5 bps | 100.00% |
| Fidelity Spartan International Index (Adv) (FSIVX) | 12 bps | Fidelity Spartan International Index (Adv Inst) (FSPSX) | 6 bps | 100.00% |
| Fidelity Spartan International Index (Inv) (FSIIX) | 10 bps | Fidelity Spartan International Index (Adv) (FSIVX) | 7 bps | 42.86% |
| Fidelity Spartan Total Market Index (Adv) (FSTVX) | 7 bps | Fidelity Spartan Total Market Index (Adv Inst) (FSKAX) | 5 bps | 40.00% |

Case 3:16-cv-02086   Document 1   Filed 08/10/16   Page 40 of 89 PageID #: 40

| Plan Mutual Fund | Plan Fee | Identical Lower-Cost Mutual Fund | Identical Lower-Cost Mutual Fund Fee | Plan's Excess Cost |
|---|---|---|---|---|
| Fidelity Spartan U.S. Bond Index (Adv) (FSITX) | 10 bps | Fidelity Spartan U.S. Bond Index (Adv Inst) (FXNAX) | 5 bps | 100.00% |
| Fidelity Stock Selector (FDSSX) | 87 bps | Fidelity Stock Selector (K) (FSSKX) | 65 bps | 33.85% |
| Fidelity Stock Selector Small Cap (FDSCX) | 75 bps | Fidelity Advisor Stock Selector Small Cap (I) (FCDIX) | 62 bps | 20.97% |
| Fidelity Value (FDVLX) | 64 bps | Fidelity Value (K) (FVLKX) | 40 bps | 60.00% |
| Fidelity Value Discovery (FVDFX) | 92 bps | Fidelity Value Discovery (K) (FVDKX) | 69 bps | 33.33% |
| Fidelity Value Strategies (FSLSX) | 77 bps | Fidelity Value Strategies (K) (FVSKX) | 49 bps | 57.14% |
| Franklin Mutual Shares (A) (TESIX) | 113 bps | Franklin Mutual Shares (Z) (MUTHX) | 83 bps | 36.14% |
| Franklin Small Mid Cap Growth (A) (FRSGX) | 108 bps | Franklin Small Mid Cap Growth (Adv) (FSGAX) | 83 bps | 30.12% |
| Morgan Stanley Institutional Global Franchise (A) (MSFBX) | 126 bps | Morgan Stanley Institutional Global Franchise (I) (MSFAX) | 101 bps | 24.75% |
| PIMCO Long Term US Government (Adm) (PLGBX) | 73 bps | PIMCO Long Term US Government (Inst) (PGOVX) | 48 bps | 52.08% |
| Strategic Advisers International Multi-Manager (FMJDX) | 116 bps | Strategic Advisers International Multi-Manager (F) (FMBKX) | 107 bps | 8.41% |

41

| Plan Mutual Fund | Plan Fee | Identical Lower-Cost Mutual Fund | Identical Lower-Cost Mutual Fund Fee | Plan's Excess Cost |
|---|---|---|---|---|
| Strategic Advisers Small Mid Cap Multi- Manager (FNAPX) | 116 bps | Strategic Advisers Small Mid Cap Multi-Manager (F) (FARMX) | 106 bps | 9.43% |
| TIAA-CREF Equity Index (Ret) (TIQRX) | 33 bps | TIAA-CREF Equity Index (Inst) (TIEIX) | 9 bps | 266.67% |
| TIAA-CREF Growth & Income (Ret) (TRGIX) | 75 bps | TIAA-CREF Growth & Income (Inst) (TIGRX) | 51 bps | 47.06% |
| TIAA-CREF International Equity (Ret) (TRERX) | 82 bps | TIAA-CREF International Equity (Inst) (TIIEX) | 57 bps | 43.86% |
| TIAA-CREF International Equity Index (Ret) (TRIEX) | 40 bps | TIAA-CREF International Equity Index (Inst) (TCIEX) | 15 bps | 166.67% |
| TIAA-CREF Large-Cap Growth Index (Ret) (TRIRX) | 33 bps | TIAA-CREF Large-Cap Growth Index (Inst) (TILIX) | 7 bps | 371.43% |
| TIAA-CREF Large-Cap Value (Ret) (TRLCX) | 76 bps | TIAA-CREF Large-Cap Value (Inst) (TRLIX) | 52 bps | 46.15% |
| TIAA-CREF Large-Cap Value Index (Ret) (TRCVX) | 33 bps | TIAA-CREF Large-Cap Value Index (Inst) (TILVX) | 8 bps | 312.50% |
| TIAA-CREF Lifecycle 2010 (Ret) (TCLEX) | 47 bps | TIAA-CREF Lifecycle 2010 (Inst) (TCTIX) | 22 bps | 113.64% |
| TIAA-CREF Lifecycle 2015 (Ret) (TCLIX) | 46 bps | TIAA-CREF Lifecycle 2015 (Inst) (TCNIX) | 42 bps | 9.52% |

42

| Plan Mutual Fund | Plan Fee | Identical Lower-Cost Mutual Fund | Identical Lower-Cost Mutual Fund Fee | Plan's Excess Cost |
|---|---|---|---|---|
| TIAA-CREF Lifecycle 2020 (Ret) (TCLTX) | 45 bps | TIAA-CREF Lifecycle 2020 (Inst) (TCWIX) | 42 bps | 7.14% |
| TIAA-CREF Lifecycle 2025 (Ret) (TCLFX) | 44 bps | TIAA-CREF Lifecycle 2025 (Inst) (TCYIX) | 42 bps | 4.76% |
| TIAA-CREF Lifecycle 2030 (Ret) (TCLNX) | 44 bps | TIAA-CREF Lifecycle 2030 (Inst) (TCRIX) | 19 bps | 131.58% |
| TIAA-CREF Lifecycle 2035 (Ret) (TCLRX) | 44 bps | TIAA-CREF Lifecycle 2035 (Inst) (TCIIX) | 19 bps | 131.58% |
| TIAA-CREF Lifecycle 2040 (Ret) (TCLOX) | 44 bps | TIAA-CREF Lifecycle 2040 (Inst) (TCOIX) | 19 bps | 131.58% |
| TIAA-CREF Lifecycle 2045 (Ret) (TTFRX) | 44 bps | TIAA-CREF Lifecycle 2045 (Inst) (TTFIX) | 19 bps | 131.58% |
| TIAA-CREF Lifecycle 2050 (Ret) (TLFRX) | 44 bps | TIAA-CREF Lifecycle 2050 (Inst) (TFTIX) | 19 bps | 131.58% |
| TIAA-CREF Lifecycle 2055 (Ret) (TTRLX) | 72 bps | TIAA-CREF Lifecycle 2055 (Inst) (TTRIX) | 47 bps | 53.19% |
| TIAA-CREF Lifecycle Retirement Income (Ret) (TLIRX) | 65 bps | TIAA-CREF Lifecycle Retirement Income (Inst) (TLRIX) | 40 bps | 62.50% |
| TIAA-CREF Mid-Cap Growth (Ret) (TRGMX) | 76 bps | TIAA-CREF Mid-Cap Growth (Inst) (TRPWX) | 52 bps | 46.15% |

43

| Plan Mutual Fund | Plan Fee | Identical Lower-Cost Mutual Fund | Identical Lower-Cost Mutual Fund Fee | Plan's Excess Cost |
|---|---|---|---|---|
| TIAA-CREF Mid-Cap Value (Ret) (TRVRX) | 79 bps | TIAA-CREF Mid-Cap Value (Inst) (TIMVX) | 54 bps | 46.30% |
| TIAA-CREF Real Estate Securities (Ret) (TRRSX) | 81 bps | TIAA-CREF Real Estate Securities (Inst) (TIREX) | 56 bps | 44.64% |
| TIAA-CREF S&P 500 Index (Ret) (TRSPX) | 34 bps | TIAA-CREF S&P 500 Index (Inst) (TISPX) | 9 bps | 277.78% |
| TIAA-CREF Small-Cap Blend Index (Ret) (TRBIX) | 35 bps | TIAA-CREF Small-Cap Blend Index (Inst) (TISBX) | 10 bps | 250.00% |
| TIAA-CREF Small-Cap Equity (Ret) (TRSEX) | 78 bps | TIAA-CREF Small-Cap Equity (Inst) (TISEX) | 53 bps | 47.17% |
| TIAA-CREF Social Choice Equity (Ret) (TRSCX) | 47 bps | TIAA-CREF Social Choice Equity (Inst) (TISCX) | 22 bps | 113.64% |
| Vanguard 500 Index (Inv) (VFINX) | 18 bps | Vanguard Institutional Index (Inst Pl) (VIIIX) | 2 bps | 800.00% |
| Vanguard Asset Allocation (Inv) (VAAPX) | 29 bps | Vanguard Asset Allocation (Adm) (VAARX) | 18 bps | 61.11% |
| Vanguard Balanced Index (Inv) (VBINX) | 25 bps | Vanguard Balanced Index (Inst) (VBAIX) | 8 bps | 212.50% |
| Vanguard Capital Opportunity (Inv) (VHCOX) | 50 bps | Vanguard Capital Opportunity (Adm) (VHCAX) | 41 bps | 21.95% |

Case 3:16-cv-02086   Document 1   Filed 08/10/16   Page 44 of 89 PageID #: 44

| Plan Mutual Fund | Plan Fee | Identical Lower-Cost Mutual Fund | Identical Lower-Cost Mutual Fund Fee | Plan's Excess Cost |
|---|---|---|---|---|
| Vanguard Developed Markets Index (Inv) (VDMIX) | 20 bps | Vanguard Developed Markets Index (Inst Pl) (VDMPX) | 6 bps | 233.33% |
| Vanguard Emerging Markets Stock Index (Inv) (VEIEX) | 40 bps | Vanguard Emerging Markets Stock Index (Inst) (VEMIX) | 23 bps | 73.91% |
| Vanguard Equity-Income (Inv) (VEIPX) | 36 bps | Vanguard Equity-Income (Adm) (VEIRX) | 24 bps | 50.00% |
| Vanguard European Stock Index (Inv) (VEURX) | 27 bps | Vanguard European Stock Index (Inst) (VESIX) | 12 bps | 125.00% |
| Vanguard Explorer (Inv) (VEXPX) | 54 bps | Vanguard Explorer (Adm) (VEXRX) | 34 bps | 58.82% |
| Vanguard Extended Market Index (Inv) (VEXMX) | 30 bps | Vanguard Extended Market Index (Inst) (VIEIX) | 8 bps | 275.00% |
| Vanguard Extended Market Index (Inv) (VEXMX) | 24 bps | Vanguard Extended Market Index (Inst Pl) (VEMPX) | 6 bps | 300.00% |
| Vanguard FTSE Social Index (Inv) (VFTSX) | 29 bps | Vanguard FTSE Social Index (Inst) (VFTNX) | 16 bps | 81.25% |
| Vanguard GNMA (Inv) (VFIIX) | 22 bps | Vanguard GNMA (Adm) (VFIJX) | 12 bps | 83.33% |
| Vanguard Growth & Income (Inv) (VQNPX) | 35 bps | Vanguard Growth & Income (Adm) (VGIAX) | 21 bps | 66.67% |

45

| Plan Mutual Fund | Plan Fee | Identical Lower-Cost Mutual Fund | Identical Lower-Cost Mutual Fund Fee | Plan's Excess Cost |
|---|---|---|---|---|
| Vanguard Growth Index (Inv) (VIGRX) | 28 bps | Vanguard Growth Index (Inst) (VIGIX) | 8 bps | 250.00% |
| Vanguard Health Care (Inv) (VGHCX) | 29 bps | Vanguard Health Care (Adm) (VGHAX) | 22 bps | 31.82% |
| Vanguard High-Yield Corporate (Inv) (VWEHX) | 27 bps | Vanguard High-Yield Corporate (Adm) (VWEAX) | 15 bps | 80.00% |
| Vanguard Inflation-Protected Securities (Inv) (VIPSX) | 25 bps | Vanguard Inflation-Protected Securities (Inst) (VIPIX) | 9 bps | 177.78% |
| Vanguard Institutional Index (Inst) (VINIX) | 4 bps | Vanguard Institutional Index (Inst Pl) (VIIIX) | 2 bps | 100.00% |
| Vanguard Intermediate-Term Bond Index (Inv) (VBIIX) | 22 bps | Vanguard Intermediate-Term Bond Index (Inst) (VBIMX) | 7 bps | 214.29% |
| Vanguard Intermediate-Term Bond Index (Inv) (VBIIX) | 20 bps | Vanguard Intermediate-Term Bond Index (Inst Pl) (VBIUX) | 5 bps | 300.00% |
| Vanguard Intermediate-Term Investment-Grade (Inv) (VFICX) | 21 bps | Vanguard Intermediate-Term Investment-Grade (Adm) (VFIDX) | 11 bps | 90.91% |
| Vanguard Intermediate-Term Treasury (Inv) (VFITX) | 25 bps | Vanguard Intermediate-Term Treasury (Adm) (VFIUX) | 11 bps | 127.27% |

Case 3:16-cv-02086   Document 1   Filed 08/10/16   Page 46 of 89 PageID #: 46

| Plan Mutual Fund | Plan Fee | Identical Lower-Cost Mutual Fund | Identical Lower-Cost Mutual Fund Fee | Plan's Excess Cost |
|---|---|---|---|---|
| Vanguard International Growth (Inv) (VWIGX) | 53 bps | Vanguard International Growth (Adm) (VWILX) | 34 bps | 55.88% |
| Vanguard Long-Term Bond Index (Inv) (VBLTX) | 22 bps | Vanguard Long-Term Bond Index (Inst) (VBLLX) | 7 bps | 214.29% |
| Vanguard Long-Term Bond Index (Inv) (VBLTX) | 20 bps | Vanguard Long-Term Bond Index (Inst Pl) (VBLIX) | 5 bps | 300.00% |
| Vanguard Long-Term Investment-Grade (Inv) (VWESX) | 23 bps | Vanguard Long-Term Investment-Grade (Adm) (VWETX) | 13 bps | 76.92% |
| Vanguard Long-Term Treasury (Inv) (VUSTX) | 25 bps | Vanguard Long-Term Treasury (Adm) (VUSUX) | 11 bps | 127.27% |
| Vanguard Mid Cap Index (Inv) (VIMSX) | 27 bps | Vanguard Mid Cap Index (Inst) (VMCIX) | 8 bps | 237.50% |
| Vanguard Mid Cap Index (Inv) (VIMSX) | 24 bps | Vanguard Mid Cap Index (Inst Pl) (VMCPX) | 6 bps | 300.00% |
| Vanguard Morgan Growth (Inv) (VMRGX) | 48 bps | Vanguard Morgan Growth (Adm) (VMRAX) | 31 bps | 54.84% |
| Vanguard Pacific Stock Index (Inv) (VPACX) | 27 bps | Vanguard Pacific Stock Index (Inst) (VPKIX) | 12 bps | 125.00% |
| Vanguard Prime Money Market (Inv) (VMMXX) | 28 bps | Vanguard Prime Money Market (Adm) (VMRXX) | 13 bps | 115.38% |
| Vanguard PRIMECAP (Inv) (VPMCX) | 49 bps | Vanguard PRIMECAP (Adm) (VPMAX) | 37 bps | 32.43% |

| Plan Mutual Fund | Plan Fee | Identical Lower-Cost Mutual Fund | Identical Lower-Cost Mutual Fund Fee | Plan's Excess Cost |
|---|---|---|---|---|
| Vanguard REIT Index (Inv) (VGSIX) | 21 bps | Vanguard REIT Index (Inst) (VGSNX) | 9 bps | 133.33% |
| Vanguard Short-Term Bond Index (Inv) (VBISX) | 22 bps | Vanguard Short-Term Bond Index (Adm) (VBIRX) | 12 bps | 83.33% |
| Vanguard Short-Term Bond Index (Inv) (VBISX) | 20 bps | Vanguard Short-Term Bond Index (Inst Pl) (VBIPX) | 5 bps | 300.00% |
| Vanguard Short-Term Federal (Inv) (VSGBX) | 21 bps | Vanguard Short-Term Federal (Adm) (VSGDX) | 11 bps | 90.91% |
| Vanguard Short-Term Investment-Grade (Inv) (VFSTX) | 21 bps | Vanguard Short-Term Investment-Grade (Inst) (VFSIX) | 7 bps | 200.00% |
| Vanguard Short-Term Treasury (Inv) (VFISX) | 21 bps | Vanguard Short-Term Treasury (Adm) (VFIRX) | 11 bps | 90.91% |
| Vanguard Small Cap Growth Index (Inv) (VISGX) | 28 bps | Vanguard Small Cap Growth Index (Inst) (VSGIX) | 8 bps | 250.00% |
| Vanguard Small Cap Index (Inv) (NAESX) | 28 bps | Vanguard Small Cap Index (Inst) (VSCIX) | 8 bps | 250.00% |
| Vanguard Small Cap Value Index (Inv) (VISVX) | 28 bps | Vanguard Small Cap Value Index (Inst) (VSIIX) | 8 bps | 250.00% |
| Vanguard Tax-Managed International (Inv) (VDVIX) | 20 bps | Vanguard Tax-Managed International (Inst Pl) (VDIPX) | 6 bps | 233.33% |

Case 3:16-cv-02086   Document 1   Filed 08/10/16   Page 48 of 89 PageID #: 48

| Plan Mutual Fund | Plan Fee | Identical Lower-Cost Mutual Fund | Identical Lower-Cost Mutual Fund Fee | Plan's Excess Cost |
|---|---|---|---|---|
| Vanguard Total Bond Market Index (Inv) (VBMFX) | 22 bps | Vanguard Total Bond Market Index (Inst) (VBTIX) | 7 bps | 214.29% |
| Vanguard Total Bond Market Index (Inv) (VBMFX) | 22 bps | Vanguard Total Bond Market Index (Inst Pl) (VBMPX) | 5 bps | 340.00% |
| Vanguard Total International Stock Index (Inv) (VGTSX) | 22 bps | Vanguard Total International Stock Index (Inst Pl) (VTPSX) | 10 bps | 120.00% |
| Vanguard Total Stock Market Index (Inv) (VTSMX) | 18 bps | Vanguard Institutional Total Stock Market Index (Inst Pl) (VITPX) | 2 bps | 800.00% |
| Vanguard U.S. Growth (Inv) (VWUSX) | 49 bps | Vanguard U.S. Growth (Adm) (VWUAX) | 30 bps | 63.33% |
| Vanguard Value Index (Inv) (VIVAX) | 26 bps | Vanguard Value Index (Inst) (VIVIX) | 8 bps | 225.00% |
| Vanguard Wellesley Income (Inv) (VWINX) | 31 bps | Vanguard Wellesley Income (Adm) (VWIAX) | 21 bps | 47.62% |
| Vanguard Wellington (Inv) (VWELX) | 34 bps | Vanguard Wellington (Adm) (VWENX) | 23 bps | 47.83% |
| Vanguard Windsor II (Inv) (VWNFX) | 38 bps | Vanguard Windsor II (Adm) (VWNAX) | 27 bps | 40.74% |
| Vanguard Windsor (Inv) (VWNDX) | 33 bps | Vanguard Windsor (Adm) (VWNEX) | 20 bps | 65.00% |

49

88.    These lower-cost share classes of the identical mutual funds for the Plan have been available for years, some dating back to the early 2000s or before.

89.    The failure to select lower-cost share classes for the Plan's mutual fund options *identical in all respects* (portfolio manager, underlying investments, and asset allocation) *except for cost* demonstrates that Defendants failed to consider the size and purchasing power of the Plan when selecting share classes and failed to engage in a prudent process in the selection, monitoring, and retention of those mutual fund options.

90.    Had the amounts invested in the higher-cost share class mutual fund options instead been invested in the readily available lower-cost share class mutual fund options, Plan participants would not have lost millions of dollars of their retirement savings.

## V.    Defendants selected and retained a large number of duplicative investment options, diluting the Plan's ability to pay lower fees and confusing participants.

91.    Defendants provided a dizzying array of duplicative funds in the same investment style, thereby depriving the Plan of its bargaining power associated with offering a single option in each investment style, which significantly reduces investment fees, and leading to "decision paralysis" for participants. Prior to April 2015, over 300 investment options were placed in the core lineup by Defendants for the following asset classes: target date and asset allocation funds, large cap domestic equities, mid cap domestic equities, small cap domestic equities, international equities, fixed income, money market, real estate, sector funds, stable

50

value, and fixed guaranteed annuity. After April 2015, Defendants continue to provide duplicative investments including fixed and variable annuities still offered by both TIAA-CREF and VALIC.

92. In comparison, according to Callan Investments Institute's 2015 Defined Contribution Trends survey, defined contribution plans in 2014 had on average 15 investment options, excluding target date funds. Callan Investments Institute, *2015 Defined Contribution Trends,* at 28 (2015).[21] This provides choice of investment style to participants while maintaining a larger pool of assets in each investment style and avoiding confusion.

93. A larger pool of assets in each investment style significantly reduces fees paid by participants. By consolidating duplicative investments of the same investment style into a single investment option, the Plan would then have the ability to command lower-cost investments, such as a low-cost institutional share class of the selected mutual fund option.

94. Prudent fiduciaries of large defined contribution plans engage in a detailed due diligence process to select and retain investments for a plan based on the risk, investment return, and expenses of available investment alternatives. Overall, the investment lineup should provide participants with the ability to diversify their portfolio appropriately while benefiting from the size of the pooled assets of other employees and retirees.

95. Within each asset class and investment style deemed appropriate for the participant-directed retirement plan, prudent fiduciaries make a reasoned

---

[21] Available at https://www.callan.com/research/files/990.pdf.

determination and select a prudent investment option. Unlike Defendants, prudent fiduciaries do not select and retain numerous investment options for a single asset class and investment style. When many investment options in a single investment style are plan options, fiduciaries lose the bargaining power to obtain lower investment management expenses for that style.

96.     In addition, providing multiple options in a single investment style adds unnecessary complexity to the investment lineup and leads to participant confusion. See, e.g., The Standard, *Fixing Your 403(b) Plan: Adopting a Best Practices Approach,* at 2 ("Numerous studies have demonstrated that when people are given too many choices of anything, they lose confidence or make no decision."); Michael Liersch, *Choice in Retirement Plans: How Participant Behavior Differs in Plans Offering Advice, Managed Accounts, and Target-Date Investments,* T. ROWE PRICE RETIREMENT RESEARCH, at 2 (Apr. 2009)("Offering too many choices to consumers can lead to decision paralysis, preventing consumers from making decisions.").[22]

97.     Moreover, having many actively managed funds in the Plan within the same investment style results in the Plan effectively having an index fund return, while paying much higher fees for active management than the fees charged by a passive index fund, which has much lower fees because there is no need for active management and its higher fees.

---

[22] Available at http://www.behavioralresearch.com/Publications/Choice_in_Retirement_Plans_April_2009.pdf.

52

98.     Defendants provided duplicative investments in every major asset class and investment style, including balanced/asset allocation (29–30 options), fixed income and high yield bond (42–53 options), international (43–46 options), large cap domestic equities (71–75 options), mid cap domestic equities (27 options), small cap domestic equities (14–15 options), real estate (6 options), money market (6 options), sector funds (44 options), stable value (4–5 options), and target date investments (3 fund families). Such a dizzying array of duplicative funds in a single investment style violates the well-recognized industry principle that too many choices harm participants, and can lead to "decision paralysis".

99.     For illustration purposes, the Plan's 18 large cap domestic blend investments as of December 31, 2014 are summarized below and compared to a single lower-cost alternative that was available to the Plan: the Vanguard Institutional Index Fund-Instl. Plus (VIIIX), which mirrors the market and has an expense ratio of 2 bps.

| Large Cap Blend Investments | Assets | Plan Fee | Lower-Cost Alternative Fee | Plan's Excess Cost |
|---|---|---|---|---|
| Aberdeen US Equity I IS | $80,049 | 96 bps | 2 bps | 4700% |
| CREF Equity Index | $35,286,527 | 37 bps | 2 bps | 1750% |
| CREF Stock Account | $370,987,187 | 46 bps | 2 bps | 2200% |
| Fidelity Disciplined Equity K | $1,297,628 | 39 bps | 2 bps | 1850% |
| Fidelity Growth & Income K | $5,340,927 | 52 bps | 2 bps | 2500% |
| Fidelity Large Cap Core Enhanced Index | $197,668 | 45 bps | 2 bps | 2150% |
| Fidelity Large Cap Stock | $656,804 | 88 bps | 2 bps | 4300% |

53

| Large Cap Blend Investments | Assets | Plan Fee | Lower-Cost Alternative Fee | Plan's Excess Cost |
|---|---|---|---|---|
| Fidelity Mega Cap Stock | $277,617 | 68 bps | 2 bps | 3300% |
| Fidelity Spartan 500 Index Adv | $13,502,916 | 5 bps | 2 bps | 150% |
| Fidelity Spartan Total Market Index Adv | $4,044,099 | 6 bps | 2 bps | 200% |
| TIAA-CREF Equity Index Instl | $1,015,150 | 5 bps | 2 bps | 150% |
| TIAA-CREF S&P 500 Index Instl | $3,767,349 | 6 bps | 2 bps | 200% |
| VALIC Company I Growth & Income | $363,547 | 185 bps | 2 bps | 9150% |
| VALIC Company I Large Cap Core | $1,752,525 | 184 bps | 2 bps | 9100% |
| VALIC Company I Stock Index | $16,702,484 | 135 bps | 2 bps | 6650% |
| Vanguard Growth & Income Inv | $14,751,676 | 37 bps | 2 bps | 1750% |
| Vanguard Institutional Index Instl | $86,697,433 | 4 bps | 2 bps | 100% |
| Vanguard Total Stock Market Index Inv | $59,129,455 | 17 bps | 2 bps | 750% |
| **Total** | **$615,851,041** | | | |

100.    With over *$400 million* held in the CREF Stock Account and the CREF Equity Index Account, these large cap blend options were *23 and 18 times* more expensive than the lower-cost Vanguard option with an expense ratio of 2 bps, respectively.



**Excessive Expense Ratio of CREF Stock Account and CREF Equity Index Account**

CREF Expense 2200%–1750% Higher than Index Fund

46 bps

37 bps

2 bps

Basis Points (bps)

■ CREF Stock Account   ■ CREF Equity Index Account
▨ Vanguard Institutional Index Fund

101.    Many other large cap index funds are also available at far lower costs than the Plan's large cap blend funds. Had the amounts invested in the Plan's large cap blend options been consolidated into a single large cap blend investment, such as the Vanguard Institutional Index Fund-Instl. Plus, Plan participants would have saved in excess of $2 million in fees for 2014 alone, and many more millions since 2010.

102.    In addition, Defendants selected and retained multiple passively managed index options in the same investment style. Rather than a fund whose investment manager actively selects stocks or bonds to beat an index benchmark, passively managed index funds hold a representative sample of securities in a specific index, such as the S&P 500 index. The sole investment strategy of an index fund is to track the performance of a specific market index. No stock selection or

55

research is needed, unlike investing in actively managed funds. Thus, index fund fees are substantially lower.

103. For example, in the large cap blend investment style, Defendants provided up to *ten* separate index funds that have similar investment strategies designed to generate investment results that correspond to the return of the U.S. equity market and do not involve stock selection.

104. Since index funds merely hold the same securities in the same proportions as the index,[23] having multiple index funds in the Plan provides no benefit to participants. Instead, it hurts participants by diluting the Plan's ability to obtain lower rates for a single index fund of that style because the amount of assets in any one such fund is smaller than the aggregate would be in that investment style. Moreover, multiple managers holding stocks which mimic the S&P 500 or a similar index would pick the same stocks in the same proportions as the index. Thus, there is no value in offering separate index funds in the same investment style.

105. Had Defendants combined hundreds of millions of dollars in Plan assets from duplicative index funds into a single index fund, the Plan would have generated higher investment returns, net of fees, and participants would not have lost significant retirement assets.

106. Overall, Defendants failed to pool the assets invested in duplicative investment options for the same investment style into a single investment option, as

---

[23] Another example of an index is the Dow Jones Industrial Average.

set forth in ¶98, which caused Plan participants to pay millions of dollars in unreasonable investment expenses, thereby depleting their retirement assets.

## VI. Defendants imprudently retained historically underperforming Plan investments.

107. Given the overlap in investment options in asset classes and investment styles based on Defendants' failure to conduct appropriate due diligence in selecting and retaining the Plan investments, numerous investment options underperformed lower-cost alternatives that were available to the Plan.

### A. CREF Stock Account

108. The CREF Stock Account is one of the largest, by asset size, investment options in the Plan with over $370 million in assets, and has been included in the Plan from 2010 to date. In its fund fact sheets and participant disclosures, TIAA-CREF classifies the CREF Stock Account as a domestic equity investment in the large cap blend Morningstar category. This option has consistently underperformed over years, and continues to underperform its benchmark and lower-cost actively and passively managed investments that were available to the Plan.

109. TIAA-CREF imposed restrictive provisions on the specific annuities that *must* be provided in the Plan. Under these terms, TIAA-CREF required that the CREF Stock Account be offered to Plan participants, in addition to the TIAA Traditional and the CREF Money Market Account. Plan fiduciaries provided these mandatory offerings in the Plan without a prudent process to determine whether they were prudent alternatives and in the exclusive best interest of Plan

57

participants and beneficiaries. TIAA-CREF required the CREF Stock Account to be included in the Plan to drive very substantial amounts of revenue sharing payments to TIAA-CREF for recordkeeping services. The CREF Stock Account paid 24 bps for revenue sharing, which exceeded other TIAA-CREF investments by over 50% (15 bps).

110.    As is generally understood in the investment community, passively managed investment options should be used, or at minimum, thoroughly analyzed and considered, in efficient markets such as large capitalization U.S. stocks. This is because it is difficult and extremely unlikely to find actively managed mutual funds that outperform a passive index, net of fees, particularly on a persistent basis, as set forth in ¶¶78–80. This extreme unlikelihood is even greater in the large cap market because such big companies are the subject of many analysts' coverage, unlike smaller stocks which are not covered by many analysts leading to potential inefficiencies in pricing.

111.    The efficiencies of the large cap market hinder an active manager's ability to achieve excess returns for investors.

> In conclusion, this study of mutual funds does not provide any reason to abandon a belief that securities markets are remarkably efficient. Most investors would be considerably better off by purchasing a low expense index fund, than by trying to select an active fund manager who appears to possess a "hot hand." Since active management generally fails to provide excess returns and tends to generate greater tax burdens for investors, the advantage of passive management holds, a fortiori.

58

Burton G. Malkiel, *Returns from Investing in Equity Mutual Funds 1971 to 1991*, 50 J. FIN. 549, 571 (1995).[24]

112.    Academic literature overwhelmingly concludes that active managers consistently underperform the S&P 500 index.

> Active managers themselves provide perhaps the most persuasive case for passive investing. Dozens of studies have examined the performance of mutual funds and other professional-managed assets, and virtually all of them have concluded that, on average, active managers underperform passive benchmarks…The median active fund underperformed the passive index in 12 out of 18 years [for the large-cap fund universe]…The bottom line is that, over most periods, the majority of mutual fund investors would have been better off investing in an S&P 500 Index fund.
>
> ***
>
> Most of the dismal comparisons for active managers are for large-cap domestic managers versus the S&P 500 Index.

Robert C. Jones, *The Active Versus Passive Debate: Perspectives of an Active Quant*, ACTIVE EQUITY PORTFOLIO MANAGEMENT, at 37, 40, 53 (Frank J. Fabozzi ed., 1998).

113.    Prudent fiduciaries of large defined contribution plans conduct an analysis to determine whether actively managed funds, particularly large cap, will outperform their benchmark net of fees. Prudent fiduciaries then make a reasoned decision as to whether it would be in the participants' best interest to offer an actively managed large cap option, with its much higher fees, for that particular investment style and asset class.

---

[24] Available at http://indeksirahastot.fi/resource/malkiel.pdf.

114.    Defendants failed to undertake such analysis when they selected and retained the actively managed CREF Stock Account, particularly due to TIAA-CREF's requirement that the CREF Stock Account be provided in the Plan in order to drive revenue to TIAA-CREF. Defendants also provided the fund option without conducting a prudent analysis to determine whether this actively managed fund would outperform index funds, net of fees, over the long term. This occurred despite the acceptance within the investment industry that the large cap domestic equity market is the most efficient market and that active managers do not outperform passive managers, net of fees, in this investment style.

115.    Had such an analysis been conducted by Defendants, they would have determined that the CREF Stock Account would not be expected to outperform the large cap index after fees. That is in fact what occurred.

116.    Rather than poor performance in a single year or two, historical performance of the CREF Stock Account has been persistently poor for many years compared to both available lower-cost index funds and the index benchmark. In participant communications, Defendants and TIAA-CREF identified the Russell 3000 index as the appropriate benchmark to evaluate the fund's investment results. The following performance chart compares the investment returns of the CREF Stock Account to its benchmark and two other passively managed index funds in the same investment style for the one-, five-, and ten-year periods ending December 31, 2014.[25] For each comparison, the CREF Stock Account dramatically

---

[25] Performance data provided as of December 31, 2014 to correspond to the most recent filing of the Plan's Form 5500 with the Department of Labor.

underperformed the benchmark and index alternatives. The passively managed index funds used for comparison purposes are the Vanguard Total Stock Market Index Fund-Instl Plus (VITPX) and the Vanguard Institutional Index-Instl Plus (VIIIX). Like the CREF Stock Account, these options are large cap blend investments.



**CREF Stock Account
One-, Five-, and Ten-Year Investment Returns
Compared to Benchmarks**
(as of Dec. 31, 2014)

117. The CREF Stock Account, with an expense ratio of 46 bps as of December 31, 2014, was and is dramatically more expensive than far better performing index alternatives: the Vanguard Total Stock Market Index Fund-Instl Plus (2 bps) and the Vanguard Institutional Index-Instl Plus (2 bps).

61

118. Apart from underperforming passively managed index funds, the fund also significantly underperformed comparable actively managed funds over the one-, five- and ten-year periods ending December 31, 2014. These large cap alternatives with similar underlying asset allocations to the CREF Stock Account include the Vanguard Diversified Equity (VDEQX), the Vanguard PRIMECAP-Adm (VPMAX), and the Vanguard Capital Opp.-Adm (VHCAX).



Case 3:16-cv-02086   Document 1   Filed 08/10/16   Page 62 of 89 PageID #: 62

119. The CREF Stock Account also had a long history of substantial underperformance compared to these actively managed alternatives over the one-, five-, and ten-year periods ending December 31, 2009.[26]




[26] Because the Vanguard Diversified Equity Fund's inception date was June 10, 2006, it was excluded from the five- and ten-year periods. For the Vanguard PRIMECAP-Adm and Vanguard Capital Opportunity Fund-Adm, the investment returns of the investor share class for ten-year performance were used because the admiral share class for each of these funds was not offered until November 12, 2001. The return since inception for the Vanguard PRIMECAP-Adm was 3.23%, and for the Vanguard Capital Opportunity Fund-Adm, 5.89%.



**CREF Stock Account**
**Five-Year Investment Returns Compared to**
**Actively Managed Benchmarks**
(as of Dec. 31, 2009)

174%–206%
greater than
CREF return

5 Year

■ CREF Stock Account   ■ VPMAX   ◫ VHCAX



**CREF Stock Account**
**Ten-Year Investment Returns Compared to**
**Actively Managed Benchmarks**
(as of Dec. 31, 2009)

3130%–5790%
greater than
CREF return

10 Year

■ CREF Stock Account   ■ VPMAX   ◫ VHCAX

Case 3:16-cv-02086   Document 1   Filed 08/10/16   Page 64 of 89 PageID #: 64

120.    Despite the consistent underperformance, the CREF Stock Account, with an expense ratio of 46 bps as of December 31, 2014, was more expensive than better performing actively managed alternatives: the Vanguard Diversified Equity-Inv (40 bps), the Vanguard PRIMECAP-Adm (35 bps), and the Vanguard Capital Opp.-Adm (40 bps).

121.    Apart from the abysmal long-term underperformance of the CREF Stock Account compared to both index funds and actively managed funds, the fund was recognized as imprudent in the industry. In March 2012, an independent investment consultant, AonHewitt, recognized the imprudence of the CREF Stock Account and recommended to its clients they remove this fund from their retirement plan. AonHewitt, *TIAA-CREF Asset Management*, INBRIEF, at 3 (July 2012).[27] This recommendation was made due to numerous factors, including the historical underperformance, high turnover of asset management executives and portfolio managers, and the fact that the fund had over 60 separate underlying investment strategies, greatly reducing the fund's ability to generate excess returns over any substantial length of time. *Id.* at 4–5.

122.    The Supreme Court has recently and unanimously ruled that ERISA fiduciaries have "a continuing duty to monitor investments and remove imprudent ones[.]" *Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1829 (2015). In contrast to the conduct of prudent fiduciaries, Defendants failed to conduct a prudent process to monitor the CREF Stock Account and continue to retain the fund despite its

---

[27] Available at http://system.nevada.edu/Nshe/?LinkServID=82B25D1E-9128-6E45-1094320FC2037740.

continuing to underperform lower-cost investment alternatives that were readily available to the Plan.

123.  Prudent fiduciaries of defined contribution plans continuously monitor the investment performance of plan options against applicable benchmarks and peer groups to identify underperforming investments. Based on this process, prudent fiduciaries replace those imprudent investments with better performing and reasonably priced options. Under the standards used by prudent independent fiduciaries, the CREF Stock Account would have been removed from the Plan.

124.  Had Defendants removed the CREF Stock Fund and the amounts been invested in any of the actively managed lower-cost alternatives identified in ¶118, or the passively managed lower-cost alternatives identified in ¶116, Plan participants would not have lost in excess of $105 million of their retirement savings from the fund being retained in the Plan.[28]

### B.    TIAA Real Estate Account

125.  Defendants selected and retained the TIAA Real Estate Account as one of the real estate investment options in the Plan. The fund has far greater fees than are reasonable, has historically underperformed, and continues to consistently underperform comparable real estate investment alternatives, including the Vanguard REIT Index I (VGSNX).

---

[28] Plan losses have been brought forward to the present value using the investment returns of the lower-cost alternatives to compensate participants who have not been reimbursed for their losses.

66

126.     With an expense ratio of 87 bps as of December 31, 2014, the TIAA

Real Estate Account is over *10 times more expensive* than the Vanguard REIT

Index I with an expense ratio of 8 bps.



127.     The TIAA Real Estate Account had a long history of substantial

underperformance relative to the Vanguard REIT Index over the one-, five-, and

ten-year periods ending December 31, 2009.[29] Despite this, Defendants selected and

to this date retain it in the Plan.

---

[29] The return of the investor share class was used for ten-year performance because the institutional share class was not offered until December 2, 2003. The return since inception for the Vanguard REIT Index-I was 5.49%.





68



**TIAA Real Estate Account
Ten-Year Investment Returns Compared to REIT
Index Fund (VGSNX)**
(as of Dec. 31, 2009)

239%
greater
than TIAA
return

12%

7%

2%

10 Year

■ TIAA Real Estate Account  ■ VGSNX

128.   This underperformance occurred for years before 2009 and has

continued after 2009. The TIAA Real Estate Account significantly underperformed

the Vanguard REIT Index I over the one-, five-, and ten-year periods ending

December 31, 2014.[30]

---

[30] Performance data provided as of December 31, 2014 to correspond to the most recent
filing of the Plan's Form 5500 with the Department of Labor.



129.    As the Supreme Court unanimously ruled in *Tibble*, prudent

fiduciaries of defined contribution plans must continuously monitor plan investment

options and replace imprudent investments. *Tibble*, 135 S. Ct. at 1829. In contrast,

Defendants failed to conduct such a process and retained the TIAA Real Estate

Account as a Plan investment option despite its continued dramatic

underperformance and far higher cost compared to available investment

alternatives.

130.    Had Defendants removed the TIAA Real Estate Account and amounts

been invested in the lower-cost and better-performing Vanguard REIT Index I, Plan

70

participants would not have lost in excess of $10 million from the fund being

retained in the Plan.[31]

## ERISA'S FIDUCIARY STANDARDS

131.    ERISA imposes strict fiduciary duties of loyalty and prudence upon the

Defendants as fiduciaries of the Plan. 29 U.S.C. §1104(a)(1), states, in relevant part,

that:

> [A] fiduciary shall discharge his duties with respect to a plan solely in
> the interest of the participants and beneficiaries and –
>
> (A)    for the exclusive purpose of
>
>        (i) providing benefits to participants and their
> beneficiaries; and
>        (ii) defraying reasonable expenses of administering the
> plan; [and]
>
> (B)    with the care, skill, prudence, and diligence under the
>        circumstances then prevailing that a prudent man acting
>        in a like capacity and familiar with such matters would
>        use in the conduct of an enterprise of like character and
>        with like aims.

132.    Under 29 U.S.C. §1103(c)(1), with certain exceptions not relevant here,

> the assets of a plan shall never inure to the benefit of any employer
> and shall be held for the exclusive purposes of providing benefits to
> participants in the plan and their beneficiaries and defraying
> reasonable expenses of administering the plan.

133.    Under ERISA, fiduciaries that exercise any authority or control over

plan assets, including the selection of plan investments and service providers, must

act prudently and solely in the interest of participants in the plan.

---

[31] Plan losses have been brought forward to the present value using the investment
returns of the Vanguard REIT Index I to compensate participants who have not been
reimbursed for their losses.

134.    ERISA also imposes explicit co-fiduciary liabilities on plan fiduciaries. 29 U.S.C. §1105(a) provides a cause of action against a fiduciary for knowingly participating in a breach by another fiduciary and knowingly failing to cure any breach of duty. The statute states, in relevant part, that:

> In addition to any liability which he may have under any other provisions of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances:
>
> (1)    if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach; [or]
>
> (2)    if, by his failure to comply with section 1104(a)(1) of this title in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or
>
> (3)    if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

135.    29 U.S.C. §1132(a)(2) authorizes a plan participant to bring a civil action to enforce a breaching fiduciary's liability to the plan under 29 U.S.C. §1109. Section 1109(a) provides in relevant part:

> Any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary.

72

## CLASS ACTION ALLEGATIONS

136.   29 U.S.C. §1132(a)(2) authorizes any participant or beneficiary of the Plan to bring an action individually on behalf of the Plan to enforce a breaching fiduciary's liability to the Plan under 29 U.S.C. §1109(a).

137.   In acting in this representative capacity and to enhance the due process protections of unnamed participants and beneficiaries of the Plan, as an alternative to direct individual actions on behalf of the Plan under 29 U.S.C. §1132(a)(2) and (3), Plaintiffs seek to certify this action as a class action on behalf of all participants and beneficiaries of the Plan. Plaintiffs seek to certify, and to be appointed as representatives of, the following class:

> All participants and beneficiaries of the Vanderbilt University Retirement Plan and the Vanderbilt University New Faculty Plan from August 10, 2010, through the date of judgment, excluding the Defendants.

138.   This action meets the requirements of Rule 23 and is certifiable as a class action for the following reasons:

a.   The Class includes over 40,000 members and is so large that joinder of all its members is impracticable.

b.   There are questions of law and fact common to this Class because the Defendants owed fiduciary duties to the Plan and to all participants and beneficiaries and took the actions and omissions alleged herein as to the Plan and not as to any individual participant. Thus, common questions of law and fact include the following, without limitation: who are the fiduciaries liable for the remedies provided by 29 U.S.C. §1109(a);

73

whether the fiduciaries of the Plan breached their fiduciary duties to the Plan; what are the losses to the Plan resulting from each breach of fiduciary duty; and what Plan-wide equitable and other relief the court should impose in light of Defendants' breach of duty.

c.      Plaintiffs' claims are typical of the claims of the Class because each Plaintiff was a participant during the time period at issue in this action and all participants in the Plan were harmed by Defendants' misconduct.

d.      Plaintiffs are adequate representatives of the Class because they were participants in the Plan during the Class period, have no interest that is in conflict with the Class, are committed to the vigorous representation of the Class, and have engaged experienced and competent attorneys to represent the Class.

e.      Prosecution of separate actions for these breaches of fiduciary duties by individual participants and beneficiaries would create the risk of (A) inconsistent or varying adjudications that would establish incompatible standards of conduct for Defendants in respect to the discharge of their fiduciary duties to the Plan and personal liability to the Plan under 29 U.S.C. §1109(a), and (B) adjudications by individual participants and beneficiaries regarding these breaches of fiduciary duties and remedies for the Plan would, as a practical matter, be dispositive of the interests of the participants and beneficiaries not parties to the adjudication or would substantially impair or impede those participants' and beneficiaries' ability to protect their interests.

74

Therefore, this action should be certified as a class action under Rule 23(b)(1)(A) or (B).

139.    A class action is the superior method for the fair and efficient adjudication of this controversy because joinder of all participants and beneficiaries is impracticable, the losses suffered by individual participants and beneficiaries may be small and impracticable for individual members to enforce their rights through individual actions, and the common questions of law and fact predominate over individual questions. Given the nature of the allegations, no class member has an interest in individually controlling the prosecution of this matter, and Plaintiffs are aware of no difficulties likely to be encountered in the management of this matter as a class action. Alternatively, then, this action may be certified as a class under Rule 23(b)(3) if it is not certified under Rule 23(b)(1)(A) or (B).

140.    Plaintiffs' counsel, Schlichter, Bogard & Denton LLP, will fairly and adequately represent the interests of the Class and is best able to represent the interests of the Class under Rule 23(g).

a.    Schlichter, Bogard & Denton has been appointed as class counsel in 15 other ERISA class actions regarding excessive fees in large defined contribution plans. As a district court in one of those cases recently observed: "the firm of Schlichter, Bogard & Denton ha[s] demonstrated its well-earned reputation as a pioneer and the leader in the field". *Abbott v. Lockheed Martin Corp.*, No. 06-701, 2015 U.S.Dist.LEXIS 93206 at 4 (S.D. Ill. July 17, 2015). Other courts have made similar findings: "It is clear to the

Case 3:16-cv-02086   Document 1   Filed 08/10/16   Page 75 of 89 PageID #: 75

Court that the firm of Schlichter, Bogard & Denton is preeminent in the field" "and is the only firm which has invested such massive resources in this area." *George v. Kraft Foods Global, Inc.*, No. 08-3799, 2012 U.S.Dist.LEXIS 166816 at 8 (N.D. Ill. June 26, 2012). "As the preeminent firm in 401(k) fee litigation, Schlichter, Bogard & Denton has achieved unparalleled results on behalf of its clients." *Nolte v. Cigna Corp.*, No. 07-2046, 2013 U.S.Dist.LEXIS 184622 at 8 (C.D. Ill. Oct. 15, 2013). "Litigating this case against formidable defendants and their sophisticated attorneys required Class Counsel to demonstrate extraordinary skill and determination." *Beesley v. Int'l Paper Co.*, No. 06-703, 2014 U.S.Dist.LEXIS 12037 at 8 (S.D. Ill. Jan. 31, 2014).

      b.    The U.S. District Court Judge G. Patrick Murphy recognized the work of Schlichter Bogard & Denton as exceptional:

> Schlichter, Bogard & Denton's work throughout this litigation illustrates an exceptional example of a private attorney general risking large sums of money and investing many thousands of hours for the benefit of employees and retirees. No case had previously been brought by either the Department of Labor or private attorneys against large employers for excessive fees in a 401(k) plan. Class Counsel performed substantial work…, investigating the facts, examining documents, and consulting and paying experts to determine whether it was viable. This case has been pending since September 11, 2006. Litigating the case required Class Counsel to be of the highest caliber and committed to the interests of the participants and beneficiaries of the General Dynamics 401(k) Plans.

*Will v. General Dynamics Corp.*, No. 06-698, 2010 U.S.Dist.LEXIS 123349 at 8–9 (S.D. Ill. Nov. 22, 2010).

76

c.     Schlichter, Bogard & Denton handled the only full trial of an ERISA excessive fee case, resulting in a $36.9 million judgment for the plaintiffs that was affirmed in part by the Eighth Circuit. *Tussey v. ABB, Inc.*, 746 F.3d 327 (8th Cir. 2014). In awarding attorney's fees after trial, the district court concluded that "Plaintiffs' attorneys are clearly experts in ERISA litigation." *Tussey v. ABB, Inc.*, No. 06-4305, 2012 U.S.Dist.LEXIS 157428 at 10 (W.D. Mo. Nov. 2, 2012). Following remand, the district court again awarded Plaintiffs' attorney's fees, emphasizing the significant contribution Plaintiffs' attorneys have made to ERISA litigation, including educating the Department of Labor and courts about the importance of monitoring fees in retirement plans.

> Of special importance is the significant, national contribution made by the Plaintiffs whose litigation clarified ERISA standards in the context of investment fees. The litigation educated plan administrators, the Department of Labor, the courts and retirement plan participants about the importance of monitoring recordkeeping fees and separating a fiduciary's corporate interest from its fiduciary obligations.

*Tussey v. ABB, Inc.,* 2015 U.S.Dist.LEXIS 164818 at 7–8 (W.D. Mo. Dec. 9, 2015).

d.     Schlichter, Bogard & Denton is also class counsel in and handled *Tibble v. Edison Int'l,* in which the Supreme Court held in a unanimous 9–0 decision that ERISA fiduciaries have "a continuing duty to monitor investments and remove imprudent ones[.]" 135 S. Ct. at 1829. Schlichter, Bogard & Denton successfully petitioned for a writ of certiorari, and obtained

amicus support from the United States Solicitor General and AARP, among others. Given the Court's broad recognition of an ongoing fiduciary duty, the *Tibble* decision will affect all ERISA defined contribution plans.

   e. The firm's work in ERISA excessive fee class actions has been featured in the New York Times, Wall Street Journal, NPR, Reuters, and Bloomberg, among other media outlets. See, e.g., Anne Tergesen, *401(k) Fees, Already Low, Are Heading Lower*, WALL ST. J. (May 15, 2016);[32] Gretchen Morgenson, *A Lone Ranger of the 401(k)'s*, N.Y. TIMES (Mar. 29, 2014);[33] Liz Moyer, *High Court Spotlight Put on 401(k) Plans*, WALL ST. J. (Feb. 23, 2015);[34] Floyd Norris, *What a 401(k) Plan Really Owes Employees*, N.Y. TIMES (Oct. 16, 2014);[35] Sara Randazzo, *Plaintiffs' Lawyer Takes on Retirement Plans*, WALL ST. J. (Aug. 25, 2015);[36] Jess Bravin and Liz Moyer, *High-Court Ruling Adds Protections for Investors in 401(k) Plans*, WALL ST. J. (May 18, 2015); [37] Jim Zarroli, *Lockheed Martin Case Puts 401(k) Plans on Trial*, NPR (Dec. 15, 2014);[38] Mark Miller*, Are 401(k) Fees Too High? The*

---

[32] Available at http://www.wsj.com/articles/401-k-fees-already-low-are-heading-lower-1463304601.

[33] Available at http://www.nytimes.com/2014/03/30/business/a-lone-ranger-of-the-401-k-s.html?_r=0.

[34] Available at http://www.wsj.com/articles/high-court-spotlight-put-on-401-k-plans-1424716527.

[35] Available at http://www.nytimes.com/2014/10/17/business/what-a-401-k-plan-really-owes-employees.html?_r=0.

[36] Available at http://blogs.wsj.com/law/2015/08/25/plaintiffs-lawyer-takes-on-retirement-plans/.

[37] Available at http://www.wsj.com/articles/high-court-ruling-adds-protections-for-investors-in-401-k-plans-1431974139.

[38] Available at http://www.npr.org/2014/12/15/370794942/lockheed-martin-case-puts-401-k-plans-on-trial.

*High Court May Have an Opinion*, REUTERS (May 1, 2014);[39] Greg Stohr,

*401(k) Fees at Issue as Court Takes Edison Worker Appeal*, BLOOMBERG (Oct.

2, 2014).[40]

## COUNT I

### Breach of Duties of Loyalty and Prudence— Unreasonable Administrative Fees

141.  Plaintiffs restate and incorporate the allegations in the preceding

paragraphs.

142.  This Count alleges breach of fiduciary duties against all Defendants.

143.  The scope of the fiduciary duties and responsibilities of these

Defendants includes discharging their duties with respect to the Plan solely in the

interest of, and for the exclusive purpose of providing benefits to, Plan participants

and beneficiaries, defraying reasonable expenses of administering the Plan, and

acting with the care, skill, prudence, and diligence required by ERISA.

144.  If a defined contribution plan overpays for recordkeeping services due

to the fiduciaries' "failure to solicit bids" from other recordkeepers, the fiduciaries

have breached their duty of prudence. See *George v. Kraft Foods Global, Inc.*, 641

F.3d 786, 798–99 (7th Cir. 2011). Similarly, "us[ing] revenue sharing to benefit [the

plan sponsor and recordkeeper] at the Plan's expense" while "failing to monitor and

control recordkeeping fees" and "paying excessive revenue sharing" is a breach of

fiduciary duties. *Tussey,* 746 F.3d at 336.

---

[39] Available at http://www.reuters.com/article/us-column-miller-401fees-idUSBREA400J220140501.

[40] Available at http://www.bloomberg.com/news/articles/2014-10-02/401-k-fees-at-issue-as-court-takes-edison-worker-appeal.

145.    Defendants failed to engage in a prudent and loyal process for selecting a recordkeeper. Rather than consolidating the Plan's administrative and recordkeeping services to a single service provider, Defendants retained up to four recordkepers to provide recordkeeping services. This failure to consolidate the recordkeeping services eliminated the Plan's ability to obtain the same services at a lower cost with a single recordkeeper and caused the Plan to pay significantly excessive recordkeeping fees. This conduct was a breach of the duties of loyalty and prudence.

146.    Moreover, Defendants failed to solicit competitive bids from vendors on a flat per-participant fee. Defendants allowed the Plan's recordkeepers to receive asset-based revenue sharing and hard dollar fees, but failed to monitor those payments to ensure that only reasonable compensation was received for the services provided to the Plan. As the amount of assets grew, the revenue sharing payments to the Plan's recordkeepers grew, even though the services provided by the recordkeepers remained the same. This caused the recordkeeping compensation paid to the recordkeepers to exceed a reasonable fee for the services provided. This conduct was a breach of the duties of loyalty and prudence.

147.    Total Plan losses will be determined at trial after complete discovery in this case and are continuing.

148.    Each Defendant is personally liable under 29 U.S.C. §1109(a) to make good to the Plan any losses to the Plan resulting from the breaches of fiduciary

duties alleged in this Count and is subject to other equitable or remedial relief as appropriate.

149.    Each Defendant knowingly participated in the breach of the other Defendants, knowing that such acts were a breach, enabled the other Defendants to commit a breach by failing to lawfully discharge its own fiduciary duties, knew of the breach by the other Defendants and failed to make any reasonable effort under the circumstances to remedy the breach. Thus, each defendant is liable for the losses caused by the breach of its co-fiduciary under 29 U.S.C. §1105(a).

## COUNT II

### Breach of Duties of Loyalty and Prudence— Unreasonable Investment Management Fees and Performance Losses

150.    Plaintiffs restate and incorporate the allegations contained in the preceding paragraphs.

151.    This Count alleges breach of fiduciary duties against all Defendants.

152.    The scope of the fiduciary duties and responsibilities of these Defendants includes managing the assets of the Plan for the sole and exclusive benefit of Plan participants and beneficiaries, defraying reasonable expenses of administering the Plan, and acting with the care, skill, diligence, and prudence required by ERISA. These Defendants are directly responsible for ensuring that the Plan's fees are reasonable, selecting prudent investment options, evaluating and monitoring the Plan's investments on an ongoing basis and eliminating imprudent ones, and taking all necessary steps to ensure that the Plan's assets are invested prudently.

81

153. As the Supreme Court recently confirmed, ERISA's "duty of prudence involves a continuing duty to monitor investments and remove imprudent ones[.]" *Tibble,* 135 S. Ct. at 1829.

154. Defendants selected and retained for years as Plan investment options mutual funds and insurance company variable annuities with higher expenses and historically poor performance relative to other investment options that were readily available to the Plan at all relevant times.

155. Rather than consolidating the Plan's over 300 investment options into a core investment lineup in which prudent investments were selected for a given asset class and investment style, as is the case with most defined contribution plans, Defendants retained multiple investment options in each asset class and investment style, thereby depriving the Plan of its ability to qualify for lower cost share classes of certain investments, while violating the well-known principle for fiduciaries that such a high number of investment options causes participant confusion. In addition, Defendants, as fiduciaries charged with operating as prudent financial experts, *Katsaros v. Cody*, 744 F.2d 270, 279 (2d Cir. 1984), knew or should have known that providing numerous actively managed duplicative funds in the same investment style would produce a "shadow index" return before accounting for much higher fees than index fund fees, thereby resulting in significant underperformance. The Plan's investment offerings included the use of mutual funds and variable annuities with expense ratios far in excess of other options available to the Plan. These lower-cost options included lower-cost share

82

class mutual funds with the identical investment manager and investments, and lower-cost insurance company variable annuities and insurance company pooled separate accounts. In so doing, Defendants failed to make Plan investment decisions based solely on the merits of the investment funds and what was in the interest of participants. Defendants therefore failed to discharge their duties with respect to the Plan solely in the interest of the participants and beneficiaries and for the exclusive purpose of providing benefits to participants and their beneficiaries and defraying reasonable expenses of administering the Plan. Defendants therefore breached their fiduciary duty of loyalty under 29 U.S.C. §1104(a)(1)(A).

156.    The same conduct by the Defendants shows a failure to discharge their duties with respect to the Plan with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims. Defendants therefore breached their fiduciary duty of prudence under 29 U.S.C. §1104(a)(1)(B).

157.    Defendants failed to engage in a prudent process for the retention of Plan investment options. Rather, Defendants used more expensive funds with inferior performance compared to investments that were available to the Plan.

158.    <u>CREF Stock Account</u>: Defendants selected and retained the CREF Stock Account despite its excessive cost and historical underperformance compared to both passively managed investments and actively managed investments with a similar underlying asset allocation.

83

159.  <u>TIAA Real Estate Account</u>: Defendants selected and retained the TIAA Real Estate Account in the Plan despite its excessive fees and historical underperformance compared to lower-cost real estate investments.

160.  Had a prudent and loyal fiduciary conducted a prudent process for the retention of investment options, it would have concluded that the Plan's investment options were retained for reasons other than the best interest of the Plan and its participants and were causing the Plan to lose tens of millions of dollars of participants' retirement savings in excessive and unreasonable fees and underperformance relative to prudent investment options available to the Plan.

161.  Total Plan losses will be determined at trial after complete discovery in this case and are continuing.

162.  Each Defendant is personally liable under 29 U.S.C. §1109(a) to make good to the Plan any losses to the Plan resulting from the breaches of fiduciary duties alleged in this Count and is subject to other equitable or remedial relief as appropriate.

163.  Each Defendant knowingly participated in the breach of the other Defendants, knowing that such acts were a breach, enabled the other Defendants to commit a breach by failing to lawfully discharge its own fiduciary duties, knew of the breach by the other Defendants and failed to make any reasonable effort under the circumstances to remedy the breach. Thus, each defendant is liable for the losses caused by the breach of its co-fiduciary under 29 U.S.C. §1105(a).

84

## COUNT III

### Failure to Monitor Fiduciaries

164.   Plaintiffs restate and incorporate the allegations contained in the preceding paragraphs.

165.   This Count alleges breach of fiduciary duties against Vanderbilt University.

166.   Vanderbilt University has responsibility to control and manage the operation and administration of the Plan, including the selection of Plan service providers, with all powers necessary to enable it to properly carry out such responsibilities.

167.   A monitoring fiduciary must ensure that the monitored fiduciaries are performing their fiduciary obligations, including those with respect to the investment and holding of plan assets, and must take prompt and effective action to protect the plan and participants when they are not.

168.   To the extent any of Vanderbilt University's fiduciary responsibilities were delegated to another fiduciary, its monitoring duty included an obligation to ensure that any delegated tasks were being performed prudently and loyally.

169.   Vanderbilt University breached its fiduciary monitoring duties by, among other things:

   a.   failing to monitor its appointees, to evaluate their performance, or to have a system in place for doing so, and standing idly by as the Plan suffered enormous losses as a result of its appointees' imprudent actions and omissions with respect to the Plan;

85

b.   failing to monitor its appointees' fiduciary process, which would have alerted any prudent fiduciary to the potential breach because of the excessive administrative and investment management fees and consistently underperforming Plan investments in violation of ERISA;

c.   failing to ensure that the monitored fiduciaries had a prudent process in place for evaluating the Plan's administrative fees and ensuring that the fees were competitive, including a process to identify and determine the amount of all sources of compensation to the Plan's recordkeeper and the amount of any revenue sharing payments; a process to prevent the recordkeeper from receiving revenue sharing that would increase the recordkeeper's compensation to unreasonable levels even though the services provided remained the same; and a process to periodically obtain competitive bids to determine the market rate for the services provided to the Plan;

d.   failing to ensure that the monitored fiduciaries considered the ready availability of comparable and better performing investment options that charged significantly lower fees and expenses than the Plan's investments; and

e.   failing to remove appointees whose performance was inadequate in that they continued to maintain imprudent, excessively costly, and poorly performing investments, all to the detriment of Plan participants' retirement savings.

170.    As a consequence of these breaches of the fiduciary duty to monitor, the Plan suffered substantial losses. Had Vanderbilt University discharged its fiduciary monitoring duties prudently as described above, the Plan would not have suffered these losses. Therefore, as a direct result of the breaches of fiduciary duty alleged herein, the Plan, and the Plaintiffs and the other Class members, lost tens of millions of dollars of their retirement savings.

## JURY TRIAL DEMANDED

171.    Pursuant to Fed.R.Civ.P. 38 and the Constitution of the United States, Plaintiffs demand a trial by jury.

## PRAYER FOR RELIEF

For these reasons, Plaintiffs, on behalf of the Plan and all similarly situated Plan participants and beneficiaries, respectfully request that the Court:

- find and declare that the Defendants have breached their fiduciary duties as described above;

- find and adjudge that Defendants are personally liable to make good to the Plan all losses to the Plan resulting from each breach of fiduciary duty, and to otherwise restore the Plan to the position it would have occupied but for the breaches of fiduciary duty;

- determine the method by which Plan losses under 29 U.S.C. §1109(a) should be calculated;

- order Defendants to provide all accountings necessary to determine the amounts Defendants must make good to the Plan under §1109(a);

87

- remove the fiduciaries who have breached their fiduciary duties and enjoin them from future ERISA violations;

- surcharge against Defendants and in favor of the Plan all amounts involved in any transactions which such accounting reveals were improper, excessive and/or in violation of ERISA;

- reform the Plan to include only prudent investments;

- reform the Plan to obtain bids for recordkeeping and to pay only reasonable recordkeeping expenses;

- certify the Class, appoint each of the Plaintiffs as a class representative, and appoint Schlichter, Bogard & Denton LLP as Class Counsel;

- award to the Plaintiffs and the Class their attorney's fees and costs under 29 U.S.C. §1132(g)(1) and the common fund doctrine;

- order the payment of interest to the extent it is allowed by law; and

- grant other equitable or remedial relief as the Court deems appropriate.

August 10, 2016

Respectfully submitted,

/s/ William B. Hawkins III

William B. Hawkins III (TBPR # 20117)
Eric G. Evans (TBPR # 34224)
HAWKINS HOGAN, PLC
205 17th Avenue North, Suite 202
Nashville, TN 37203
Phone: (615) 726-0050
Fax: (315) 726-5177
whawkins@hawkinshogan.com
eevans@hawkinshogan.com

Local Counsel for Plaintiffs

SCHLICHTER, BOGARD & DENTON, LLP
Jerome J. Schlichter, MO No. 32225*
Michael A. Wolff, MO No. 38207
Troy A. Doles, MO No. 47958*
Heather Lea, MO No. 49872*
James Redd, IV, MO No. 66172*
Stephen M. Hoeplinger, MA No. 676219*
100 South Fourth Street, Ste. 1200
St. Louis, MO 63102
Phone: (314) 621-6115
Fax: (314) 621-5934
    *Pro Hac Vice forthcoming

Lead Counsel for Plaintiffs

89