# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | |
|---|---|
| LOREN L. CASSELL, PAMELA M. STEELE, JOHN E. RICE, PENELOPE A. ADGENT, IAN SALTER, MICHELLE N. WRAY, DAWN E. CRAGO, AND LYNDA PAYNE, individually and as representatives of a class of participants and beneficiaries on behalf of the Vanderbilt University Retirement Plan and the Vanderbilt University New Faculty Plan, | Civil Action No. No. 3:16-cv-02086 <br><br> AMENDED COMPLAINT— CLASS ACTION <br><br><br> JURY TRIAL DEMANDED |
| *Plaintiffs*, <br> v. | Judge Crenshaw |
| VANDERBILT UNIVERSITY, VANDERBILT RETIREMENT PLAN OVERSIGHT COMMITTEE, DONALD BRADY, ANDERS HALL, ERIC KOPSTAIN, JOHN MANNING, TRACI NORDBERG, BRETT SWEET, RICHARD WILLIS, AND BARBARA L. CARROLL, | Magistrate Judge Brown |
| *Defendants*. | |

## AMENDED COMPLAINT

1.     Plaintiffs Loren L. Cassell, Pamela M. Steele, John E. Rice, Penelope A. Adgent, Ian Salter, Michelle N. Wray, Dawn E. Crago, and Lynda Payne, individually and as representatives of a class of participants and beneficiaries in the Vanderbilt University Retirement Plan and the Vanderbilt University New Faculty Plan (collectively the "Plan"),[1] bring this action under 29 U.S.C. §1132(a)(2) on

_____

[1] The Vanderbilt University Retirement Plan and the Vanderbilt University New Faculty Plan are also known as the Vanderbilt University 403(b) Retirement Plan.

behalf of the Plan against Defendants Vanderbilt University, the Vanderbilt Retirement Plan Oversight Committee, Donald Brady, Anders Hall, Eric Kopstain, John Manning, Traci Nordberg, Brett Sweet, Richard Willis, and Barbara L. Carroll for breach of fiduciary duties under ERISA.[2]

2.      "ERISA is a comprehensive statute designed to promote the interests of employees and their beneficiaries in employee benefit plans." *Chao v. Hall Holding Co.*, 285 F.3d 415, 425 (6th Cir. 2002) (internal quotation omitted). "Consequently, ERISA fiduciaries 'must act for the *exclusive benefit* of plan beneficiaries.'" *Id.* at 424–26 (quoting *Howard v. Shay*, 100 F.3d 1484, 1488 (9th Cir. 1996) (emphasis added)). ERISA fiduciary duties are "the highest known to the law." *Id.* at 426 (quoting *Donovan v. Bierwirth*, 680 F.2d 263, 272 n.8 (2d Cir. 1982)). Fiduciaries must "initially determine, and continue to monitor, the prudence of *each* investment option available to plan participants," *DiFelice v. U.S. Airways, Inc.*, 497 F.3d 410, 423 (4th Cir. 2007) (emphasis original), and must "remove imprudent ones" within a reasonable time, *Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1828–29 (2015). In exercising those duties, ERISA fiduciaries are held to the standard of financial experts in the field of investment management. *See Katsaros v. Cody*, 744 F.2d 270, 275, 279 (2d Cir. 1984); *Liss v. Smith*, 991 F. Supp. 278, 296 (S.D.N.Y. 1998).

3.      The marketplace for retirement plan services is established and competitive. Billion-dollar-defined contribution plans, like the Plan—which is

---

[2] The Employee Retirement Income Security Act, 29 U.S.C. §§1001–1461.

among the largest 0.03% of defined contribution plans in the United States—have tremendous bargaining power to demand low-cost administrative and investment management services. As fiduciaries to the Plan, Defendants are obligated to limit the Plan's expenses to a reasonable amount, to ensure that *each* fund in the Plan is a prudent option for participants to invest their retirement savings and priced at a reasonable level for the size of the Plan; and to analyze the costs and benefits of alternatives for the Plan's administrative and investment structure. Defendants must make those decisions for the exclusive benefit of participants, and not for the benefit of conflicted third parties, such as the Plan's service providers.

4.     Instead of using the Plan's bargaining power to reduce expenses and exercising independent judgment to determine what investments to include in the Plan, Defendants squandered that leverage by allowing the Plan's conflicted third-party service providers—TIAA-CREF, Fidelity, VALIC, and Vanguard—to dictate the Plan's investment lineup, to include over 330 of their proprietary mutual funds in the Plan, to link their recordkeeping services to the placement of those funds in the Plan, and to collect nearly unlimited asset-based compensation from their proprietary products.

5.     To remedy these fiduciary breaches, Plaintiffs, individually and as representatives of a class of participants and beneficiaries of the Plan, bring this action on behalf of the Plan under 29 U.S.C. §1132(a)(2) to enforce Defendants personal liability under 29 U.S.C. §1109(a) to make good to the Plan all losses resulting from each breach of fiduciary duty and to restore to the Plan any profits

3

made through Defendants' use of the Plan's assets. In addition, Plaintiffs seek such other equitable or remedial relief for the Plan as the Court may deem appropriate.

## JURISDICTION AND VENUE

6. **Subject-matter jurisdiction.** This Court has exclusive jurisdiction over the subject matter of this action under 29 U.S.C. §1132(e)(1) and 28 U.S.C. §1331 because it is an action under 29 U.S.C. §1132(a)(2).

7. **Venue.** This District is the proper venue for this action under 29 U.S.C. §1132(e)(2) and 28 U.S.C. §1391(b) because it is the district in which the subject Plan is administered, where at least one of the alleged breaches took place, and where the Defendants reside or may be found.

8. **Standing.** An action under §1132(a)(2) allows recovery only for a plan, and does not provide a remedy for individual injuries distinct from plan injuries. *LaRue v. DeWolff, Boberg & Assocs.*, 552 U.S. 248, 256 (2008). The plan is the victim of any fiduciary breach and the recipient of any recovery. *Id*. at 254. Section 1132(a)(2) authorizes any participant, fiduciary, or the Secretary of Labor to sue derivatively as a representative of the plan to seek relief on behalf of the plan. 29 U.S.C. §1132(a)(2). As explained in detail below, the Plan suffered millions of dollars in losses caused by Defendants' fiduciary breaches and remain exposed to harm and continued future losses. Those injuries may be redressed by a judgment of this Court in favor of Plaintiffs. To the extent the Plaintiffs must also show an individual injury even though §1132(a)(2) does not provide redress for individual injuries, each Plaintiff has suffered such an injury, in at least the following ways:

a.      The named Plaintiffs and all participants in the Plan suffered financial harm as a result of the imprudent or excessive fee options in the Plan because Defendants' inclusion of those options deprived participants of the opportunity to grow their retirement savings by investing in prudent options with reasonable fees, which would have been available in the Plan if Defendants had satisfied their fiduciary obligations. All participants continue to be harmed by the ongoing inclusion of certain imprudent and excessive cost options in the Plan and payment of excessive recordkeeping fees.

b.      The named Plaintiffs and all participants in the Plan were financially harmed by Defendants' improper bundling of some of the Plan's investment products, improperly allowing the companies who did recordkeeping for the Plan to require inclusion of their investment products in the Plan, instead of each investment option being independently selected.

c.      The named Plaintiffs' individual accounts in the Plan were further harmed by Defendants' breaches of fiduciary duties because one or more of the named Plaintiffs during the proposed class period (1) invested in the CREF Stock and TIAA Real Estate accounts—which were improperly bundled with TIAA's recordkeeping services and which Defendants also failed to remove from the Plan when it was clear from past poor performance and their excessive fees that they were imprudent investments—at a time when those options underperformed prudent alternatives in which those assets

5

would have been invested had Defendants not breached their fiduciary duties (Plaintiff Rice), (2) invested in excessive-cost investment options, including funds that paid revenue sharing to the Plan's recordkeepers and higher-cost share classes of mutual funds priced for small investors when far lower-cost but otherwise identical share classes of the same mutual funds were available to the Plan because of its enormous size (all Plaintiffs), and (3) through the fees charged on their investments in those mutual funds and other investments, paid a portion of the Plan's excessive administrative and recordkeeping fees, which would not have been incurred had Defendants discharged their fiduciary duties to the Plan (all Plaintiffs).

      d.     Specifically, during the class period, Plaintiff Rice invested in the higher-cost share classes of Vanguard Capital Opportunity, Vanguard GNMA, Vanguard Inflation-Protected Securities, Vanguard PRIMECAP, Vanguard Total Stock Market Index Vanguard International Stock Index, Vanguard Windsor, as well as CREF Stock, TIAA Real Estate, CREF Social Choice, CREF Bond Market, CREF Global Equities, CREF Inflation-Linked Bond (and many others); Plaintiff Adgent invested in Vanguard Target Retirement 2010 and Vanguard Target Retirement Income; Plaintiff Cassell invested in Fidelity Freedom K 2015 and Vanguard Target Retirement 2015; Plaintiff Steele invested in Vanguard Target Retirement 2020 and Fidelity Freedom K 2020; Plaintiff Salter invested in VALIC variable annuities, among other investment options; Plaintiff Crago invested in

Vanguard Institutional Index and Vanguard Target Retirement 2025; and

Plaintiff Payne invested in the higher-cost share classes of Vanguard

Wellington and Vanguard Windsor II. Through their investments in these

funds, each Plaintiff paid excessive investment management fees and each

was assessed a portion of the Plan's excessive administrative and

recordkeeping fees. Plaintiffs would not have suffered these losses if

Defendants had monitored revenue sharing, solicited competitive bids,

consolidated recordkeepers in a timely fashion, or reduced fees to

reasonable levels in accordance with their fiduciary duties under ERISA.

## PARTIES

### The Plans

9.     The Vanderbilt University Retirement Plan and the New Faculty Plan,
which are referred to by Defendants in their filings as "the Plan", are defined
contribution, individual account, employee pension benefit plans under 29 U.S.C.
§1002(2)(A) and §1002(34).

10.     The Plan is established and maintained under a written document in
accordance with 29 U.S.C. §1102(a)(1). The Plan was adopted on July 1, 1989.

11.     The Plan is comprised of the "Vanderbilt University Retirement Plan"
and the "Vanderbilt University New Faculty Plan." The Plan has actually two plans
within it, and each of these plans requires mandatory participation for eligible
employees. The Vanderbilt University Retirement Plan provides for retirement
income for all employees of Vanderbilt University except for: employees that work

less than 20 hours per week; students, post-doctoral fellows, trainees performing services and who are exempt from social security taxes; newly hired faculty who are not highly compensated and who are eligible to participate in the Vanderbilt University New Faculty Plan; and any person not classified by the University as an employee. The Vanderbilt University New Faculty Plan covers all newly hired faculty who are not highly compensated.

12.     A participant's retirement income depends upon mandatory contributions from each employee, employer matching contributions, employee supplemental contributions, and the performance of the investment options to which the contributions are directed, net of fees and expenses.

13.     As of December 31, 2014, the Plan had $3.4 billion in net assets and 41,863 participants with account balances. As of that date, the Plan was among the largest 0.03% of all defined contribution plans in the United States based on total assets. Plans of such great size are commonly referred to as "jumbo plans."

14.     Effective June 1, 2016, the account balances of eligible Vanderbilt University Medical Center employees were transferred from the Plan to a new plan, called the Vanderbilt University Medical Center Retirement Plan. The newly created VUMC Plan offers the same investment options as the Plan and has the same recordkeeper. Like the Plan, the VUMC Plan requires mandatory participation for eligible employees. Because Defendants have not yet filed an annual report with the Department of Labor for the VUMC Plan, Plaintiffs do not know the precise number of participants in the VUMC Plan or the amount of assets

8

it holds. However, as of fiscal year 2015, Vanderbilt University Medical Center had 15,384 full-time employees, the vast majority of whom became participants in the VUMC Plan at its inception.

## Plaintiffs

15. Loren L. Cassell resides in Hendersonville, Tennessee and is currently retired. He previously worked as a Senior Desktop Support Specialist at Vanderbilt University and is a "participant" in the Plan under 29 U.S.C. §1002(7) because he and his beneficiaries are or may become eligible to receive benefits under the Plan.

16. Pamela M. Steele resides in White House, Tennessee, and formerly worked as a Registered Nurse and Certified Clinical Research Coordinator in the Regulatory Department of Vanderbilt University Medical Center. She is a participant in the Plan under 29 U.S.C. §1002(7) because she and her beneficiaries are or may become eligible to receive benefits under the Plan.

17. John E. Rice resides in Goodlettsville, Tennessee, and is Staff Nurse IV in the Surgical Critical Care Department at Vanderbilt University Medical Center. He is a participant in the Plan under 29 U.S.C. §1002(7) because he and his beneficiaries are or may become eligible to receive benefits under the Plan.

18. Penelope A. Adgent resides in Nashville, Tennessee is a Guest Services Representative at Vanderbilt University. She is a participant in the Plan under 29 U.S.C. §1002(7) because she and her beneficiaries are or may become eligible to receive benefits under the Plan.

19.     Ian Salter resides in Madison, Tennessee, and is a Journeyman Mechanic in the Plan Services Department at Vanderbilt University Medical Center. He is a participant in the Plan under 29 U.S.C. §1002(7) because he and his beneficiaries are or may become eligible to receive benefits under the Plan.

20.     Michelle N. Wray resides in Nashville, Tennessee, and is an Account Reimbursement Specialist II in the Patient Accounts Receivable Department at Vanderbilt University Medical Center. She is a participant in the Plan under 29 U.S.C. §1002(7) because she and her beneficiaries are or may become eligible to receive benefits under the Plan.

21.     Dawn E. Crago resides in Joelton, Tennessee, and is a Pre-School Teacher in the Children and Family Center, a Division of Administration Child & Family Center at Vanderbilt University. She is a participant in the Plan under 29 U.S.C. §1002(7) because she and her beneficiaries are or may become eligible to receive benefits under the Plan.

22.     Lynda Payne resides in Nashville, Tennessee, and formerly worked in Patient Registration in the Cardiology Department at Vanderbilt University Medical Center. She is a participant in the Plan under 29 U.S.C. §1002(7) because she and her beneficiaries are or may become eligible to receive benefits under the Plan.

### Defendants

23.     Vanderbilt University is a non-profit corporation organized under Tennessee law with its principal place of business in Nashville, Tennessee.

Vanderbilt University is the plan sponsor under 29 U.S.C. §1002(16)(B), and has responsibility and discretionary authority to control the operation, management and administration of the Plan, with all powers necessary to enable it properly to carry out such responsibilities, including the selection and compensation of the providers of administrative services to the Plan and the selection, monitoring, and removal of the investment options made available to participants for the investment of their contributions and provision of their retirement income.

24.     Vanderbilt University is a fiduciary to the Plan because it exercised discretionary authority or discretionary control respecting the management of the Plan or exercised authority or control respecting the management or disposition of its assets, and has discretionary authority or discretionary responsibility in the administration of the Plan, as described more fully below. 29 U.S.C. §1002(21)(A)(i) and (iii).

25.     The Plan, as amended and restated effective April 1, 2015, designates the Associate Vice Chancellor for Human Resources as the Plan Administrator. Section 3.6 of the Plan provides that the Plan Administrator "shall be the named fiduciary of the Plan for purposes of ERISA." The Plan grants the Plan Administrator responsibility for administration of the Plan and the investment options offered in the Plan.

26.     Traci Nordberg previously served as Associate Vice Chancellor for Human Resources for both Vanderbilt University and Vanderbilt University

Medical Center. She remains the Chief Human Resources Officer of Vanderbilt University Medical Center.

27.     Barbara L. Carroll was appointed Associate Vice Chancellor for Human Resources for Vanderbilt University as of January 5, 2016.

28.     In serving as Associate Vice Chancellor for Human Resources, Traci Nordberg and Barbara L. Carroll are fiduciaries to the Plan because they exercised discretionary authority or discretionary control respecting the management of the Plan or exercised authority or control respecting the management or disposition of its assets, and have discretionary authority or discretionary responsibility in the administration of the Plan, as described more fully below. 29 U.S.C. §1002(21)(A)(i) and (iii).

29.     The Vanderbilt Retirement Plan Oversight Committee ("Committee") was established only in August 2012 and was delegated fiduciary responsibility over the administration and investment of Plan assets, including: selecting and monitoring Plan investment options; selecting vendors and implementing contractual service arrangements; developing investment objectives, policies, and procedures for the Plan; and monitoring and controlling investment and administrative fees paid from the Plan to ensure those fees are reasonable for the services provided. However, as explained in detail below, the Committee failed to fulfill those responsibilities, as did the other Defendants.

30. Upon information and belief, current members of the Committee include: Donald Brady, Anders Hall, Eric Kopstain, John Manning, Traci Nordberg, Brett Sweet, and Richard Willis.

31. The Committee and its individual members are fiduciaries to the Plan because they exercised discretionary authority or discretionary control respecting the management of the Plan or exercised authority or control respecting the management or disposition of its assets, and have discretionary authority or discretionary responsibility in the administration of the Plan, as described in more detail below. 29 U.S.C. §1002(21)(A)(i) and (iii).

32. Because the Vanderbilt University entities or individual committee members described above have acted as alleged herein as the agents of Vanderbilt University, all defendants are collectively referred to hereafter as "Defendants".

## A ERISA FIDUCIARY STANDARDS

33. ERISA imposes strict fiduciary duties of loyalty and prudence upon the Defendant as a fiduciary of the Plan. 29 U.S.C. §1104(a), states, in relevant part, that:

> [A] fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and –
>
> (A)    for the exclusive purpose of
>
> > (i)    providing benefits to participants and their beneficiaries; and
> >
> > (ii)    defraying reasonable expenses of administering the plan; [and]

(B)     with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims.

34.     Under ERISA, fiduciaries that exercise any authority or control over plan assets, including the selection of plan investments and service providers, must act prudently and for the *exclusive* benefit of participants in the plan, and not for the benefit of third parties including service providers to the plan such as recordkeepers and those who provide investment products. Fiduciaries must ensure that the amount of fees paid to those service providers is no more than reasonable. DOL Adv. Op. 97-15A; DOL Adv. Op. 97-16A; *see also* 29 U.S.C. §1103(c)(1) (plan assets "shall be held for the exclusive purposes of providing benefits to participants in the plan and their beneficiaries and defraying reasonable expenses of administering the plan").

35.     "[T]he duty to conduct an independent investigation into the merits of a particular investment" is "the most basic of ERISA's investment fiduciary duties." *In re Unisys Savings Plan Litig.*, 74 F.3d 420, 435 (3d Cir. 1996); *Katsaros,* 744 F.2d at 279 (fiduciaries must use "the appropriate methods to investigate the merits" of plan investments). Fiduciaries must "initially determine, and continue to monitor, the prudence of *each* investment option available to plan participants." *DiFelice*, 497 F.3d at 423 (emphasis original); *see also* 29 C.F.R. § 2550.404a-1; DOL Adv. Opinion 98-04A; DOL Adv. Opinion 88-16A. Thus, a defined contribution plan fiduciary cannot "insulate itself from liability by the simple expedient of including a very

14

large number of investment alternatives in its portfolio and then shifting to the participants the responsibility for choosing among them." *Hecker v. Deere & Co.*, 569 F.3d 708, 711 (7th Cir. 2009). Fiduciaries have "a continuing duty to monitor investments and remove imprudent ones[.]" *Tibble*, 135 S. Ct. at 1828–29.

36.     The general fiduciary duties imposed by 29 U.S.C. §1104 are supplemented by a detailed list of transactions that are expressly prohibited by 29 U.S.C. §1106, and are considered *per se* violations because they entail a high potential for abuse. Section 1106(a)(1) states, in pertinent part, that:

> [A] fiduciary with respect to a plan shall not cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect –
>
> (A)     sale or exchange, or leasing, of any property between the plan and a party in interest;
> * * *
> (C)     furnishing of goods, services, or facilities between the plan and party in interest;
> (D)     transfer to, or use by or for the benefit of a party in interest, of any assets of the plan ...

37.     ERISA also imposes explicit co-fiduciary liabilities on plan fiduciaries. 29 U.S.C. §1105(a) provides a cause of action against a fiduciary for knowingly participating in a breach by another fiduciary and knowingly failing to cure any breach of another fiduciary:

> In addition to any liability which he may have under any other provisions of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances:

(1)     if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach; [or]

(2)     if, by his failure to comply with section 1104(a)(1) of this title in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or

(3)     if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

38.     29 U.S.C. §1132(a)(2) authorizes a plan participant to bring a civil action to enforce a breaching fiduciary's liability to the plan under 29 U.S.C. §1109. Section 1109(a) provides in relevant part:

> Any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary.

## BACKGROUND FACTS

## I.     Defined contribution plans, services, and fees.

36.     When ERISA was enacted in 1974, defined benefit pension plans were America's retirement system. Such plans are now rarely available to employees in the private sector. "Defined contribution plans dominate the retirement plan scene today." *LaRue v. DeWolff, Boberg & Assocs.*, 552 U.S. 248, 255 (2008).

37.     Defined contribution plans allow employees to contribute a percentage of their pre-tax earnings to the plan, with the employer often matching those contributions up to a specified percentage. Each participant in the plan has an individual account. Participants direct plan contributions into one or more investment options in a lineup chosen and assembled by the plan's fiduciaries. "[P]articipants' retirement benefits are limited to the value of their own individual investment accounts, which is determined by the market performance of employee and employer contributions, less expenses." *Tibble*, 135 S. Ct. at 1826.

38.     The majority of fees assessed to participants in a defined contribution plan are attributable to two general categories of services: plan administration (including recordkeeping), and investment management. These expenses "can sometimes significantly reduce the value of an account in a defined-contribution plan." *Id.*

39.     A plan's fiduciaries have control over defined contribution plan expenses. The fiduciaries are responsible for hiring administrative service providers for the plan, such as a recordkeeper, and for negotiating and approving the amount of fees paid to those administrative service providers. The fiduciaries also have exclusive control over the menu of investment options to which participants may direct the assets in their accounts. Those selections each have their own fees, which are deducted from the returns that participants receive on their investments.

40.     These fiduciary decisions have the potential to dramatically affect the amount of money that participants are able to save for retirement. According to the

17

U.S. Department of Labor, a 1% difference in fees over the course of a 35-year career makes a difference of *28%* in savings at retirement. U.S. Dep't of Labor, *A Look at 401(k) Plan Fees,* at 1–2 (Aug. 2013).[3] Accordingly, fiduciaries of defined contribution plans must engage in a rigorous process to control these costs and ensure that participants pay no more than a reasonable level of fees. This is particularly true for multi-billion dollar plans like the Plan, which have the bargaining power to obtain the highest level of service and the lowest fees. The fees available to multi-billion dollar retirement plans are orders of magnitude lower than the much higher retail fees available to small investors.

41.     The entities that provide services to defined contribution plans have an incentive to maximize their fees by putting their own higher-cost funds in plans and collecting the highest amount possible for recordkeeping. For each additional dollar in fees paid to a service provider, participants' retirement savings are directly reduced by the same amount, and participants lose the potential for those lost assets to grow over the remainder of their careers. Accordingly, participants' retirement security is directly affected by the diligence used by plan fiduciaries to control, negotiate, and reduce the plan's fees.

42.     Fiduciaries must be cognizant of providers' self-interest in maximizing fees, and not simply accede to the providers' preferred investment lineup—i.e., proprietary funds that will generate substantial fee revenue for the provider—or agree to the provider's administrative fee quotes without negotiating or considering

---

[3] Available at http://www.dol.gov/ebsa/pdf/401kfeesemployee.pdf.

alternatives. In order to act in the exclusive interest of participants and not in the service providers' interest, fiduciaries must negotiate as if their own money was at stake. Instead of simply accepting the investment funds or fees demanded by these conflicted providers, fiduciaries must consider whether participants would be better served by using alternative investment products or services.

## II.    Defined contribution recordkeeping.

43.    Recordkeeping is a service necessary for every defined contribution plan. The recordkeeper keeps track of the amount of each participant's investments in the various options in the plan, and typically provides each participant with a quarterly account statement. The recordkeeper often maintains a plan website or call center that participants can access to obtain information about the plan and to review their accounts. The recordkeeper may also provide access to investment education materials or investment advice. These services are largely commodities, and the market for recordkeeping services is highly competitive.

44.    There are numerous recordkeepers in the marketplace who are capable of providing a high level of service and who will vigorously compete to win a recordkeeping contract for a jumbo defined contribution plan. These recordkeepers will readily respond to a request for proposal and will tailor their bids based on the desired services (e.g., recordkeeping, website, call center, etc.). In light of the commoditized nature of their services, recordkeepers primarily differentiate themselves based on price, and will aggressively bid to offer the best price in an effort to win the business, particularly for jumbo plans like the Plan.

45.     Some recordkeepers in the market provide only recordkeeping and administrative services, while others provide both recordkeeping services and investment products. The latter group has an incentive to place their own proprietary products in the plan in order to maximize revenues from servicing the plan. As explained below, when faced with such conflicted fund recommendations, fiduciaries must independently assess whether the provider's investment product is the best choice for the plan, or whether the purpose of providing benefits to participants would be better accomplished by considering other investment managers who may offer superior funds at a better price.

## III.    Defined contribution investment options.

46.     Defined contribution fiduciaries have exclusive control over the particular investment alternatives available in the plan to which participants direct and allocate their plan accounts, and the returns on which are credited to participants' accounts.

47.     Each investment option is typically a pooled investment product, such as a mutual fund, and invests in a diversified portfolio of securities in a broad asset class such as fixed income, bonds, or equities. Fixed income funds may include conservative principal protection options, such as stable value funds, or other diversified portfolios of government or corporate debt securities. Equity funds invest in diversified portfolios of stocks of large, mid, or small domestic or international companies in a particular style such as growth or value (or a blend of the two). Balanced funds invest in a mix of stocks and bonds in varying percentages.

48.     Investment options can be passively or actively managed. In a passively managed or "index" fund, the investment manager attempts to match the performance of a given benchmark index by holding a representative sample of securities in that index, such as the S&P 500. In an actively managed fund, the investment manager uses her judgment in buying and selling individual securities (*e.g.*, stocks, bonds, etc.) in an attempt to generate investment returns that surpass a benchmark index, net of fees. Because no stock selection or research is necessary for the manager to track the index and trading is limited, passively managed investments charge significantly lower fees than actively managed funds.

49.     Mutual fund fees are usually expressed as a percentage of assets under management, or "expense ratio." For example, if the mutual fund deducts 1% of fund assets each year in fees, the fund's expense ratio would be 1%, or 100 basis points (bps).[4] The fees deducted from a mutual fund's assets reduce the value of the shares owned by fund investors.

50.     Many mutual funds offer their investors different share classes. Retail share classes are marketed to individuals with small amounts to invest. Institutional share classes are offered to investors with large amounts to invest, such as large retirement plans. The different share classes of a given mutual fund have the identical manager, are managed identically, and invest in the same portfolio of securities. The only difference is that the retail shares charge significantly higher

---

[4] One basis point is equal to 1/100th of one percent (or 0.01%).

fees, resulting in retail class investors receiving lower returns. The share classes are otherwise identical in all respects.

51.     Some mutual funds engage in a practice known as "revenue sharing." In a revenue-sharing arrangement, a mutual fund pays a portion of its expense ratio to the entity providing administrative and recordkeeping services to a plan. The difference in fees between a mutual fund's retail and institutional share classes is often attributable to revenue sharing. To illustrate, a fund's retail share class may have an expense ratio of 100 bps, including 25 bps of revenue sharing, while the institutional share charges 75 bps, with no or lesser revenue sharing. The presence of revenue sharing thus provides an incentive for administrative service providers to recommend that the fiduciary select higher cost funds, including in-house funds of the administrative service provider that pay the provider revenue sharing. "[V]ery little about the mutual fund industry," including revenue sharing practices, "can plausibly be described as transparent[.]" *Leimkuehler v. Am. United Life Ins. Co.*, 713 F.3d 905, 907 (7th Cir. 2013).

52.     The importance of fees in prudent investment selection cannot be overstated. The prudent investor rule developed in the common law of trusts, which informs ERISA's fiduciary duties, emphasizes "the duty to avoid unwarranted costs[.]" Restatement (Third) of Trusts ch. 17, intro. note (2007); *see Tibble*, 135 S. Ct. at 1828 (analyzing common law of trusts and Restatement (Third) of Trusts §90 in finding a continuing duty to monitor under ERISA). As the Restatement explains, "cost-conscious management is fundamental to prudence in the

investment function." Restatement (Third) of Trusts § 90 cmt. b. While a fiduciary may consider higher-cost, actively-managed mutual funds as an alternative to index funds, "active management strategies involve investigation expenses and other transaction costs . . . that must be considered, realistically, in relation to the likelihood of increased return from such strategies." Restatement (Third) of Trusts ch. 17, intro. note; *id.* § 90 cmt. h(2).

53.    Academic and financial industry literature demonstrates that high expenses are not correlated with superior investment management. Indeed, funds with high fees on average perform worse than less expensive funds even on a *pre-fee basis.* Javier Gil-Bazo & Pablo Ruiz-Verdu, *When Cheaper is Better: Fee Determination in the Market for Equity Mutual Funds*, 67 J. ECON. BEHAV. & ORG. 871, 873 (2008); *see also* Jill E. Fisch, *Rethinking the Regulation of Securities Intermediaries*, 158 U. PA. L. REV. 1961, 1993 (2010)(summarizing numerous studies showing that "the most consistent predictor of a fund's return to investors is the fund's expense ratio").

> [T]he empirical evidence implies that superior management is not priced through higher expense ratios. On the contrary, it appears that the effect of expenses on after-expense performance (even after controlling for funds' observable characteristics) is more than one-to-one, which would imply that low-quality funds charge higher fees. Price and quality thus seem to be inversely related in the market for actively managed mutual funds.

Gil-Bazo & Ruiz-Verdu, *When Cheaper is Better*, at 883.

54.    In light of this effect of fees on expected returns, fiduciaries must carefully consider whether the added cost of actively managed funds is realistically

23

justified by an expectation of higher returns. Restatement (Third) of Trusts ch. 17, intro. note; *id*. § 90 cmt. h(2). A prudent investor will not select higher-cost actively managed funds without analyzing whether a particular investment manager is likely to beat the overwhelming odds against outperforming its benchmark index over time, net of the fund's higher investment expenses.

## IV. Revenue sharing: a practice that can lead to excessive fees if not properly monitored and capped.

55.    There are two primary methods for defined contribution plans to pay for recordkeeping and administrative services: "direct" payments from plan assets, and "indirect" revenue sharing payments from plan investments such as mutual funds. Plans may use one method or the other exclusively, or may use a combination of both direct and indirect payments.

56.    In a typical direct payment arrangement, the fiduciary contracts with the recordkeeper to obtain administrative services in exchange for a flat annual fee based on the number of participants for which the recordkeeper will be providing services, for example $30 per participant. Jumbo defined contribution plans possess tremendous economies of scale for purposes of recordkeeping and administrative fees. A plan with 20,000 participants can obtain a much lower fee on a per-participant basis than a plan with 2,000 participants.

57.    A recordkeeper's cost for providing services depends on the number of participants in the plan, not the amount of assets in the plan or in an individual account. The cost of recordkeeping a $75,000 account balance is the same as a $7,500 account. Accordingly, a flat price based on the number of participants in the

24

plan ensures that the amount of compensation is tied to the actual services provided and does not grow based on matters that have nothing to do with the services provided, such as an increase in plan assets due to market growth or greater plan contributions by the employee.

58.     As an example, a fiduciary of a 20,000 participant, $2 billion plan may issue a request for proposal to several recordkeepers and request that the respondents provide pricing based on a flat rate for a 20,000-participant plan. If the winning recordkeeper offers to provide the specified services at a flat rate of $30 per participant per year, the fiduciary would then contract with the recordkeeper for the plan to pay a $600,000 direct annual fee (20,000 participants at $30/participant). If the plan's assets increase to $3 billion during the course of the contract but the participant level stays constant, the recordkeeper's compensation does not change, because the services provided have not changed.

59.     Such a flat per-participant agreement does not necessarily mean, however, that every participant in the plan must pay the same $30 fee from his or her account. The fiduciary could reasonably determine that it is equitable to charge each participant the same $30 (for example, through a quarterly charge of $7.50 to each account in the plan). Alternatively, the fiduciary could conclude that assessing the same fee to all investors would discourage participants with relatively small accounts from participating in the plan, and that, once the aggregate flat fee for the plan has been determined, a proportional asset-based charge would be best. In that case, the flat per-participant rate of $30 per participant multiplied by the number of

participants would simply be converted to an asset-based charge, such that every participant pays the same percentage of his or her account balance. For the $2 billion plan in this example, each participant would pay a direct administrative fee of 0.03% of her account balance annually for recordkeeping ($600,000/$2,000,000,000 = 0.0003). If plan assets increase thereafter, the percentage would be adjusted downward so that the *plan* is still paying the same $600,000 price that was negotiated at the plan level for services to be provided to the plan.

60. Defendants used a different method of paying for recordkeeping for the Plan, through "indirect" revenue sharing payments from the plan's mutual funds. Revenue sharing, while not a *per se* violation of ERISA, can lead to excessive fees if not properly monitored and capped.

61. In a revenue sharing arrangement, the mutual fund pays the plan's recordkeeper putatively for providing recordkeeping and administrative services for the fund. However, because revenue sharing payments are asset based, the fees can grow to unreasonable levels if plan assets grow while the number of participants, and thus the services provided, has not increased at a similar rate. The opposite is generally not true. If plan assets decline, participants will not receive a sustained benefit of paying lower fees, because the recordkeeper will demand that the plan make up the shortfall through additional direct payments.

62. If a fiduciary decides to use revenue sharing to pay for recordkeeping, it is required that the fiduciary (1) determine and monitor the amount of the revenue sharing and any other sources of compensation that the provider has

received, (2) compare that amount to the price that would be available on a flat per-participant basis, and (3) control the amount of fees paid through recordkeeping by obtaining rebates of any revenue sharing amounts that exceed the reasonable level of fees.

63.     As to the second critical element—determining the price that would be available on a flat per-participant basis—making that assessment for a jumbo plan requires soliciting bids from competing providers. In multi-billion dollar plans with over 10,000 participants, such as the Plan, benchmarking based on fee surveys alone is inadequate. Recordkeeping fees for jumbo plans have declined significantly in recent years due to increased technological efficiency, competition, and increased attention to fees by sponsors of other plans such that fees that may have been reasonable at one time may have become excessive based on current market conditions. Accordingly, the only way to determine the true market price at a given time is to obtain competitive bids. *See George v. Kraft Foods Global, Inc.*, 641 F.3d 786, 800 (7th Cir. 2011) (a 401(k) excessive fee case which denied summary judgment based in part on the opinion of an independent consultant that "'without an actual fee quote comparison'—i.e., a bid from another service provider— [consultant] 'could not comment on the competitiveness of [recordkeeper's] fee amount for the services provided.'").

64.     Industry experts recognize that this principle applies fully in the 403(b) context, just as in the 401(k) context. Compared to benchmarking, "the RFP is a far better way to negotiate fee and service improvements for higher education

organizations." Fiduciary Plan Governance, LLC, *Buying Power for Higher Education Institutions: When you Have It and When You Don't – Part 2*.[5] Indeed, "[c]onducting periodic due diligence RFPs is a critical part of fulfilling the fiduciary duty." Western PA Healthcare News, *403(b) Retirement Plans: Why a Due Diligence Request for Proposal*.[6] Engaging in in this RFP process "allows plan sponsors . . . to meet their fiduciary obligations, provides leverage to renegotiate services and fees; enhances service and investment opportunities and improves overall plan operation." *Id.* Prudent fiduciaries of defined contribution plans—including 403(b) plans—thus obtain competitive bids for recordkeeping at regular intervals of approximately three years.

## V. Bundled services and open architecture.

65. As the prevalence and asset size of defined contribution plans grew, in the shift away from traditional defined benefit pension plans, numerous financial services companies entered this burgeoning retirement plan market. These providers often marketed "bundled" plans, offering to assist in setting up a plan and providing a package of the provider's proprietary investment funds as well as administrative and recordkeeping services. The plans were often marketed as "free" plans, meaning there were supposedly no additional fees beyond the revenues the provider received from having their investment funds in the plan. These purportedly free plans had a significant condition—in order to obtain the free

---

[5] Available at http://www.fiduciaryplangovernance.com/blog/buying-power-for-higher-education-institutions-when-you-have-it-and-when-you-dont-part-2.

[6] Available at http://www.wphealthcarenews.com/403b-retirement-plans-why-a-due-diligence-request-for-proposal/.

pricing, the fiduciary had to agree to put the provider's preferred investment lineup in the plan—a group of handpicked funds that would guarantee the provider would receive its desired fee revenue on an ongoing basis. Any deviations from that lineup or removal of funds after the plan was established would require the provider's approval or result in the plan being assessed additional direct fees. Thus, under these closed arrangements, funds were included in some defined contribution plans not based on an independent analysis of their merits or what was in the best interests of participants, but because of the benefits they provided to the plan's service providers.

66.     In an open architecture model, a plan is not limited to the recordkeeper's own proprietary investment products, which the provider has an interest in including in the plan because the funds provide it with revenue sharing and investment fees. Instead, the fiduciary is free to reject the recordkeeper's conflicted fund recommendations, can independently assess whether another investment manager offers a superior product at a more attractive price, and can include such funds in the plan's investment lineup. Open architecture also facilitates negotiation of reasonable recordkeeping fees, since the price of the recordkeeping service is more transparent and not obscured by opaque revenue sharing arrangements—through which the investment product provider does not publicize the amount of revenue sharing it kicks back to itself in its separate role as a recordkeeper—and can be negotiated separately without investment revenue skewing the recordkeeping price. There are recordkeepers in the market that

exclusively operate on an open architecture basis in that they do recordkeeping only and do not sell investment products. These providers can offer pricing on a pure per-participant basis, without any revenue sharing component taken from funds in the plan. In light of these benefits, prudent fiduciaries of large defined contribution plans have largely rejected bundling and embraced open architecture platforms.

67.     Open, transparent architecture allows for greater control over revenue sharing arrangements if they are used at all, and indeed, allows a fiduciary to eliminate revenue sharing altogether. If revenue sharing payments are used, they can effectively be "kickbacks" to induce recordkeepers to advocate for a fund to be included in the plan's investment lineup or even attempt to dictate its inclusion. An independent assessment of each fund is thus essential and required by ERISA to determine whether the fund should be included in the plan based strictly on its merits as an investment, regardless of whether it provides revenue sharing.

## VI.   403(b) plans share common fiduciary duties with 401(k) plans.

68.     Defined contribution plans can qualify for favored tax treatment under different sections of the Internal Revenue Code. Plans offered by corporate employers typically qualify under 26 U.S.C. §401(k), and are commonly referred to as 401(k) plans. Tax-exempt organizations, public schools (including state colleges and universities), and churches are eligible to offer plans qualified under §403(b), commonly known as 403(b) plans. 26 U.S.C. §403(b)(1)(A).

69.     Plans sponsored by tax-exempt organizations such as private universities, unlike churches and public schools, are subject to Title I of ERISA and

its fiduciary requirements, unless the plan satisfies a 1979 "safe-harbor" regulation based on the employer having limited involvement in operating the plan. 29 C.F.R. §2510.3-2(f). To the best of Plaintiffs' knowledge, the Plan has never qualified for the safe harbor, and thus has long been subject to ERISA's fiduciary requirements. In the Plan's annual reports (Forms 5500) filed with the Department of Labor, Defendants have acknowledged that the Plan is subject to ERISA.

70.     Although 401(k) plans and 403(b) plans have different historical origins, legislative and regulatory developments over a number of decades largely eroded those differences, as reflected in final 403(b) regulations published by the IRS on July 26, 2007. Sponsors of 403(b) plans were given almost one-and-a-half years to prepare for the effective date of the regulations, January 1, 2009. The regulations required certain employers to become more involved with administering their plans than they had previously, potentially disqualifying those plans from satisfying the ERISA safe harbor and subjecting the plans to ERISA fiduciary requirements for the first time. However, for plans like the Plan that were *already* subject to ERISA's fiduciary requirements because they were never safe-harbor plans, the IRS regulations had no effect on the Plan's status for ERISA fiduciary purposes; ERISA already required Defendants to be actively involved in exercising care, prudence, skill, and diligence in administering the Plan for the exclusive benefit of participants.

71.     When §403(b) was first enacted in 1958, plan assets could only be invested in insurance company annuity contracts. 26 U.S.C. §403(b)(1). In 1974,

§403(b) was amended to allow 403(b) plans to invest in custodial accounts holding mutual fund shares. 26 U.S.C. §403(b)(7).

72.     Regardless of any differences between 401(k) and 403(b) plans, both types of plans have the same fundamental purpose: allowing employees to save for a secure retirement. The duties of fiduciaries in both are the same: to operate as a financial expert familiar with investment practices, to operate the plan for the exclusive benefit of employees and retirees, and to make sure that fees are reasonable and investments are prudent. Participants in both types of plans depend on their plan fiduciaries to ensure that retirement savings are not depleted by excessive fees or imprudent investments. Accordingly, the historical differences and investment limitations of 403(b) plans do not allow 403(b) fiduciaries to exercise a lesser degree of care or attention to fees and investments than their 401(k) counterparts.

## VII.    Historical practice of multiple recordkeepers and placement of many investment options in 403(b) plans, which some fiduciaries failed to evaluate as required.

73.     As the Department of Labor has recognized, historically, many 403(b) sponsors had treated their plans as a collection of individual contracts under which employees could take various actions without the consent or involvement of the employer or plan administrator, instead of fiduciaries evaluating investment options placed in the plan. Field Assistance Bulletin 2009-02.

74.     Some 403(b) plans historically before 2009 included multiple bundled service providers, with each performing the recordkeeping function for its own

32

investment products in the plan, unlike 401(k) plans which had a single recordkeeper. In fact, "403(b) plan investment options were often 'sold' by record keepers and their representatives rather than offered by plan sponsors as evaluated investments." Fiduciary Plan Governance, LLC, *Legacy Investments in Higher Education: What is a Plan Sponsor's Responsibility to Participants*?[7] Indeed, sponsors of these plans often took a "'hands off' approach to plan oversight." *Id*. This practice resulted in plans having excessive recordkeeping costs and structures involving multiple recordkeepers with each recordkeeper having its own investment options in the plan. This left participants with the task of navigating a haphazard collection of duplicative and overlapping investment options from the various recordkeepers, and ultimately led to them paying excessive and unnecessary fees, both for recordkeeping and for investment products in the plans. *Id*. In some cases the recordkeeper insisted on its own funds being included in the plan without any resistance or analysis of those funds by the fiduciaries.

## VIII. TIAA-CREF's bundled 403(b) plan services.

75.     TIAA-CREF is an insurance company financial services provider that historically has dominated the market for services to educational institution 403(b) plans, and has heavily marketed to them. TIAA-CREF consists of two companion organizations: Teachers Insurance and Annuity Association of America (TIAA), and College Retirement Equities Fund (CREF). The services that TIAA-CREF provides

---

[7] Available at http://www.fiduciaryplangovernance.com/blog/legacy-investments-in-higher-education-what-is-a-plan-sponsors-responsibility-to-participants.

to 403(b) plans include annuities, mutual funds, insurance coverage, trust services, and administrative services.

76.     Although TIAA-CREF's marketing materials suggest that it is a "nonprofit" organization, that is misleading. In 1998, Congress revoked both TIAA's and CREF's statuses as tax-deductible 501(c)(3) charitable organizations because TIAA-CREF "competed directly with for-profit insurance companies and mutual fund groups." Reed Abelson, *Budget Deal to Cost T.I.A.A.-C.R.E.F. Its Tax Exemption*, N.Y. Times (July 30, 2007).[8] As a result, they are subject to federal income taxation and are not 501(c)(3) charitable organizations.

77.     While CREF is organized as a New York not-for-profit corporation, TIAA is organized as a *for-profit* stock life insurance company. TIAA's "operating surplus" is spent, loaned, and otherwise distributed to some of its subsidiaries as well. An example is Nuveen Investments, a for-profit investment manager, which TIAA acquired in April 2014 for an enterprise value of $6.25 billion. TIAA receives dividends from these for-profit subsidiaries.[9]

78.     TIAA owns and controls numerous for-profit subsidiaries, which send dividends to TIAA, including the following subsidiaries for which TIAA files consolidated federal income tax returns:

---

[8] Available at http://www.nytimes.com/1997/07/30/business/budget-deal-to-cost-tiaa-cref-its-tax-exemption.html.

[9] Available at https://www.tiaa.org/public/pdf/C16623_where-tiaa-profits-go.pdf.

| TIAA Subsidiary | Not-For-Profit Entity | For-Profit Entity |
|---|---|---|
| 730 Texas Forests Holdings, Inc. | | X |
| Covariance Capital Management, Inc. | | X |
| GreenWood Resources, Inc. | | X |
| JWL Properties, Inc. | | X |
| ND Properties, Inc. | | X |
| Nuveen Asia Investments, Inc. | | X |
| Nuveen Holdings, Inc. | | X |
| Nuveen Investments, Inc. | | X |
| Nuveen Investments Advisers, Inc. | | X |
| Nuveen Investments Holdings, Inc. | | X |
| Nuveen Investments Institutional Services Group, LLC | | X |
| Nuveen Investment Solutions, Inc. | | X |
| Nuveen Securities, LLC | | X |
| Oleum Holding Company, Inc. | | X |
| Rittenhouse Asset Management, Inc. | | X |
| T-C Europe Holdings, Inc. | | X |
| T-C SP, Inc. | | X |
| T-C Sports Co., Inc. | | X |
| T-Investment Properties Corp. | | X |
| TCT Holdings, Inc. | | X |
| Teachers Advisors, Inc. | | X |
| Teachers Personal Investors Service, Inc. | | X |
| Terra Land Company | | X |
| TIAA Asset Management Finance Company, LLC | | X |
| TIAA-CREF Life Insurance Company. | | X |
| TIAA-CREF Tuition Financing, Inc. | | X |
| TIAA-CREF Trust Company, FSB | | X |

| TIAA Subsidiary | Not-For-Profit Entity | For-Profit Entity |
|---|---|---|
| Westchester Group Asset Management, Inc. | | X |
| Westchester Group Farm Management, Inc. | | X |
| Westchester Group Investment Management Holding, Inc. | | X |
| Westchester Group Investment Management, Inc. | | X |
| Westchester Group Real Estate, Inc. | | X |

*See 2015 Annual Statement of the Teachers Insurance and Annuity Association of America* 39, 112–19 (Jan. 26, 2016).[10]

79. Also, consistent with its conduct as a profit-seeking enterprise, the compensation of TIAA's CEO and other executives is greater than or close to the very highest paid executives of some of Wall Street's largest for-profit investment managers and insurance companies, such as J.P. Morgan Chase, Prudential, Deutsche Bank, and Metlife. In 2015, TIAA's CEO received $18 million in compensation,[11] more than the CEOs of Metlife ($14 million) and Deutsche Bank ($5.2 million), and just below the CEOs of J.P. Morgan Chase ($18.2 million) and Prudential ($19.9 million). In fact, TIAA's five highest-ranking "named executive

---

[10] Available at https://www.tiaa.org/public/pdf/tiaa_annual_statement_2015.pdf. This list does not include the hundreds of TIAA's for-profit, joint venture subsidiaries, all of which are controlled by TIAA. *See id.* at 112–19; *see also* https://www.sec.gov/Archives/edgar/data/1429401/000119312510093446/dex21.htm.

[11] TIAA Compensation Disclosures, Executive Compensation Discussion and Analysis 20 (May 2016), available at https://www.tiaa.org/public/pdf/about/governance/exec_comp_policy.pdf.

officers" earned a combined total of well over $40 million in compensation in 2015.

*Id.* When expressed as a percentage of assets under management, TIAA's CEO had

the very highest compensation rate among reporting investment companies.



80.     Adding to this, and undercutting any claim that it operates as a non-

profit, TIAA's compensation disclosures further state that its employees'

compensation and benefits programs are linked to "*profitability*." TIAA

Compensation Disclosures (emphasis added).

81.     Responding to criticism that TIAA-CREF's CEO and other executives

"garnered salaries and bonuses significantly greater than similar pension fund

operations," TIAA-CREF responded that such extremely high pay was justified

because "the company had to compete for top-level employees with major financial

services corporations." Funding Universe, *Teachers Insurance and Annuities Association – College Retirement Equities Fund History.*[12] Critics found this justification dubious because the "flagship CREF Stock Account, an equity portfolio of $59 billion, was primarily indexed to the Russell 3000," meaning that "CREF automatically invested nearly two of every three dollars in companies held by the benchmark fund," leaving "little for the highly paid officers to manage." *Id.*

82.    In benchmarking (and justifying) its executives' compensation packages, TIAA disclosed the following sixteen *for-profit* financial services and insurance companies as the peer group it used for competitive analysis:

The comparator group used in the market competitive analysis consists of the following sixteen companies (the "Peer Group"), which were selected based on being of similar size and complexity in the asset management and insurance industries:

| Affiliated Managers Group | Invesco | Principal Financial |
|---|---|---|
| Ameriprise Financial | Legg Mason | Prudential Financial |
| Bank of NY Mellon | Lincoln National | T. Rowe Price |
| Charles Schwab | MassMutual Financial | Voya Financial |
| Franklin Resources | MetLife | |
| The Hartford Financial | Northern Trust | |

83.    TIAA-CREF provided its 403(b) plan services exclusively on a bundled basis. If a plan wished to offer the TIAA Traditional Annuity, a fixed annuity product, TIAA-CREF required that the CREF Stock Account and Money Market Account also be put in the plan, and required the plan to use TIAA as recordkeeper for its proprietary products. Thus, by using TIAA-CREF, Defendants locked the Plan into an arrangement in advance in which certain investments could not be removed from the plan—*even if the funds were not prudent investments or would*

---

[12] Available at http://www.fundinguniverse.com/company-histories/teachers-insurance-and-annuity-association-college-retirement-equities-fund-history/.

*become imprudent in the future.* By accepting this arrangement, Defendants failed to implement an open architecture platform and use another recordkeeper who could provide the same administrative services at lower cost. Compounding this bundling requirement by TIAA, Defendants used multiple recordkeepers, each with their own investment products, resulting in an inefficient and excessively expensive plan structure, as described in more detail below.

84.     There is no shortage of high-quality, low-cost alternatives to TIAA-CREF's products in the defined contribution plan market. For example, many 403(b) plan fiduciaries have recognized that stable value funds are prudent alternatives to TIAA's Traditional Annuity as a conservative principal preservation option, providing superior returns to a money market fund, and can be recordkept by virtually any defined contribution recordkeeper. Other insurance companies, besides TIAA, also offer fixed annuity products. And there are myriad large cap blend mutual fund investments in the market that provide far superior returns to the CREF Stock Account at much lower cost. In light of TIAA-CREF's restrictions and superior alternatives in the market, fiduciaries of 403(b) defined contribution plans must evaluate each investment option and engage in a cost-benefit analysis to determine whether it is prudent and in the exclusive best interest of participants to lock their plans into an arrangement that precludes the removal of imprudent plan investments and results in excessive plan fees. Defendants failed to perform such an evaluation of the funds and services TIAA-CREF required. Defendants also failed to evaluate whether participants would be better served by using superior low-cost

alternatives to TIAA-CREF's products given that the Plan could have saved millions of dollars in administrative and investment management costs by hiring a different recordkeeper. As explained below, prudent 403(b) fiduciaries have engaged in this analysis and overhauled their plans for the benefit of participants.

## IX.  Move to consolidation and open architecture in 403(b) plans.

85.    Under the 2007 final regulations that became effective January 1, 2009,[13] certain employers with 403(b) plans were compelled to exercise greater control over their 403(b) plans than they had previously. Among other things, the final regulations required 403(b) plans to be maintained under a "written defined contribution plan" containing all the material terms and conditions for benefits under the plan. DOL separately published revised Form 5500 annual reporting rules effective January 1, 2009, that required large ERISA-covered 403(b) plans to file audited financial statements providing detailed information about the assets in the plan. The regulations are expressly intended to make 403(b) plans more like 401(k) plans.

86.    Once the final regulations were published, many 403(b) plan fiduciaries recognized that fulfilling their fiduciary obligations—whether on an ongoing basis or for the first time—required them to engage, if they had not already been doing so, in a comprehensive review of their plans' fees, investment options and structure, and service provider arrangements, to determine whether changes had to be made for

_____

[13] The regulations gave 403(b) plans almost a year and a half to make changes necessary to comply before the regulation became effective January 1, 2009.

Case 3:16-cv-02086   Document 38   Filed 12/12/16   Page 40 of 160 PageID #: 670

the benefit of participants. While the Plan has long been subject to ERISA because the employer match was sufficient for the Plan to be "established or maintained" as ERISA plans under 29 U.S.C. §1002(2)(A)—and, indeed Defendants have informed the Department of Labor in the Plan's Forms 5500 that the Plan is subject to ERISA—even if the Plan had not previously been subject to ERISA, there can be no doubt that 403(b) plan fiduciaries could not just accept investment options provided by the same providers who did recordkeeping for the plan in order to comply with ERISA's requirements that all fees be reasonable and investments be prudent.

87.     Once the regulations were published, some non-profit plan sponsors whose 403(b) programs previously qualified for the safe-harbor determined they would have to comply with ERISA's fiduciary requirements by the regulations' effective date of January 1, 2009. As a result, the fiduciaries of many 403(b) plans implemented dramatic overhauls to their plans and acknowledged that these changes were necessary to comply with the IRS regulations and to satisfy their fiduciary obligations under ERISA.

88.     For example, the fiduciaries of the Loyola Marymount University (LMU) Defined Contribution Plan, a 403(b) plan, recognized that under the new regulations, "Recordkeeping must be consolidated and/or managed by a single party." *See* LMU 403(b) Retirement Plan Project Overview, at 1.[14] "Keeping two on-going record keepers in 2009 would mean that faculty/staff would pay higher fees and receive reduced services." *Id*. at 2. Beginning in 2008, to assist LMU in assessing the plan's

---

[14] Available at http://www.lmu.edu/AssetFactory.aspx?vid=33038.

investment options and recordkeeping services, LMU hired an independent third party consultant, Hewitt Associates (n/k/a AonHewitt), to issue a request for proposal to seven different 403(b) recordkeeping providers, including AIG Retirement, Diversified Investment Advisors, Fidelity, ING, Lincoln Financial Group, Principal Financial Group, and TAA-CREF.[15] LMU consolidated from two recordkeepers to one effective on the date the final regulation became effective, January 1, 2009. Loyola Marymount's fiduciaries recognized that a dual recordkeeper structure would require its employees to pay higher fees for overlapping services, and because consultants, legal counsel, and all of the recordkeeping firms interviewed recommended that LMU use only one record keeper, starting in January 2009. LMU 403(b) Retirement Plan Project Overview, at 2. Moreover, LMU selected Diversified as the new recordkeeper because Diversified "is not an investment manager and therefore, does not require that certain investment options be offered by LMU." *Id.* LMU was therefore able to offer "best in class" funds in each fund category. *Id.* at 6.

89.     Similarly, following the new IRS 403(b) regulations, the fiduciaries of the Pepperdine University Retirement Plan recognized the implications of maintaining four different recordkeepers. In order to comply with the regulations and its fiduciary responsibilities, Pepperdine determined that it must make certain changes to the plan, including "Consolidating recordkeeping (by having one fund provider manage administration for multiple providers or by moving to a sole

---

[15] *See* http://www.lmu.edu/AssetFactory.aspx?vid=32045.

administrator scenario)." *See* Pepperdine University Participant Q & A.[16]

Pepperdine retained an independent third party consultant to assist the fiduciaries in issuing a request for proposal to different 403(b) recordkeeping providers. Following the competitive bidding process, effective February 1, 2009, Pepperdine selected Diversified, a recordkeeper which does not offer proprietary investments, as the "sole administrator" and consolidated from four recordkeepers (Fidelity, TIAA-CREF, Vanguard and Prudential) to a single recordkeeper. Pepperdine found that the benefits of consolidation included lower costs and more robust services, as well as a streamlined compliance process and simplified data coordination. *Id.* Pepperdine acknowledged that maintaining a multiple-vendor platform was not a "cost-effective, viable option." Paul B. Lasiter, *Single Provider, Multiple Choices*, NACUBO.[17] Recognizing the inefficiencies and overlapping work in a multiple recordkeeper arrangement, Pepperdine determined that costs were "higher in a multivendor arrangement, because each vendor receives only a portion of the ongoing total plan contributions," while a single provider allowed to "realize true economies of scale." *Id.*

90.     Pepperdine also recognized that the bundled model demanded by certain providers was not in participants' interest. Using those providers "meant being obligated to offer some or all of that provider's proprietary funds on the plan's

_____

[16] Available at
http://community.pepperdine.edu/hr/content/benefits/fulltime/faq.pdf.
[17] Available at
http://www.nacubo.org/Business_Officer_Magazine/Magazine_Archives/March_201
0/Single_Provider_Multiple_Choices.html.

Case 3:16-cv-02086   Document 38   Filed 12/12/16   Page 43 of 160 PageID #: 673

investment menu—*whether or not those investments offered participants the best range of choice, value, and relative performance.*" *Id.* (emphasis added). Acting in participants' interest required that the fiduciaries instead have the ability to select those "funds that the university—working with an independent financial adviser—could identify as being the 'best options in their respective asset classes.'" *Id.* After weighing and analyzing a variety of factors, Pepperdine determined that "consolidating with a single vendor has been the straightforward solution to achieving" the objective of acting "for the exclusive benefit of plan participants." *Id.* The benefits of consolidation included "[a] better fiduciary process with ongoing evaluation" of plan investments, "[e]conomies of scale," and "[g]reater transparency of fees and lowered costs for plan participants." *Id.*

91.     In the fall of 2008, in response to the new, not yet effective regulations and required changes within the defined contribution industry, Purdue University began a comprehensive review of its defined contribution retirement program. Purdue recognized that "*[t]he primary intent of the regulations was to reduce the difference between Section 403(b) plans, Section 401(k) plans* and Section 457(b) plans; to enhance 403(b) plan compliance; and to establish a more structured retirement program for employees in the non-profit sector.*" James S. Almond, *403(b) Plan Redesign-Making a Good Retirement Plan Better*, PURDUE UNIVERSITY

(emphasis added).[18] Purdue hired an independent third party consultant, EnnisKnupp & Associates (n/k/a AonHewitt), to assist the fiduciaries in evaluating the investment options, participants' fees, and recordkeeping services, which included developing and issuing an RFP to recordkeepers. The "benefits" of Purdue's program enhancements included the transition from five providers (TIAA-CREF, Fidelity, American Century, Lincoln, and VALIC) to a single administrative service provider (Fidelity) with a corresponding significant reduction in recordkeeping expenses. The reformed plan "[p]rovided a transparent investment and administrative fee structure" and "[l]everaged plan assets to lower administrative and investment fees, including access to institutional share class funds and a flat administrative fee, instead of administrative fees as a percentage of retirement savings." *Id.* Purdue reduced the number of investment options from 381 to 19, "eliminating redundant investment options with varying levels of expenses" and replacing the menu of duplicative investment options with "a limited menu of pre-screened, broadly diversified investment options." *Id.* Purdue's analysis showed that "reducing administrative and investment plan fees under the new structure for a plan of Purdue's size, would increase participant balances by an estimated *$3-4 million per year* which is then compounded over time." *Id.* (emphasis added).

---

[18] Available at http://www.cacubo.org/wp-content/uploads/2016/02/10_403b_Plan_Redesign_Making_a_Good_Retirement_Plan_Better.docx.

92.     Likewise, the California Institute of Technology (CalTech) TIAA-CREF DC Retirement Plan consolidated from multiple recordkeepers (TIAA-CREF and Fidelity) to a single recordkeeper (TIAA-CREF) effective January 1, 2010, with the assistance of an independent third party consultant, Mercer Investment Consulting. *Caltech Names TIAA-CREF Recordkeeper,* INSTITUTIONAL INVESTOR (Dec. 10, 2009).[19] In selecting a core set of investment options for the plan, CalTech eliminated over 100 Fidelity mutual fund options. Based on disclosures in the plan's Forms 5500 filed with the Department of Labor, between 2013 and 2015, CalTech negotiated over *$15 million* in revenue sharing rebates from TIAA-CREF, which was returned to the plan to benefit participants.

93.     Extensive industry literature shows that these sponsors are not outliers, and that similarly situated fiduciaries who have also comprehensively reviewed their plans have been able to reduce recordkeeping and investment management fees, consolidate recordkeepers and investment options, leading to enhanced outcomes and retirement security for their plans' participants.

94.     In connection with a plan redesign project at the University of Notre Dame, independent investment consultant Hewitt EnnisKnupp (n/k/a AonHewitt) issued a "403(b) Plan Redesign Working Paper" which set forth 403(b) fiduciary best practices taken in response to the IRS 403(b) regulations. Hewitt EnnisKnupp,

---

[19] Available at
http://www.institutionalinvestor.com/Article/2355324/Search/Caltech-Names-TIAA-CREF-Record-Keeper.html#/.WBn8Oy0rKpp.

*403(b) Plan Redesign Working Paper: University of Notre Dame* (Feb. 2014).[20]

Hewitt noted that "[w]ith the issuance of new Internal Revenue Service regulations in 2008, there has been an accelerated evolution of the 403(b) marketplace into something that more closely resembles the private sector 401(k) market." *Id.* at 3.

95.     Hewitt noted several areas of plan improvements. *First*, recordkeeper consolidation provided "many benefits to participants," including cost savings. Although the multiple-recordkeeper model had been common in the higher-education marketplace, "[e]xperience and research suggests that this type of administrative structure can be costly and confusing to faculty and staff." *Id.* at 4. "The multiple-recordkeeper model tends to divide participant assets into individual accounts held at separate recordkeepers resulting in costs that are meaningfully higher than under a single recordkeeper model." *Id.* at 5. Such "[e]xcess fees and misallocated costs are a potential threat to the financial security of many defined contribution plan participants." *Id.*

96.     *Second*, Hewitt recommended that plans "unbundl[e]" investment management and administrative services, and to replace revenue sharing arrangements with "explicit, hard dollar administrative fee[s]." *Id.* Hewitt's "experience and research suggests that the transparency gained through an 'unbundled' administrative fee solution with little or no revenue sharing typically results in meaningful fee savings for participants." *Id.* at 6. An unbundled

---

[20] Available at https://workplacecontent.fidelity.com/bin-public/070_NB_PreLogin_Pages/documents/ND_403(b)%20Plan%20Redesign%20White%20Paper.pdf.

arrangement allows plan fiduciaries "to determine whether or not the internal administrative fee allocations used by the existing bundled recordkeepers is a true representation of the costs of these services." *Id.* An unbundled arrangement also provided opportunities to incorporate "'institutional' share classes of funds" into the investment lineup. *Id.*

97.    Further, according to a 2013 survey of 403(b) plans, more than 90% of plans use a single recordkeeper to provide administrative and recordkeeping services to participants. *See* LIMRA Retirement Research, *403(b) Plan Sponsor Research* (2013).[21]

98.    Annual surveys by Plan Sponsor Council of America found that in each year from 2010 through 2014, unlike the Vanderbilt Plan, the overwhelming majority of 403(b) plans—over 80%—have only a single recordkeeper, and provide an average of 28 investment fund options.[22] An earlier PSCA survey of 403(b) plans found that as of 2009, 57% of 403(b) plan fiduciaries had made changes to their

---

[21] Available at http://www.limra.com/uploadedFiles/limracom/LIMRA_Root/Secure_Retirement_Institute/News_Center/Reports/130329-01exec.pdf.

[22] Each PSCA survey covers the year prior to the year indicated in the title. PSCA's 2015 Benchmarking Survey of 403(b) Plans, at 32, 65; PSCA's 2014 Benchmarking Survey of 403(b) Plans, at 32, 61; PSCA's 2013 Benchmarking Survey of 403(b) Plans, at 32, 61, 64; PSCA's 2013 Benchmarking Survey of 403(b) Plans, at 32, 61, 64; PSCA's 2012 Benchmarking Survey of 403(b) Plans, at 30, 61, 64; PSCA's 2012 Benchmarking Survey of 403(b) Plans, at 30, 61, 64; PSCA's 2011 Benchmarking Survey of 403(b) Plans, at 28, 55, 59.

plans as a result of the new 403(b) regulations that became effective January 1, 2009.[23]

99.     The majority of plans use a single recordkeeper because a "**multi-recordkeeper platform is inefficient**" and squanders the ability to leverage a plan's bargaining power. The Standard Retirement Services, Inc., *Fixing Your 403(b) Plan: Adopting a Best Practices Approach,* at 2 (Nov. 2009)(emphasis in original).[24] "By selecting a single recordkeeper, plan sponsors can enhance their purchasing power and negotiate lower, transparent investment fees for participants," while allowing participants to "benefit from a more manageable number of institutional-quality investment options to choose from." *Id.* Additional benefits of a single recordkeeper platform include simplifying personnel and payroll data feeds, reducing electronic fund transfers, and avoiding duplication of services when more than one recordkeeper is used.

100.    AonHewitt, an independent investment consultant, similarly recognized that "403(b) plan sponsors can dramatically reduce participant-borne costs while improving employees' retirement readiness by" "[c]onsolidating recordkeepers," "[l]everaging aggregate plan size and scale to negotiate competitive pricing, and reducing the number of investment options and "utilizing an 'open

---

[23] PSCA's 2010 Benchmarking Survey of 403(b) Plans at 45.
[24] Available at https://www.standard.com/pensions/publications/14883_1109.pdf.

architecture' investment menu[.]" AonHewitt, *How 403(b) Plans Are Wasting Nearly $10 Billion Annually, and What Can Be Done to Fix It* (Jan. 2016).[25]

101.    Another independent investment consultant, Towers Watson, also recognized that using multiple recordkeepers makes it "difficult for employers to monitor available choices and provide ongoing oversight" while harming participants through "high investment and administrative costs" and a lack of guidance needed to achieve retirement readiness. Peter Grant and Gary Kilpatrick, *Higher Education's Response to a New Defined Contribution Environment*, TOWERS WATSON VIEWPOINTS, at 2 (2012).[26]

102.    The recommendations of these independent, widely used investment consultants are buttressed by other industry literature supporting the fact that the use of a single recordkeeper provides reasonable fees. *See, e.g.,* Kristen Heinzinger, *Paring Down Providers: A 403(b) Sponsor's Experience,* PLANSPONSOR (Dec. 6, 2012)("One advantage of consolidating to a single provider was an overall drop in administrative fees and expenses. Recordkeeping basis points returned to the plan sponsors rather than to the vendor. All plan money aggregated into a single platform, and participants were able to save on fee structure. This also eliminated

---

[25] Available at
https://retirementandinvestmentblog.aon.com/getattachment/36ff81a4-db35-4bc0-aac1-1685d2a64078/How_403(b)_Plans_are_Wasting_Nearly_$10_Billion_Annually_Whit ep aper_FINAL.pdf.aspx.
[26] Available at
https://www.towerswatson.com/DownloadMedia.aspx?media=%7B08A2F366-14E3-4C52-BB78-8930F598FD26%7D.

the complications and confusion of having three different recordkeepers.");[27] Paul B. Lasiter, *Single Provider, Multiple Choices*, BUSINESS OFFICER (Mar. 2010)(identifying, among other things, the key disadvantages of maintaining a multi-provider platform including the fact that it is "cumbersome and costly to continue overseeing multiple vendors.").[28]

103.    Use of a single recordkeeper is also less confusing to participants and eliminates excessive, overlapping recordkeeping fees. *Vendor Consolidation in Higher Education: Getting More from Less*, PLAN SPONSOR (July 29, 2010)(recognizing the following benefits, among others: "The plan participant experience is better" because "employees are benefiting from less confusion as a result of fewer vendors in the mix"; "Administrative burden is lessened" by "bringing new efficiencies to the payroll"; and "Costs can be reduced" because "[w]ith a reduced number of vendors in the equation, plan sponsors are better able to negotiate fees" and many are "reporting lower overall cost resulting in an improved cost-per-participant ratio").[29]

## DEFENDANTS BREACHED THEIR FIDUCIARY DUTIES AND COMMITTED PROHIBITED TRANSACTIONS

### I.    The Plan's 330-plus investment options and four recordkeepers

104.    Defendants select investment options into which participants' investments are directed, including those investment options that are removed from

---

[27] Available at http://www.plansponsor.com/paring-down-providers-a-403b-sponsors-experience/?fullstory=true.

[28] Available at http://www.nacubo.org/Business_Officer_Magazine/Magazine_Archives/March_2010/Si ngle_Provider_Multiple_Choices.html.

[29] Available at http://www.plansponsor.com/vendor-consolidation-in-higher-education/?fullstory=true.

the Plan. These investments are designated by Vanderbilt University as available investment alternatives offered under the Plan.

105. Prior to April 2015, Defendants selected and retained approximately *340* investment options, which included mutual funds, insurance pooled separate accounts, and insurance company fixed and variable annuity products. The mutual fund options included *retail* share class mutual funds, despite the massive size of the Plan. These retail share class mutual funds are designed for small individual investors and are identical in every respect to institutional share class funds, except for much higher fees.

106. The Plan's investment options were offered by four separate recordkeepers to the Plan. These recordkeepers included Fidelity Investments Institutional Operations Company ("Fidelity"), the Vanguard Group, Inc. ("Vanguard"), Teachers Insurance and Annuity Association of America and College Retirement Equities Fund ("TIAA-CREF"), and the Variable Life Insurance Company ("VALIC"). With the exception of approximately six investments, all investments were proprietary investments of these four recordkeepers.

107. The Plan's TIAA-CREF investments consist of fixed and variable annuity products, an insurance separate account, and mutual funds. The Plan's CREF Stock Account, CREF Global Equities Account, CREF Equity Index Account, CREF Growth Account, CREF Social Choice Account, CREF Money Market Account, and CREF Bond Market Account are variable annuities, which invest in underlying securities for a given mandate. The value of each participant's

investment in the variable annuity changes over time based on investment experience and the expenses of the account.

108.    The TIAA Traditional Annuity offered in the Plan is a fixed annuity contract that returns a contractually specified minimum interest rate. Assets invested in the TIAA Traditional Annuity are held in the general account of TIAA and are dependent upon the claims-paying ability of TIAA. The TIAA Traditional Annuity has severe restrictions and penalties for withdrawal if participants wish to change their investments in the Plan.

109.    The TIAA Real Estate Account is an insurance company separate account maintained by TIAA. An insurance company separate account is a pooled investment vehicle that aggregates assets from more than one retirement plan for a given investment strategy, but those assets are segregated from the insurance company's general account assets.

110.    The remaining TIAA-CREF funds are mutual funds. The TIAA-CREF mutual funds charge varying amounts for investment management, but also charge distribution, marketing, and other expenses, depending on the type of investment and share class.

111.    The Vanguard and Fidelity investment options offered to Plan participants are exclusively mutual funds that charge varying amounts for investment management and other expenses, depending on the investment at issue and share class.

112.    VALIC issued a fixed and variable insurance annuity program to the Plan, referred to as the Portfolio Director, from which participants can direct their contributions among various fixed and variable account options. The value of each participant's investment in these variable accounts will change over time based on investment experience and expenses of the account. The variable accounts include insurance company pooled separate accounts that invest in underlying mutual funds advised by VALIC or other mutual fund companies, such as Vanguard. For these options, VALIC charges fees *in addition to* the expense ratio of the underlying mutual funds, which can reach *multiples* of the total fees charged by the mutual funds. For instance, VALIC charged 140 bps for the VALIC Vanguard Lifestrategy Conservative Growth Fund when the underlying Vanguard Lifestrategy Conservative Growth Fund (VSCGX) charged 15 bps, an increase of *over 833%*. See *infra* ¶144.

113.    The VALIC fixed accounts invest in the general account of VALIC and depend upon the claims-paying ability of VALIC. These options offer a fixed rate of return to participants.

114.    In April 2015, Defendants eliminated hundreds of mutual funds from the Plan and implemented a tiered structure comprised of a limited core set of 14 investment options.[30]

115.    Tier 1 consists of Vanguard target date mutual funds. Target date funds automatically rebalance their portfolios to become more conservative as the

_____

[30] The Plan's target date funds are counted as a single investment option.

participant gets closer to retirement. The "target date" refers to the participant's expected retirement date, and is often part of the name of the fund. For instance, "2030" target date funds are designed for individuals who intend to retire in the year 2030.

116.    Tier 2 includes only 12 mutual fund options among various asset classes and investment styles, and an insurance stable value option called the Principal Fixed Account.

117.    Tier 3 consists of a self-directed brokerage window.

118.    Despite this "tiered" structure, Defendants did not remove the TIAA-CREF and VALIC fixed and variable annuity options. These options are still included in the Plan, but are frozen to new participant contributions. The new Vanderbilt University Medical Center Plan does not offer TIAA-CREF or VALIC annuities among the core options.

## II.    Defendants improperly allowed TIAA-CREF to require the inclusion of its investment products in the Plan and improperly allowed TIAA to require it to provide recordkeeping for its proprietary options.

119.    ERISA requires fiduciaries to independently evaluate the prudence of each investment option offered in a defined contribution plan, *DiFelice*, 497 F.3d at 423, and to remove imprudent investments no matter how long they have been in a plan, *Tibble*, 135 S. Ct. at 1828–29.

120.    As noted, TIAA-CREF offered its products and services strictly on a bundled basis. If a plan offers the TIAA Traditional Annuity, TIAA-CREF required that the plan also offer its flagship CREF Stock Account and Money Market

55

Account, and to also use TIAA as recordkeeper for its proprietary products. By agreeing to TIAA's mandate that its recordkeeping services had to be linked to including its funds in the Plan, Defendants promoted TIAA's financial interests at the expense of participants and drove excessive and uncapped revenue to TIAA's recordkeeping arm for years.

121. By allowing the Plan to enter such a bundled arrangement with TIAA-CREF, Vanderbilt agreed to lock its employees into funds which Vanderbilt did not analyze. It can never be prudent to lock in a fund in a plan for the future no matter what its expenses or its performance. To do so creates a structure which at the outset, and on an ongoing basis, violates ERISA's requirement that fiduciaries must independently monitor investment options on an ongoing basis and remove those that are imprudent. *Tibble*, 135 S. Ct. at 1828–29. Defendants thus failed to discharge their duty to independently evaluate whether each investment option was prudent for the Plan; whether the use of TIAA as a plan recordkeeper was prudent, reasonably priced, and in the exclusive interest of participants; and whether it was prudent to include and retain the CREF Stock and Money Market accounts and the TIAA Traditional in the Plan. Instead of acting solely in the interest of participants, Defendants allowed TIAA's financial interest to dictate the Plan's investment selections and recordkeeping arrangement. Because Defendants allowed CREF Stock to be locked into the Plan, Defendants could not satisfy their duty to evaluate the option for inclusion and retention in the Plan, whether it was prudent at the time of inclusion and whether it should be removed if imprudent. As a result of Defendants'

breach in allowing CREF Stock to be retained in the Plan because TIAA-CREF demanded it and not based on an independent and ongoing assessment of the merits of the option, the Plan suffered massive losses compared to prudent alternatives, as discussed in more detail below. *See infra* ¶¶189–211.

122.   As noted above, the Plan offers the TIAA Traditional Annuity. This option is a fixed annuity contract that returns a contractually specified minimum interest rate. An example of the restrictions and penalties for withdrawal imposed by this Annuity include a 2.5% surrender charge if a participant withdraws his or her investment in a single lump sum within 120 days of termination of employment. Participants who wish to withdraw their savings without this 2.5% penalty can only do so by spreading their withdrawal over a *ten-year period*.

123.   The Plan includes TIAA-CREF's proprietary funds, including the CREF Stock Account, CREF Global Equities Account, CREF Equity Index Account, CREF Growth Account, CREF Social Choice Account, CREF Money Market Account, CREF Inflation-Linked Bond Account, and CREF Bond Market Account, which are variable annuities with four layers of expenses that invest in underlying securities for a given investment style.

124.   The expense ratio of the CREF variable annuity accounts is made up of multiple layers of expense charges consisting of the following:

      a.   "administrative expense" charge (24 bps);[31]

      b.   "distribution expense" charge (9.5 bps);

---

[31] Expenses are stated as of May 1, 2014.

    c.   "mortality and expense risk" charge (0.5 bps); and

    d.   "investment advisory expense" charge (ranging from 4 to 12.5 bps).

125.   Two of these four layers of fees charged on the CREF variable annuity accounts, including the CREF Stock Account, are unreasonable for the actual services provided by TIAA-CREF to the Plan's participants, and the other two layers of fees pay for services that provide *no* benefit to the Plan's participants.

    **a.  Administrative expenses (or recordkeeping fees):** The administrative fee assessed on each variable annuity option is charged as a percentage of assets, rather than a flat fee per participant. As described above, recordkeeping costs depend on the number of participant accounts that the recordkeeper will service in the plan rather than the size of assets because a higher account balance costs no more to track than a lower account balance. As a result, as the growth in the Plan's assets outpaced the growth in participants, the fees paid to TIAA-CREF likewise increased even though the services provided did not increase at the same rate, resulting in further unreasonable compensation.

    **b.  Distribution expenses (or 12b-1 fees):** Distribution expenses are charged for services performed for marketing and advertising of the fund to potential investors. However, in a retirement plan, the funds are selected by the sponsor. Thus, marketing and distribution services provide no benefit to plan participants and are wholly unnecessary. Being charged

for such wholly useless expenses causes a loss of retirement assets to participants with no benefit.

**c. Mortality and expense risk charges:** Some annuity or insurance providers charge mortality and expense risk charges to compensate the insurance company for the risk it assumes when providing periodic income or payments to the investor over her lifetime, which will vary depending on the value of the underlying investments. However, in the CREF variable annuities in the Plan, the participant does not make the choice of whether to take the account's value in a lump sum or an annuity until retirement. Thus, this charge only benefits a participant if she elects at the time of retirement to annuitize her holdings in the account to provide for periodic income. Prior to annuitizing her account, the participant derives no benefit for paying such a charge, year after year, and TIAA-CREF provides no actual services or incurs any risk to justify the fee until a decision is made at retirement to convert the value of the lump sum to an annuity. Moreover, most participants in retirement plans recordkept by TIAA-CREF do not elect to annuitize their holdings in their variable annuity accounts upon retirement. Yet, *all* participants pay these fees for many years regardless of whether they annuitize their variable annuity account.

**d. Investment advisory expense charge (or investment management fees):** It is a fundamentally established principle of

investment management that larger asset size enables the asset holder to obtain lower investment management fees as a percentage of assets. Fund managers institute breakpoints, whereby the investment management fee is reduced, as asset size goes up, at pre-specified asset thresholds to pass along economies of scale to the investor. For example, if $5 million is a breakpoint, one fee, based on a percentage of assets, will be charged on the first $5 million, and a lesser percentage will be charged on the next portion of the assets, or on all assets. A large investor will therefore be charged a lower fee, on a percentage of assets, than a smaller investor to recognize the economies of scale generated from the higher asset levels. Jumbo plans, such as the Vanderbilt Plan, can command extremely low fees. Despite this recognized principle, TIAA-CREF has not instituted *any* breakpoints whatsoever on its investment management fees to pass along economies of scale experienced by jumbo plan investors. The Plan's fiduciaries did not obtain the lower investment management fees that come with the Plan's enormous asset size. As a result, the Plan, with billions of dollars invested in CREF variable annuities, pay the same asset-based fee as the smallest clients with a tiny fraction of their total assets, resulting in a windfall to TIAA-CREF and excessive fees paid by Vanderbilt's employees and retirees. The Plan subsidized these efforts for years, often at a loss—compounding their conflict and breaching their duty to participants under ERISA.

126. The excessiveness of this investment management fee is even more egregious because of the way critics have documented how CREF "manages" the CREF Stock Account by investing nearly two out of every three dollars in companies held by its benchmark index, the Russell 3000 Index. *See supra* ¶81.

127. The TIAA Real Estate Account is an insurance company separate account maintained by TIAA. Similar to the CREF variable annuity accounts, the expense ratio of the TIAA Real Estate Account is made up of the same four layers of excessive expenses detailed above, and even adds a fifth layer for a so-called "liquidity guarantee." As of May 1, 2013, these charges consisted of the following:

    a. "administrative expense" charge (26.5 bps);

    b. "distribution expense" charge (8 bps);

    c. "mortality and expense risk" charge (0.5 bps);

    d. "liquidity guarantee" (18 bps); and

    e. "investment management expense" charge (36.5 bps).

128. The 18 bps "liquidity guarantee" expense of the TIAA Real Estate Account is yet another excessive fee that is not charged by better performing and lower cost mutual funds such as the Vanguard REIT Index (Inst), which has a *total* expense ratio of 8 bps. *See infra* ¶¶214–215.

129. As noted, the TIAA-CREF mutual funds in the Plan charge varying amounts for investment management, but also charge distribution, marketing, and other expenses, depending on the type of investment and share class. Thus, Vanderbilt Plan participants are paying for marketing costs of funds which their

employer has placed in their retirement plan when such marketing costs provide no benefit to them. Other mutual funds that were available to the Plan do not include such marketing costs.

## III. Defendants caused the Plan to pay excessive administrative and recordkeeping fees.

130. As set forth above, the market for defined contribution recordkeeping services is highly competitive. There are numerous recordkeepers in the marketplace who are equally capable of providing a high level of service to large defined contribution plans like the Plan and will readily respond to a request for proposal. These recordkeepers primarily differentiate themselves based on price and vigorously compete for business by offering the best price.

131. Because market rates for recordkeeping services have declined in recent years and because the only way to reliably determine the true market rate for a complex jumbo plan is to obtain an actual fee quote comparison, prudent fiduciaries of jumbo defined contribution plans put their plans' recordkeeping and administrative services out for competitive bidding at regular intervals of approximately three years.

132. As detailed above, extensive industry literature and the experience of similarly situated fiduciaries has shown that multiple recordkeeper platforms are inefficient and result in excessive fees, while the use of a single recordkeeper offers many benefits such as leveraging the plan's participant base to obtain economies of scale to ensure that participants pay only reasonable recordkeeping fees, while also simplifying personnel and payroll data feeds, reducing electronic fund transfers, and

avoiding duplication of services when more than one recordkeeper is used. Instead of leveraging the size of the participant base to take advantage of economies of scale, using multiple recordkeepers eliminates a plan's leverage. Rather than obtaining pricing based on a 40,000-participant plan from one recordkeeper, Defendants spread recordkeeping of participants among *four* recordkeepers, who pushed each of their own products on the Plan. This took away the Plan's ability to obtain favorable pricing and resulted in the Plan including hundreds of investment options that Defendants never reviewed.

133.    Despite the long-recognized benefits of a single recordkeeper for a defined contribution plan, Defendants continued to contract with *four* separate recordkeepers for the Plan for many years (TIAA-CREF, Fidelity, Vanguard, and VALIC). This inefficient and costly structure caused the Plan to pay excessive and unreasonable administrative and investment fees.

134.    Only in April 2015 did Defendants consolidate the Plan's recordkeeping and administrative services to a single primary service provider (Fidelity). There was no loyal or prudent reason that Defendants failed to engage in such process long before April 2015, and before 2009. TIAA-CREF and VALIC continue to provide recordkeeping services for the TIAA-CREF and VALIC annuities. Even after the recordkeeping change, the Plan continues to pay unreasonable recordkeeping and administrative fees. The new Vanderbilt University Medical Center has only a single primary service provider (Fidelity).

135.    The Plan's *four* recordkeepers prior to April 2015 (TIAA-CREF, Fidelity, Vanguard, and VALIC) received compensation for providing recordkeeping services through per-participant fees and/or revenue sharing payments from the Plan's investments.

136.    Prior to April 2015, Fidelity was compensated based on revenue sharing payments from the Fidelity mutual fund investment options. Fidelity received between 20 and 35 bps on actively managed Fidelity mutual funds provided in the Plan. Similarly, Vanguard was compensated based on internal revenue sharing it received from the Vanguard Investor share class mutual funds for recordkeeping services, a higher priced share class than institutional rates readily available to a jumbo plan such as the Plan.

137.    Because VALIC continues to recordkeep the VALIC annuity options, VALIC was paid and continues to be paid uncapped and undisclosed revenue sharing payments from the VALIC annuity options that were closed to new participant contributions in April 2015.

138.    Upon information and belief and industry experts, the amount of revenue sharing kicked back to the TIAA-CREF recordkeeping entity for the Plan's TIAA-CREF investments is set forth below.

| TIAA-CREF Investment | Revenue Share |
|---|---|
| CREF variable annuity contracts | 24 bps |
| Premier share class of TIAA-CREF mutual funds | 15 bps |
| Retirement share class of TIAA-CREF mutual funds | 25 bps |

| TIAA-CREF Investment | Revenue Share |
|---|---|
| TIAA Real Estate Account | 24–26.5 bps |
| TIAA Traditional Annuity | 15 bps |

139.    Because the TIAA-CREF annuities were not formally removed from the Plan but merely closed to new participant contributions, TIAA-CREF still receives uncapped revenue sharing from the CREF variable annuity contracts and the TIAA Traditional Annuity.

140.    In addition, the Plan's recordkeepers receive additional indirect compensation, including float, revenue derived from securities lending, distribution fees, mortality and expense charges, surrender charges, spread, and redemption fees.

141.    Effective April 2015, Defendants negotiated a $32 per participant recordkeeping fee with Fidelity for recordkeeping and administrative services. Upon information and belief, in addition to this per-participant fee, Fidelity also receives revenue sharing from one or more investment options provided to Plan participants. Despite this new arrangement with Fidelity, the Plan continues to pay additional and excessive amounts of uncapped revenue sharing to TIAA-CREF and VALIC for the annuity products that is not rebated back to the Plan for recordkeeping services.

142.    Based on the Plan's features, the nature of the administrative services provided by the Plan's recordkeepers, the Plan's participant level (roughly 40,000), and the recordkeeping market, the outside limit of a reasonable recordkeeping fee for the Plan would have been a fixed $1.2 to $1.3 million (or $30 per participant with an account balance).

65

143.    Based on schedules regarding service provider compensation in the Plan's Forms 5500 filed with the Department of Labor, and upon information regarding the rate of internal revenue share allocated to Vanguard, TIAA-CREF and Fidelity for recordkeeping services, the Plan paid at least $4.1 to $6 million (approximately $100 to $145 per participant) per year from 2010 to 2014, over *383%* higher than a reasonable fee for these services, resulting in millions of dollars in excessive recordkeeping fees each year.

144.    The Plan continues to pay excessive fees for recordkeeping services based on the combination of a fixed fee and revenue sharing paid to Fidelity, VALIC, and TIAA-CREF.

145.    This is a *very* conservative total because this amount excludes asset-based revenue sharing payments VALIC received for recordkeeping and administrative services on over $250 million invested in VALIC variable and fixed accounts. This information was not disclosed to Plan participants. These asset-based payments are substantial. For instance, on each of the variable accounts, VALIC charged fees *66% to 833%* higher than the fees actually charged by the underlying mutual funds, and received additional compensation through revenue sharing payments from the underlying proprietary mutual funds and other third-party mutual funds. Based on information presently available to Plaintiffs, as of 2014, the amounts charged by VALIC on its variable annuity products and the expenses of the underlying mutual funds are set forth below.

| VALIC Variable Annuity | Plan Fee | Underlying Mutual Fund | Underlying Mutual Fund Fee | Percentage Added by VALIC Above Mutual Fund Fee |
|---|---|---|---|---|
| VALIC Dividend Value | 182 bps | VALIC Company I Dividend Value Fund (VCIGX) | 82 bps | 121.95% |
| VALIC American Beacon Holland Large Cap Growth | 227 bps | American Beacon Holland Large Cap Growth Fund (Inv) (LHGFX) | 121 bps | 87.60% |
| VALIC Mid Cap Value | 180 bps | VALIC Company II Mid Cap Value Fund (VMCVX) | 105 bps | 71.43% |
| VALIC Ariel Appreciation | 213 bps | Ariel Appreciation Fund (Inv) (CAAPX) | 112 bps | 90.18% |
| VALIC Ariel Fund | 203 bps | Ariel Fund (Inv) (ARGFX) | 103 bps | 97.09% |
| VALIC Asset Allocation | 171 bps | VALIC Company I Asset Allocation Fund (VCAAX) | 69 bps | 147.83% |
| VALIC Blue Chip Growth | 183 bps | VALIC Company I Blue Chip Growth Fund (VCBCX) | 84 bps | 117.86% |
| VALIC Broad Cap Value Income | 185 bps | VALIC Company I Broad Cap Value Income Fund (VBCVX) | 85 bps | 117.65% |

| VALIC Variable Annuity | Plan Fee | Underlying Mutual Fund | Underlying Mutual Fund Fee | Percentage Added by VALIC Above Mutual Fund Fee |
|---|---|---|---|---|
| VALIC Capital Conservation | 164 bps | VALIC Company I Capital Conservation Fund (VCCCX) | 64 bps | 156.25% |
| VALIC Core Equity | 180 bps | VALIC Company I Core Equity Fund (VCCEX) | 80 bps | 125.00% |
| VALIC Emerging Economies | 195 bps | VALIC Company I Emerging Economies Fund (VCGEX) | 95 bps | 105.26% |
| VALIC Foreign Value | 180 bps | VALIC Company I Foreign Value Fund (VCFVX) | 80 bps | 125.00% |
| VALIC Global Social Awareness | 164 bps | VALIC Company I Global Social Awareness Fund (VCSOX) | 64 bps | 156.25% |
| VALIC Global Strategy | 164 bps | VALIC Company I Global Strategy Fund (VGLSX) | 64 bps | 156.25% |
| VALIC Government Securities | 165 bps | VALIC Company I Government Securities Fund (VCGSX) | 65 bps | 153.85% |
| VALIC Growth | 181 bps | VALIC Company I Growth Fund (VCULX) | 81 bps | 123.46% |

Case 3:16-cv-02086   Document 38   Filed 12/12/16   Page 68 of 160 PageID #: 698

| VALIC Variable Annuity | Plan Fee | Underlying Mutual Fund | Underlying Mutual Fund Fee | Percentage Added by VALIC Above Mutual Fund Fee |
|---|---|---|---|---|
| VALIC Growth & Income | 185 bps | VALIC Company I Growth & Income Fund (VCGAX) | 85 bps | 117.65% |
| VALIC Health Sciences | 211 bps | VALIC Company I Health Sciences Fund (VCHSX) | 111 bps | 90.09% |
| VALIC Inflation Protected | 159 bps | VALIC Company I Inflation Protected Fund (VCTPX) | 59 bps | 169.49% |
| VALIC International Equities Index | 146 bps | VALIC Company I International Equities Index Fund (VCIEX) | 46 bps | 217.39% |
| VALIC International Government Bond | 165 bps | VALIC Company I International Government Bond Fund (VCIFX) | 65 bps | 153.85% |
| VALIC International Growth | 201 bps | VALIC Company I International Growth Fund (VCINX) | 101 bps | 99.01% |
| VALIC Large Cap Core | 184 bps | VALIC Company I Large Cap Core Fund (VLCCX) | 83 bps | 121.69% |

| VALIC Variable Annuity | Plan Fee | Underlying Mutual Fund | Underlying Mutual Fund Fee | Percentage Added by VALIC Above Mutual Fund Fee |
|---|---|---|---|---|
| VALIC Large Capital Growth | 176 bps | VALIC Company I Large Capital Growth Fund (VLCGX) | 76 bps | 131.58% |
| VALIC Mid Cap Index | 136 bps | VALIC Company I Mid Cap Index Fund (VMIDX) | 36 bps | 277.78% |
| VALIC Mid Cap Strategic Growth | 182 bps | VALIC Company I Mid Cap Strategic Growth Fund (VMSGX) | 81 bps | 124.69% |
| VALIC Money Market I | 151 bps | VALIC Company I Money Market I Fund (VCIXX) | 51 bps | 196.08% |
| VALIC NASDAQ-100 Index | 153 bps | VALIC Company I NASDAQ-100 Index Fund (VCNIX) | 53 bps | 188.68% |
| VALIC Science & Technology | 199 bps | VALIC Company I Science & Technology Fund (VCSTX) | 98 bps | 103.06% |
| VALIC Small Cap | 193 bps | VALIC Company I Small Cap Fund (VCSMX) | 93 bps | 107.53% |

| VALIC Variable Annuity | Plan Fee | Underlying Mutual Fund | Underlying Mutual Fund Fee | Percentage Added by VALIC Above Mutual Fund Fee |
|---|---|---|---|---|
| VALIC Small Cap Aggressive Growth | 199 bps | VALIC Company I Small Cap Aggressive Growth Fund (VSAGX) | 99 bps | 101.01% |
| VALIC Small Cap Index | 140 bps | VALIC Company I Small Cap Index Fund (VCSLX) | 40 bps | 250.00% |
| VALIC Small Cap Special Value | 188 bps | VALIC Company I Small Cap Special Value Fund (VSSVX) | 88 bps | 113.64% |
| VALIC Small-Mid Growth | 200 bps | VALIC Company I Small-Mid Growth Fund (VSSGX) | 100 bps | 100.00% |
| VALIC Stock Index | 135 bps | VALIC Company I Stock Index Fund (VSTIX) | 35 bps | 285.71% |
| VALIC Value | 185 bps | VALIC Company I Value Fund (VAVAX) | 85 bps | 117.65% |
| VALIC Aggressive Growth Lifestyle | 163 bps | VALIC Company II Aggressive Growth Lifestyle Fund (VAGLX) | 86 bps | 89.53% |

Case 3:16-cv-02086  Document 38  Filed 12/12/16  Page 71 of 160 PageID #: 701

| VALIC Variable Annuity | Plan Fee | Underlying Mutual Fund | Underlying Mutual Fund Fee | Percentage Added by VALIC Above Mutual Fund Fee |
|---|---|---|---|---|
| VALIC Capital Appreciation | 160 bps | VALIC Company II Capital Appreciation Fund (VCCAX) | 84 bps | 90.48% |
| VALIC Conservative Growth Lifestyle | 163 bps | VALIC Company II Conservative Growth Lifestyle Fund (VCGLX) | 87 bps | 87.36% |
| VALIC Core Bond | 152 bps | VALIC Company II Core Bond Fund (VCCBX) | 77 bps | 97.40% |
| VALIC High Yield Bond | 171 bps | VALIC Company II High Yield Bond Fund (VCHYX) | 96 bps | 78.13% |
| VALIC International Opportunities | 175 bps | VALIC Company II International Opportunities Fund (VISEX) | 100 bps | 75.00% |
| VALIC Large Cap Value | 156 bps | VALIC Company II Large Cap Value Fund (VACVX) | 80 bps | 95.00% |
| VALIC Mid Cap Growth | 160 bps | VALIC Company II Mid Cap Growth Fund (VAMGX) | 84 bps | 90.48% |

Case 3:16-cv-02086   Document 38   Filed 12/12/16   Page 72 of 160 PageID #: 702

| VALIC Variable Annuity | Plan Fee | Underlying Mutual Fund | Underlying Mutual Fund Fee | Percentage Added by VALIC Above Mutual Fund Fee |
|---|---|---|---|---|
| VALIC Moderate Growth Lifestyle | 162 bps | VALIC Company II Moderate Growth Lifestyle Fund (VMGLX) | 85 bps | 90.59% |
| VALIC Money Market II | 130 bps | VALIC Company II Money Market II Fund (VIIXX) | 55 bps | 136.36% |
| VALIC Small Cap Growth | 191 bps | VALIC Company II Small Cap Growth Fund (VASMX) | 115 bps | 66.09% |
| VALIC Small Cap Value | 170 bps | VALIC Company II Small Cap Value Fund (VCSVX) | 94 bps | 80.85% |
| VALIC Socially Responsible | 131 bps | VALIC Company II Socially Responsible Fund (VCSRX) | 56 bps | 133.93% |
| VALIC Strategic Bond | 164 bps | VALIC Company II Strategic Bond Fund (VCSBX) | 88 bps | 86.36% |
| VALIC SunAmerica 2020 High Watermark | 223 bps | SunAmerica 2020 High Watermark Fund (I) | 89 bps | 150.56% |

Case 3:16-cv-02086   Document 38   Filed 12/12/16   Page 73 of 160 PageID #: 703

| VALIC Variable Annuity | Plan Fee | Underlying Mutual Fund | Underlying Mutual Fund Fee | Percentage Added by VALIC Above Mutual Fund Fee |
|---|---|---|---|---|
| VALIC Vanguard LifeStrategy Conservative Growth | 140 bps | Vanguard LifeStrategy Conservative Growth Fund (Inv) (VSCGX) | 15 bps | 833.33% |
| VALIC Vanguard LifeStrategy Growth | 142 bps | Vanguard LifeStrategy Growth Fund (Inv) (VASGX) | 17 bps | 735.29% |
| VALIC Vanguard LifeStrategy Moderate Growth | 141 bps | Vanguard LifeStrategy Moderate Growth Fund (Inv) (VSMGX) | 16 bps | 781.25% |
| VALIC Vanguard Long-Term Investment-Grade | 122 bps | Vanguard Long-Term Investment-Grade Fund (Inv) (VWESX) | 22 bps | 454.55% |
| VALIC Vanguard Long-Term Treasury | 120 bps | Vanguard Long-Term Treasury Fund (Inv) (VUSTX) | 20 bps | 500.00% |
| VALIC Vanguard Wellington | 151 bps | Vanguard Wellington Fund (Inv) (VWELX) | 26 bps | 480.77% |
| VALIC Vanguard Windsor II | 161 bps | Vanguard Windsor II Fund (Inv) (VWNFX) | 36 bps | 347.22% |

146.    Aside from the failures to monitor the amount of revenue sharing

payments and to solicit competitive bids, Defendants also failed to adequately

negotiate rebates of excessive fee payments to TIAA-CREF, Fidelity, VALIC, and Vanguard. As a specific example, because the multi-billion dollar plans paid the same percentage of asset-based fees as much smaller plans that used TIAA-CREF's products and services, Defendants could have demanded "plan pricing" rebates from TIAA-CREF based on the Plan's economies of scale. Just as with investment management fees, the Plan's size would have enabled Defendants to command a much lower fee. Defendants could have also demanded and obtained similar rebates of all excessive fee payments from Vanguard, VALIC, and Fidelity. Had Defendants adequately negotiated for these rebates, the Plan's recordkeeping fees would have been reduced, avoiding additional losses of retirement savings.

147.    The impact of excessive fees on employees' and retirees' retirement assets is dramatic. The U.S. Department of Labor has noted that a 1% higher level of fees over a 35-year period makes a 28% difference in retirement assets at the end of a participant's career. U.S. Dep't of Labor, *A Look at 401(k) Plan Fees,* at 1–2 (Aug. 2013).[32]

148.    Defendants also failed to control recordkeeping costs as Plan assets grew. From the beginning of 2009 to the end of 2014, the Plan's assets increased from $1.6 billion to over $3.4 billion, an increase of *113 percent.* Because revenue sharing payments are asset-based, the already excessive compensation paid to the Plan's recordkeepers became even more excessive as the Plan's assets grew, even though the administrative services provided to the Plan remained the same.

---

[32] Available at http://www.dol.gov/ebsa/pdf/401kfeesemployee.pdf.

Defendants could have capped the amount of revenue sharing to ensure that any excessive amounts were returned to the Plan as other plans do, but failed to do so.

149. Upon information and belief, Defendants also failed to conduct a competitive bidding process for the Plan's recordkeeping services. A competitive bidding process for the Plan's recordkeeping services would have produced a reasonable recordkeeping fee for the Plan. This competitive bidding process would have enabled Defendants to select a recordkeeper charging reasonable fees, to negotiate a reduction in recordkeeping fees, and to rebate any excess expenses paid by participants for recordkeeping services.

150. Defendants failed to prudently monitor and control the compensation paid for recordkeeping and administrative services, particularly the asset-based revenue sharing received by the Plan's recordkeepers, and therefore caused the Plan participants to pay unreasonable expenses for administering the Plan.

151. Had Defendants monitored the compensation paid to the Plan's recordkeepers and ensured that participants were only charged reasonable fees for administrative and recordkeeping services, Plan participants would not have lost in excess of $25 million of their retirement savings through unreasonable recordkeeping fees.[33]

---

[33] Plan losses have been brought forward to the present value using the investment returns of the S&P 500 index to compensate participants who have not been reimbursed for their losses. This is because the excessive fees participants paid would have remained in Plan investments growing with the market.

**IV. Defendants have admitted that the prior Plan structure was imprudent, that "high fees were hidden," and that the 350-plus investment options were "overwhelming" for participants.**

152.    In December 2014, Defendants explicitly recognized having more than 350 investment options in the Plan was "overwhelming" to Plan participants. Defendants admitted that in the previous plan structure, "high fees were hidden in the returns of the investment." Specifically, in the December 2014 Meeting Minutes of the 2014 Staff Advisory Council, Vanderbilt stated:

> We currently have **350+ investment options**. **This is overwhelming for some people** and they end up doing the default option without doing more. Our consultant's, Hewitt, study said that as the number of options increases, participation decreases. We need to simplify the program.
>
> **Previously high fees were hidden in the returns of the investment.** Administrative fees were charged as a portion of your account and they were included in the fund expense ratio. Going forward, administrative fee [sic] are fixed $32/year. This will be visible on the statement.
> *Vanderbilt's perspective*: concerns about regulations and increased scrutiny by federal agencies, **complicated to monitor 350+ options with multiple administrative vendors** (makes regulatory compliance difficult), **and a single administrator is a best practice.**[34]

153.    Moreover, Defendants expressly recognized that the Plan's multiple recordkeeper structure and *hundreds* of investment options caused the Plan to pay unreasonable recordkeeping and investment fees. When describing the April 2015 Plan changes, Vanderbilt stated:

> **Reduced expenses**
> Vanderbilt's consolidated administration platform and new investment options were selected to be **cost effective**. Therefore, **the expenses and fees associated with investing in the 403(b) Plan will be**

---

[34] Vanderbilt University, Staff Advisory Council Meeting Minutes, December 9, 2014 (emphasis added), available at http://www.vanderbilt.edu/usac/documents/December_2014_Minutes_DRAFT.pdf.

**considerably lower for participants. Lower fees and expenses
can increase the return on your investment**. A separate notice
will be provided in February regarding the expenses and fees
associated with the 403(b) Plan.[35]

154.    A Vanderbilt newsletter informed participants that the Plan changes

would "save you and your colleagues nearly *$2 million in fees* each year."[36]

(emphasis added).

155.    A description of the fiduciary process conducted by Defendants in the

selection of the recent 2015 investment lineup demonstrates Defendants' previous

failures to act solely in the interest of Plan participants when making investment

decisions. In an article titled "New Retirement Plan Structure Offers Best-in-Class

Funds Independent of Administrative Services Provider,"[37] Vanderbilt's Senior

Director of Compensation and Benefits noted, in relevant part:

> Our new plan structure separates the funds offered in our core
> investment lineup from the administrative services provider. **We can
> choose the funds and provider we think meet employees' needs
> based on their own merits ...** This means that we aren't tied to
> offering funds managed only by the company providing administrative
> services for the plan. **We can choose the funds that we feel are
> best in different asset classes, no matter which company
> manages them.**

---

[35] Vanderbilt University 403(b) Retirement Plan Transition Guide (emphasis
added), available at https://workplacecontent.fidelity.com/bin-
public/070_NB_PreLogin_Pages/documents/Vanderbilt_Transition_Guide.pdf.

[36] Vanderbilt University Medical Center Reporter, *Retirement Plan Updates
Make Saving Easier in 2015* (Dec. 4, 2014), available at
https://news.vanderbilt.edu/2014/12/04/retirement-plan-updates-make-saving-
easier-for-vu-employees/

[37] Vanderbilt News, *New Retirement Plan Structure Offers Best-in-Class Funds
Independent of Administrative Services Provider* (Feb. 20, 2015), available at
http://news.vanderbilt.edu/2015/02/new-structure-offers-best-in-class-funds/.

**The funds we selected are the ones we felt had the strongest performance, managers and stability, as well as the most competitive management expenses ... We didn't limit ourselves to funds offered by one or two companies**. We wanted to offer different types of funds, including small-, mid- and large-cap; international; and bonds, so participants could build a diverse portfolio from a manageable set of options. That's why you see funds managed by several companies in the core lineup.

(emphasis added).

156. Not until April 2015 was the monitoring of Plan investment options a claimed "top priority" for the Plan.[38] For the first time, apparently since the Plan's inception, Defendants set as a standard that they would evaluate investment options based on specific quantitative and qualitative factors, as prudent investment managers do:

In selecting core lineup funds, the committee considered several characteristics for each one, including:
- Expense ratio, or the measure of what it costs for an investment company to run a fund relative to the total value of its assets;
- Performance, including the average rate of return of the fund over time;
- The management team's experience and track record in selecting the stocks or other assets within a fund; and
- Size and stability.[39]

157. Had Defendants conducted a prudent analysis of the Plan's administrative services and investment options by 2009 or earlier, Plan participants

---

[38] Vanderbilt News, *Retirement Plan Fund Selectin and Monitoring is Top Priority* (Mar. 6, 2015), available at http://news.vanderbilt.edu/2015/03/vanderbilt-retirement-plan-fund-selection-and-monitoring-is-top-priority-of-retirement-plan-oversight-committee/.

[39] *Id.*

would have avoided paying millions of dollars in unreasonable investment and administrative fees, and avoided millions of dollars in performance losses.

## V. Defendants caused the Plan to pay wholly unnecessary and excessive fees by using higher-cost share classes of mutual funds instead of identical versions of the same funds in lower-cost share classes.

158. Jumbo retirement plans have massive bargaining power to negotiate low fees for investment management services. If a plan invests in mutual funds, fiduciaries must review and consider the available share classes. Because the only difference between the various share classes is fees, selecting a higher-cost share class results in the plan paying wholly unnecessary fees. Accordingly, absent some compelling reason to opt for the higher-cost version, prudent fiduciaries will select the lowest-cost share class available to the plan. As a prominent legal counsel to defined contribution fiduciaries explained:

> The fiduciaries also must consider the size and purchasing power of their plan and select the share classes (or alternative investments) that a fiduciary who is knowledgeable about such matters would select under the circumstances. In other words, the "prevailing circumstances"—such as the size of the plan—are a part of a prudent decisionmaking process. The failure to understand the concepts and to know about the alternatives could be a costly fiduciary breach.

Fred Reish, *Class-ifying Mutual Funds*, PLANSPONSOR (Jan. 2011).[40]

159. Given that defined contribution plan fiduciaries are held to the standard of a knowledgeable financial expert, a fiduciary should know the basic

---

[40] Available at http://www.plansponsor.com/MagazineArticle.aspx?id=6442476537.

principle that asset size matters, and must review a fund's prospectus to determine if a lower-cost chare class of the same fund is available, to avoid saddling the plan with unnecessary fees.

160.    Jumbo investors like the Plan can obtain share classes with far lower costs than retail mutual fund shares. In addition, insurance company pooled separate accounts are available that can significantly reduce investment fees charged on mutual fund investments in defined contribution plans.

161.    Moreover, lower-cost share classes of mutual fund investment options were readily available to the Plan. Institutional share classes sometimes have a minimum investment threshold to qualify for the institutional rate. However,

> For large 401(k) plans with over a billion dollars in total assets ... mutual funds will often waive an investment minimum for institutional share classes. It is also common for investment advisors representing large 401(k) plans to call mutual funds and request waivers of the investment minimums so as to secure the institutional shares.

*Tibble v. Edison Int'l*, No. 07-5359, 2010 U.S. Dist. LEXIS 69119, at *27–28 (C.D. Cal. July 8, 2010), *aff'd* 729 F.3d 1110 (9th Cir. 2013).

162.    In fact, Vanguard expressly states in its SEC filings that it "reserves the right to establish higher or lower minimum amounts for certain investors", including when the "plan sponsor's aggregate assets within the Vanguard Funds will likely generate substantial economies in the servicing of their accounts."[41]

---

[41] *See* Vanguard Funds Multiple Class Plan, available at https://www.sec.gov/Archives/edgar/data/1409957/000093247113007109/multipleclassplanvanguardfun.pdf.

163.    As further support of the routine waiver of investment minimums for large institutional investors, fiduciaries of other defined contribution plans have successfully negotiated on behalf of their plans less expensive institutional share classes of Vanguard, TIAA-CREF, Fidelity, and VALIC mutual fund options despite not meeting the minimum investment thresholds.

164.    Therefore, Defendants knew or should have known that investment providers would have allowed the Plan to provide lower-cost share classes to participants if Defendants had asked.

165.    Defendants selected and continue to retain Plan investment options with far higher costs than were and are available for the Plan based on its size. This includes Defendants selecting and continuing to offer far higher-cost share classes even though lower-cost share classes of the *exact same mutual funds* were available. The following table sets forth each higher-cost mutual fund share class that was included in the Plan during the proposed class period for which a significantly lower-cost, but otherwise identical, share class of the same mutual fund was available. The expense ratios identified for the Plan's investment option and the lower-cost share class alternative are based on the earliest date during the proposed class period that the higher-cost fund was included in the Plan.

| Plan Mutual Fund | Plan Fee | Identical Lower-Cost Mutual Fund | Identical Lower-Cost Mutual Fund Fee | Plan's Excess Cost |
|---|---|---|---|---|
| Aberdeen US Equity I (IS) (GXXIX) | 96 bps | Aberdeen US Equity I (Inst) (GGLIX) | 90 bps | 6.67% |
| Alger Mid Cap Growth (I) (ALMRX) | 117 bps | Alger Mid Cap Growth (I-2) (AMGOX) | 98 bps | 19.39% |
| Fidelity Balanced (FBALX) | 68 bps | Fidelity Balanced (K) (FBAKX) | 50 bps | 36.00% |
| Fidelity Blue Chip Growth (FBGRX) | 76 bps | Fidelity Blue Chip Growth (K) (FBGKX) | 52 bps | 46.15% |
| Fidelity Capital Appreciation (FDCAX) | 78 bps | Fidelity Capital Appreciation (K) (FCAKX) | 54 bps | 44.44% |
| Fidelity China Region (FHKCX) | 98 bps | Fidelity Advisor China Region (I) (FHKIX) | 93 bps | 5.38% |
| Fidelity Conservative Income Bond (FCONX) | 40 bps | Fidelity Conservative Income Bond (Inst) (FCNVX) | 30 bps | 33.33% |
| Fidelity Contrafund (FCNTX) | 101 bps | Fidelity Contrafund (K) (FCNKX) | 85 bps | 18.82% |
| Fidelity Disciplined Equity (FDEQX) | 83 bps | Fidelity Disciplined Equity (K) (FDEKX) | 60 bps | 38.33% |
| Fidelity Diversified International (FDIVX) | 99 bps | Fidelity Diversified International (K) (FDIKX) | 76 bps | 30.26% |
| Fidelity Dividend Growth (FDGFX) | 62 bps | Fidelity Dividend Growth (K) (FDGKX) | 39 bps | 58.97% |

| Plan Mutual Fund | Plan Fee | Identical Lower-Cost Mutual Fund | Identical Lower-Cost Mutual Fund Fee | Plan's Excess Cost |
|---|---|---|---|---|
| Fidelity Emerging Europe, Middle East, Africa (EMEA) (FEMEX) | 125 bps | Fidelity Emerging Europe, Middle East, Africa (EMEA) (I) (FIEMX) | 119 bps | 5.04% |
| Fidelity Emerging Markets (FEMKX) | 110 bps | Fidelity Emerging Markets (K) (FKEMX) | 84 bps | 30.95% |
| Fidelity Equity Income II (FEQTX) | 74 bps | Fidelity Equity Income II (K) (FETKX) | 56 bps | 32.14% |
| Fidelity Equity-Income (FEQIX) | 71 bps | Fidelity Equity-Income (K) (FEIKX) | 53 bps | 33.96% |
| Fidelity Export & Multinational (FEXPX) | 91 bps | Fidelity Export & Multinational (K) (FEXKX) | 67 bps | 35.82% |
| Fidelity Freedom 2000 (FFFBX) | 51 bps | Fidelity Freedom 2000 (K) (FFKBX) | 43 bps | 18.60% |
| Fidelity Freedom 2005 (FFFVX) | 64 bps | Fidelity Freedom 2005 (K) (FFKVX) | 52 bps | 23.08% |
| Fidelity Freedom 2010 (FFFCX) | 67 bps | Fidelity Freedom 2010 (K) (FFKCX) | 53 bps | 26.42% |
| Fidelity Freedom 2015 (FFVFX) | 68 bps | Fidelity Freedom 2015 (K) (FKVFX) | 54 bps | 25.93% |
| Fidelity Freedom 2020 (FFFDX) | 74 bps | Fidelity Freedom 2020 (K) (FFKDX) | 57 bps | 29.82% |
| Fidelity Freedom 2025 (FFTWX) | 76 bps | Fidelity Freedom 2025 (K) (FKTWX) | 59 bps | 28.81% |
| Fidelity Freedom 2030 (FFFEX) | 79 bps | Fidelity Freedom 2030 (K) (FFKEX) | 61 bps | 29.51% |
| Fidelity Freedom 2035 (FFTHX) | 81 bps | Fidelity Freedom 2035 (K) (FKTHX) | 61 bps | 32.79% |
| Fidelity Freedom 2040 (FFFFX) | 81 bps | Fidelity Freedom 2040 (K) (FFKFX) | 62 bps | 30.65% |

| Plan Mutual Fund | Plan Fee | Identical Lower-Cost Mutual Fund | Identical Lower-Cost Mutual Fund Fee | Plan's Excess Cost |
|---|---|---|---|---|
| Fidelity Freedom 2045 (FFFGX) | 82 bps | Fidelity Freedom 2045 (K) (FFKGX) | 62 bps | 32.26% |
| Fidelity Freedom 2050 (FFFHX) | 84 bps | Fidelity Freedom 2050 (K) (FFKHX) | 63 bps | 33.33% |
| Fidelity Freedom 2055 (FDEEX) | 78 bps | Fidelity Freedom 2055 (K) (FDENX) | 64 bps | 21.88% |
| Fidelity Freedom Income (FFFAX) | 50 bps | Fidelity Freedom Income (K) (FFKAX) | 42 bps | 19.05% |
| Fidelity Fund (FFIDX) | 64 bps | Fidelity Fund (K) (FFDKX) | 45 bps | 42.22% |
| Fidelity Global Commodity Stock (FFGCX) | 109 bps | Fidelity Advisor Global Commodity Stock (I) (FFGIX) | 107 bps | 1.87% |
| Fidelity Growth & Income (FGRIX) | 78 bps | Fidelity Growth & Income (K) (FGIKX) | 55 bps | 41.82% |
| Fidelity Growth Company (FDGRX) | 93 bps | Fidelity Growth Company (K) (FGCKX) | 72 bps | 29.17% |
| Fidelity Growth Discovery (FDSVX) | 89 bps | Fidelity Growth Discovery (K) (FGDKX) | 67 bps | 32.84% |
| Fidelity Growth Strategies (FDEGX) | 85 bps | Fidelity Growth Strategies (K) (FAGKX) | 58 bps | 46.55% |
| Fidelity Independence (FDFFX) | 91 bps | Fidelity Independence (K) (FDFKX) | 72 bps | 26.39% |
| Fidelity International Discovery (FIGRX) | 107 bps | Fidelity International Discovery (K) (FIDKX) | 83 bps | 28.92% |

| Plan Mutual Fund | Plan Fee | Identical Lower-Cost Mutual Fund | Identical Lower-Cost Mutual Fund Fee | Plan's Excess Cost |
|---|---|---|---|---|
| Fidelity International Growth (FIGFX) | 104 bps | Fidelity International Growth (Z) (FZAJX) | 88 bps | 18.18% |
| Fidelity International Real Estate (FIREX) | 114 bps | Fidelity International Real Estate (Inst) (FIRIX) | 109 bps | 4.59% |
| Fidelity International Small Cap (FISMX) | 144 bps | Fidelity International Small Cap (Inst) (FIXIX) | 137 bps | 5.11% |
| Fidelity Japan (FJPNX) | 80 bps | Fidelity Advisor Japan (I) (FJPIX) | 75 bps | 6.67% |
| Fidelity Large Cap Growth (FSLGX) | 80 bps | Fidelity Advisor Large Cap Growth (Inst) (FLNOX) | 68 bps | 17.65% |
| Fidelity Latin America (FLATX) | 103 bps | Fidelity Latin America (Inst) (FLFIX) | 101 bps | 1.98% |
| Fidelity Leveraged Company Stock (FLVCX) | 92 bps | Fidelity Leveraged Company Stock (K) (FLCKX) | 71 bps | 29.58% |
| Fidelity Low-Priced Stock (FLPSX) | 98 bps | Fidelity Low-Priced Stock (K) (FLPKX) | 81 bps | 20.99% |
| Fidelity Magellan (FMAGX) | 71 bps | Fidelity Magellan (K) (FMGKX) | 55 bps | 29.09% |
| Fidelity Mega Cap Stock (FGRTX) | 68 bps | Fidelity Mega Cap Stock (Z) (FZALX) | 54 bps | 25.93% |
| Fidelity Mid Cap Growth (FSMGX) | 67 bps | Fidelity Advisor Mid Cap Growth (Inst) (FGCOX) | 59 bps | 13.56% |

| Plan Mutual Fund | Plan Fee | Identical Lower-Cost Mutual Fund | Identical Lower-Cost Mutual Fund Fee | Plan's Excess Cost |
|---|---|---|---|---|
| Fidelity Mid-Cap Stock (FMCSX) | 72 bps | Fidelity Mid-Cap Stock (K) (FKMCX) | 52 bps | 38.46% |
| Fidelity OTC (FOCPX) | 113 bps | Fidelity OTC (K) (FOCKX) | 92 bps | 22.83% |
| Fidelity Overseas (FOSFX) | 98 bps | Fidelity Overseas (K) (FOSKX) | 74 bps | 32.43% |
| Fidelity Puritan (FPURX) | 67 bps | Fidelity Puritan (K) (FPUKX) | 50 bps | 34.00% |
| Fidelity Real Estate Income (FRIFX) | 92 bps | Fidelity Real Estate Income (I) (FRIRX) | 89 bps | 3.37% |
| Fidelity Select Gold (FSAGX) | 94 bps | Fidelity Advisor Gold (I) (FGDIX) | 91 bps | 3.30% |
| Fidelity Select Materials (FSDPX) | 94 bps | Fidelity Advisor Materials (I) (FMFEX) | 93 bps | 1.08% |
| Fidelity Spartan 500 Index (Adv) (FUSVX) | 7 bps | Fidelity Spartan 500 Index (Adv Inst) (FXAIX) | 3 bps | 133.33% |
| Fidelity Spartan Extended Market Index (Adv) (FSEVX) | 7 bps | Fidelity Spartan Extended Market Index (Adv Inst) (FSMAX) | 6 bps | 16.67% |
| Fidelity Spartan Inflation-Protected Index (Adv) (FSIYX) | 10 bps | Fidelity Spartan Inflation-Protected Index (Adv Inst) (FIPDX) | 5 bps | 100.00% |
| Fidelity Spartan International Index (Adv) (FSIVX) | 12 bps | Fidelity Spartan International Index (Adv Inst) (FSPSX) | 6 bps | 100.00% |

Case 3:16-cv-02086   Document 38   Filed 12/12/16   Page 87 of 160 PageID #: 717

| Plan Mutual Fund | Plan Fee | Identical Lower-Cost Mutual Fund | Identical Lower-Cost Mutual Fund Fee | Plan's Excess Cost |
|---|---|---|---|---|
| Fidelity Spartan International Index (Inv) (FSIIX) | 10 bps | Fidelity Spartan International Index (Adv) (FSIVX) | 7 bps | 42.86% |
| Fidelity Spartan Total Market Index (Adv) (FSTVX) | 7 bps | Fidelity Spartan Total Market Index (Adv Inst) (FSKAX) | 5 bps | 40.00% |
| Fidelity Spartan U.S. Bond Index (Adv) (FSITX) | 10 bps | Fidelity Spartan U.S. Bond Index (Adv Inst) (FXNAX) | 5 bps | 100.00% |
| Fidelity Stock Selector (FDSSX) | 87 bps | Fidelity Stock Selector (K) (FSSKX) | 65 bps | 33.85% |
| Fidelity Stock Selector Small Cap (FDSCX) | 75 bps | Fidelity Advisor Stock Selector Small Cap (I) (FCDIX) | 62 bps | 20.97% |
| Fidelity Value (FDVLX) | 64 bps | Fidelity Value (K) (FVLKX) | 40 bps | 60.00% |
| Fidelity Value Discovery (FVDFX) | 92 bps | Fidelity Value Discovery (K) (FVDKX) | 69 bps | 33.33% |
| Fidelity Value Strategies (FSLSX) | 77 bps | Fidelity Value Strategies (K) (FVSKX) | 49 bps | 57.14% |
| Franklin Mutual Shares (A) (TESIX) | 113 bps | Franklin Mutual Shares (Z) (MUTHX) | 83 bps | 36.14% |
| Franklin Small Mid Cap Growth (A) (FRSGX) | 108 bps | Franklin Small Mid Cap Growth (Adv) (FSGAX) | 83 bps | 30.12% |

| Plan Mutual Fund | Plan Fee | Identical Lower-Cost Mutual Fund | Identical Lower-Cost Mutual Fund Fee | Plan's Excess Cost |
|---|---|---|---|---|
| Morgan Stanley Institutional Global Franchise (A) (MSFBX) | 126 bps | Morgan Stanley Institutional Global Franchise (I) (MSFAX) | 101 bps | 24.75% |
| PIMCO Long Term US Government (Adm) (PLGBX) | 73 bps | PIMCO Long Term US Government (Inst) (PGOVX) | 48 bps | 52.08% |
| Strategic Advisers International Multi-Manager (FMJDX) | 116 bps | Strategic Advisers International Multi-Manager (F) (FMBKX) | 107 bps | 8.41% |
| Strategic Advisers Small Mid Cap Multi- Manager (FNAPX) | 116 bps | Strategic Advisers Small Mid Cap Multi-Manager (F) (FARMX) | 106 bps | 9.43% |
| TIAA-CREF Equity Index (Ret) (TIQRX) | 33 bps | TIAA-CREF Equity Index (Inst) (TIEIX) | 9 bps | 266.67% |
| TIAA-CREF Growth & Income (Ret) (TRGIX) | 75 bps | TIAA-CREF Growth & Income (Inst) (TIGRX) | 51 bps | 47.06% |
| TIAA-CREF International Equity (Ret) (TRERX) | 82 bps | TIAA-CREF International Equity (Inst) (TIIEX) | 57 bps | 43.86% |
| TIAA-CREF International Equity Index (Ret) (TRIEX) | 40 bps | TIAA-CREF International Equity Index (Inst) (TCIEX) | 15 bps | 166.67% |
| TIAA-CREF Large-Cap Growth Index (Ret) (TRIRX) | 33 bps | TIAA-CREF Large-Cap Growth Index (Inst) (TILIX) | 7 bps | 371.43% |

Case 3:16-cv-02086   Document 38   Filed 12/12/16   Page 89 of 160 PageID #: 719

| Plan Mutual Fund | Plan Fee | Identical Lower-Cost Mutual Fund | Identical Lower-Cost Mutual Fund Fee | Plan's Excess Cost |
|---|---|---|---|---|
| TIAA-CREF Large-Cap Value (Ret) (TRLCX) | 76 bps | TIAA-CREF Large-Cap Value (Inst) (TRLIX) | 52 bps | 46.15% |
| TIAA-CREF Large-Cap Value Index (Ret) (TRCVX) | 33 bps | TIAA-CREF Large-Cap Value Index (Inst) (TILVX) | 8 bps | 312.50% |
| TIAA-CREF Lifecycle 2010 (Ret) (TCLEX) | 47 bps | TIAA-CREF Lifecycle 2010 (Inst) (TCTIX) | 22 bps | 113.64% |
| TIAA-CREF Lifecycle 2015 (Ret) (TCLIX) | 46 bps | TIAA-CREF Lifecycle 2015 (Inst) (TCNIX) | 42 bps | 9.52% |
| TIAA-CREF Lifecycle 2020 (Ret) (TCLTX) | 45 bps | TIAA-CREF Lifecycle 2020 (Inst) (TCWIX) | 42 bps | 7.14% |
| TIAA-CREF Lifecycle 2025 (Ret) (TCLFX) | 44 bps | TIAA-CREF Lifecycle 2025 (Inst) (TCYIX) | 42 bps | 4.76% |
| TIAA-CREF Lifecycle 2030 (Ret) (TCLNX) | 44 bps | TIAA-CREF Lifecycle 2030 (Inst) (TCRIX) | 19 bps | 131.58% |
| TIAA-CREF Lifecycle 2035 (Ret) (TCLRX) | 44 bps | TIAA-CREF Lifecycle 2035 (Inst) (TCIIX) | 19 bps | 131.58% |
| TIAA-CREF Lifecycle 2040 (Ret) (TCLOX) | 44 bps | TIAA-CREF Lifecycle 2040 (Inst) (TCOIX) | 19 bps | 131.58% |
| TIAA-CREF Lifecycle 2045 (Ret) (TTFRX) | 44 bps | TIAA-CREF Lifecycle 2045 (Inst) (TTFIX) | 19 bps | 131.58% |
| TIAA-CREF Lifecycle 2050 (Ret) (TLFRX) | 44 bps | TIAA-CREF Lifecycle 2050 (Inst) (TFTIX) | 19 bps | 131.58% |

Case 3:16-cv-02086   Document 38   Filed 12/12/16   Page 90 of 160 PageID #: 720

| Plan Mutual Fund | Plan Fee | Identical Lower-Cost Mutual Fund | Identical Lower-Cost Mutual Fund Fee | Plan's Excess Cost |
|---|---|---|---|---|
| TIAA-CREF Lifecycle 2055 (Ret) (TTRLX) | 72 bps | TIAA-CREF Lifecycle 2055 (Inst) (TTRIX) | 47 bps | 53.19% |
| TIAA-CREF Lifecycle Retirement Income (Ret) (TLIRX) | 65 bps | TIAA-CREF Lifecycle Retirement Income (Inst) (TLRIX) | 40 bps | 62.50% |
| TIAA-CREF Mid-Cap Growth (Ret) (TRGMX) | 76 bps | TIAA-CREF Mid-Cap Growth (Inst) (TRPWX) | 52 bps | 46.15% |
| TIAA-CREF Mid-Cap Value (Ret) (TRVRX) | 79 bps | TIAA-CREF Mid-Cap Value (Inst) (TIMVX) | 54 bps | 46.30% |
| TIAA-CREF Real Estate Securities (Ret) (TRRSX) | 81 bps | TIAA-CREF Real Estate Securities (Inst) (TIREX) | 56 bps | 44.64% |
| TIAA-CREF S&P 500 Index (Ret) (TRSPX) | 34 bps | TIAA-CREF S&P 500 Index (Inst) (TISPX) | 9 bps | 277.78% |
| TIAA-CREF Small-Cap Blend Index (Ret) (TRBIX) | 35 bps | TIAA-CREF Small-Cap Blend Index (Inst) (TISBX) | 10 bps | 250.00% |
| TIAA-CREF Small-Cap Equity (Ret) (TRSEX) | 78 bps | TIAA-CREF Small-Cap Equity (Inst) (TISEX) | 53 bps | 47.17% |
| TIAA-CREF Social Choice Equity (Ret) (TRSCX) | 47 bps | TIAA-CREF Social Choice Equity (Inst) (TISCX) | 22 bps | 113.64% |

| Plan Mutual Fund | Plan Fee | Identical Lower-Cost Mutual Fund | Identical Lower-Cost Mutual Fund Fee | Plan's Excess Cost |
|---|---|---|---|---|
| Vanguard 500 Index (Inv) (VFINX) | 18 bps | Vanguard Institutional Index (Inst Pl) (VIIIX) | 2 bps | 800.00% |
| Vanguard Asset Allocation (Inv) (VAAPX) | 29 bps | Vanguard Asset Allocation (Adm) (VAARX) | 18 bps | 61.11% |
| Vanguard Balanced Index (Inv) (VBINX) | 25 bps | Vanguard Balanced Index (Inst) (VBAIX) | 8 bps | 212.50% |
| Vanguard Capital Opportunity (Inv) (VHCOX) | 50 bps | Vanguard Capital Opportunity (Adm) (VHCAX) | 41 bps | 21.95% |
| Vanguard Developed Markets Index (Inv) (VDMIX) | 20 bps | Vanguard Developed Markets Index (Inst Pl) (VDMPX) | 6 bps | 233.33% |
| Vanguard Emerging Markets Stock Index (Inv) (VEIEX) | 40 bps | Vanguard Emerging Markets Stock Index (Inst) (VEMIX) | 23 bps | 73.91% |
| Vanguard Equity-Income (Inv) (VEIPX) | 36 bps | Vanguard Equity-Income (Adm) (VEIRX) | 24 bps | 50.00% |
| Vanguard European Stock Index (Inv) (VEURX) | 27 bps | Vanguard European Stock Index (Inst) (VESIX) | 12 bps | 125.00% |
| Vanguard Explorer (Inv) (VEXPX) | 54 bps | Vanguard Explorer (Adm) (VEXRX) | 34 bps | 58.82% |
| Vanguard Extended Market Index (Inv) (VEXMX) | 30 bps | Vanguard Extended Market Index (Inst) (VIEIX) | 8 bps | 275.00% |

Case 3:16-cv-02086   Document 38   Filed 12/12/16   Page 92 of 160 PageID #: 722

| Plan Mutual Fund | Plan Fee | Identical Lower-Cost Mutual Fund | Identical Lower-Cost Mutual Fund Fee | Plan's Excess Cost |
|---|---|---|---|---|
| Vanguard Extended Market Index (Inv) (VEXMX) | 24 bps | Vanguard Extended Market Index (Inst Pl) (VEMPX) | 6 bps | 300.00% |
| Vanguard FTSE Social Index (Inv) (VFTSX) | 29 bps | Vanguard FTSE Social Index (Inst) (VFTNX) | 16 bps | 81.25% |
| Vanguard GNMA (Inv) (VFIIX) | 22 bps | Vanguard GNMA (Adm) (VFIJX) | 12 bps | 83.33% |
| Vanguard Growth & Income (Inv) (VQNPX) | 35 bps | Vanguard Growth & Income (Adm) (VGIAX) | 21 bps | 66.67% |
| Vanguard Growth Index (Inv) (VIGRX) | 28 bps | Vanguard Growth Index (Inst) (VIGIX) | 8 bps | 250.00% |
| Vanguard Health Care (Inv) (VGHCX) | 29 bps | Vanguard Health Care (Adm) (VGHAX) | 22 bps | 31.82% |
| Vanguard High-Yield Corporate (Inv) (VWEHX) | 27 bps | Vanguard High-Yield Corporate (Adm) (VWEAX) | 15 bps | 80.00% |
| Vanguard Inflation-Protected Securities (Inv) (VIPSX) | 25 bps | Vanguard Inflation-Protected Securities (Inst) (VIPIX) | 9 bps | 177.78% |
| Vanguard Institutional Index (Inst) (VINIX) | 4 bps | Vanguard Institutional Index (Inst Pl) (VIIIX) | 2 bps | 100.00% |
| Vanguard Intermediate-Term Bond Index (Inv) (VBIIX) | 22 bps | Vanguard Intermediate-Term Bond Index (Inst) (VBIMX) | 7 bps | 214.29% |

Case 3:16-cv-02086   Document 38   Filed 12/12/16   Page 93 of 160 PageID #: 723

| Plan Mutual Fund | Plan Fee | Identical Lower-Cost Mutual Fund | Identical Lower-Cost Mutual Fund Fee | Plan's Excess Cost |
|---|---|---|---|---|
| Vanguard Intermediate-Term Bond Index (Inv) (VBIIX) | 20 bps | Vanguard Intermediate-Term Bond Index (Inst Pl) (VBIUX) | 5 bps | 300.00% |
| Vanguard Intermediate-Term Investment-Grade (Inv) (VFICX) | 21 bps | Vanguard Intermediate-Term Investment-Grade (Adm) (VFIDX) | 11 bps | 90.91% |
| Vanguard Intermediate-Term Treasury (Inv) (VFITX) | 25 bps | Vanguard Intermediate-Term Treasury (Adm) (VFIUX) | 11 bps | 127.27% |
| Vanguard International Growth (Inv) (VWIGX) | 53 bps | Vanguard International Growth (Adm) (VWILX) | 34 bps | 55.88% |
| Vanguard Long-Term Bond Index (Inv) (VBLTX) | 22 bps | Vanguard Long-Term Bond Index (Inst) (VBLLX) | 7 bps | 214.29% |
| Vanguard Long-Term Bond Index (Inv) (VBLTX) | 20 bps | Vanguard Long-Term Bond Index (Inst Pl) (VBLIX) | 5 bps | 300.00% |
| Vanguard Long-Term Investment-Grade (Inv) (VWESX) | 23 bps | Vanguard Long-Term Investment-Grade (Adm) (VWETX) | 13 bps | 76.92% |
| Vanguard Long-Term Treasury (Inv) (VUSTX) | 25 bps | Vanguard Long-Term Treasury (Adm) (VUSUX) | 11 bps | 127.27% |
| Vanguard Mid Cap Index (Inv) (VIMSX) | 27 bps | Vanguard Mid Cap Index (Inst) (VMCIX) | 8 bps | 237.50% |

| Plan Mutual Fund | Plan Fee | Identical Lower-Cost Mutual Fund | Identical Lower-Cost Mutual Fund Fee | Plan's Excess Cost |
|---|---|---|---|---|
| Vanguard Mid Cap Index (Inv) (VIMSX) | 24 bps | Vanguard Mid Cap Index (Inst Pl) (VMCPX) | 6 bps | 300.00% |
| Vanguard Morgan Growth (Inv) (VMRGX) | 48 bps | Vanguard Morgan Growth (Adm) (VMRAX) | 31 bps | 54.84% |
| Vanguard Pacific Stock Index (Inv) (VPACX) | 27 bps | Vanguard Pacific Stock Index (Inst) (VPKIX) | 12 bps | 125.00% |
| Vanguard Prime Money Market (Inv) (VMMXX) | 28 bps | Vanguard Prime Money Market (Adm) (VMRXX) | 13 bps | 115.38% |
| Vanguard PRIMECAP (Inv) (VPMCX) | 49 bps | Vanguard PRIMECAP (Adm) (VPMAX) | 37 bps | 32.43% |
| Vanguard REIT Index (Inv) (VGSIX) | 21 bps | Vanguard REIT Index (Inst) (VGSNX) | 9 bps | 133.33% |
| Vanguard Short-Term Bond Index (Inv) (VBISX) | 22 bps | Vanguard Short-Term Bond Index (Adm) (VBIRX) | 12 bps | 83.33% |
| Vanguard Short-Term Bond Index (Inv) (VBISX) | 20 bps | Vanguard Short-Term Bond Index (Inst Pl) (VBIPX) | 5 bps | 300.00% |
| Vanguard Short-Term Federal (Inv) (VSGBX) | 21 bps | Vanguard Short-Term Federal (Adm) (VSGDX) | 11 bps | 90.91% |
| Vanguard Short-Term Investment-Grade (Inv) (VFSTX) | 21 bps | Vanguard Short-Term Investment-Grade (Inst) (VFSIX) | 7 bps | 200.00% |
| Vanguard Short-Term Treasury (Inv) (VFISX) | 21 bps | Vanguard Short-Term Treasury (Adm) (VFIRX) | 11 bps | 90.91% |

| Plan Mutual Fund | Plan Fee | Identical Lower-Cost Mutual Fund | Identical Lower-Cost Mutual Fund Fee | Plan's Excess Cost |
|---|---|---|---|---|
| Vanguard Small Cap Growth Index (Inv) (VISGX) | 28 bps | Vanguard Small Cap Growth Index (Inst) (VSGIX) | 8 bps | 250.00% |
| Vanguard Small Cap Index (Inv) (NAESX) | 28 bps | Vanguard Small Cap Index (Inst) (VSCIX) | 8 bps | 250.00% |
| Vanguard Small Cap Value Index (Inv) (VISVX) | 28 bps | Vanguard Small Cap Value Index (Inst) (VSIIX) | 8 bps | 250.00% |
| Vanguard Tax-Managed International (Inv) (VDVIX) | 20 bps | Vanguard Tax-Managed International (Inst Pl) (VDIPX) | 6 bps | 233.33% |
| Vanguard Total Bond Market Index (Inv) (VBMFX) | 22 bps | Vanguard Total Bond Market Index (Inst) (VBTIX) | 7 bps | 214.29% |
| Vanguard Total Bond Market Index (Inv) (VBMFX) | 22 bps | Vanguard Total Bond Market Index (Inst Pl) (VBMPX) | 5 bps | 340.00% |
| Vanguard Total International Stock Index (Inv) (VGTSX) | 22 bps | Vanguard Total International Stock Index (Inst Pl) (VTPSX) | 10 bps | 120.00% |
| Vanguard Total Stock Market Index (Inv) (VTSMX) | 18 bps | Vanguard Institutional Total Stock Market Index (Inst Pl) (VITPX) | 2 bps | 800.00% |
| Vanguard U.S. Growth (Inv) (VWUSX) | 49 bps | Vanguard U.S. Growth (Adm) (VWUAX) | 30 bps | 63.33% |
| Vanguard Value Index (Inv) (VIVAX) | 26 bps | Vanguard Value Index (Inst) (VIVIX) | 8 bps | 225.00% |

Case 3:16-cv-02086   Document 38   Filed 12/12/16   Page 96 of 160 PageID #: 726

| Plan Mutual Fund | Plan Fee | Identical Lower-Cost Mutual Fund | Identical Lower-Cost Mutual Fund Fee | Plan's Excess Cost |
|---|---|---|---|---|
| Vanguard Wellesley Income (Inv) (VWINX) | 31 bps | Vanguard Wellesley Income (Adm) (VWIAX) | 21 bps | 47.62% |
| Vanguard Wellington (Inv) (VWELX) | 34 bps | Vanguard Wellington (Adm) (VWENX) | 23 bps | 47.83% |
| Vanguard Windsor II (Inv) (VWNFX) | 38 bps | Vanguard Windsor II (Adm) (VWNAX) | 27 bps | 40.74% |
| Vanguard Windsor (Inv) (VWNDX) | 33 bps | Vanguard Windsor (Adm) (VWNEX) | 20 bps | 65.00% |

166.    These lower-cost share classes have been available to the Plan for years, some dating back to the early 2000s or before.

167.    Further, even after the changes made in April 2015, Defendants continue to provide higher-cost Vanguard mutual funds than are available for the Vanguard Total Bond Market Fund, the Vanguard Total International Stock Index Fund, and the Vanguard Institutional Index Fund.

168.    The failure to select lower-cost share classes for the Plan's mutual fund options *identical in all respects* (portfolio manager, underlying investments, and asset allocation) *except for cost* demonstrates that Defendants failed to consider the size and purchasing power of the Plan when selecting share classes and failed to engage in a prudent process in the selection, monitoring, and retention of those mutual fund options.

97

169.   Had the amounts invested in the higher-cost share class mutual fund options instead been invested in the readily available lower-cost share class mutual fund options, Plan participants would not have lost millions of dollars of their retirement savings.

## VI.   Defendants selected and retained a large number of duplicative investment options, diluting the Plan's ability to pay lower fees and confusing participants.

170.   Defendants provided an admittedly "overwhelming" multitude of duplicative funds in the same investment style, thereby depriving the Plan of its bargaining power associated with offering a single option in each investment style, which significantly reduces investment fees, and leading to "decision paralysis" for participants. *See, e.g.*, Michael Liersch, *Choice in Retirement Plans: How Participant Behavior Differs in Plans Offering Advice, Managed Accounts, and Target-Date Investments,* T. Rowe Price Retirement Research, at 2 (Apr. 2009) ("Offering too many choices to consumers can lead to decision paralysis, preventing consumers from making decisions."). Prior to April 2015, well over 330 investment options were placed in the core lineup by Defendants for the following asset classes: target date and asset allocation funds, large cap domestic equities, mid cap domestic equities, small cap domestic equities, international equities, fixed income, money market, real estate, sector funds, stable value, and fixed guaranteed annuity. After April 2015, Defendants continue to provide duplicative investments including fixed and variable annuities still offered by both TIAA-CREF and VALIC.

171. Having such a dizzying array of investment options, which Defendants have admitted was "overwhelming" plan participants, *see supra* ¶152, also places a monumental burden on the Plan's participants in selecting options in which to invest. Mutual funds are required to offer a prospectus, which is designed to provide material information to potential investors to enable them to make an informed, prudent investment decision. The prospectus sets forth a fund's objectives or goals, investment strategies, principal risks, historical performance, fees and expenses, and fund managers and advisers, among other information. For the Fidelity Freedom Funds alone, the prospectus and supporting materials filed with the SEC span almost *800* printed pages.[42] If a Vanderbilt Plan participant were to review the prospectuses of all *330-plus* investment options that were in the Plan, they would have to read many thousands of pages of materials. This is a virtually impossible burden. Even for the Plan's fiduciaries, it is inconceivable that they have read the prospectuses and supporting materials of the more than 330 funds they selected and retained for the Plan.

172. In comparison to the more than 330 options in the Vanderbilt Plan, according to Callan Investments Institute's 2015 Defined Contribution Trends survey, defined contribution plans in 2014 had on average 15 investment options, excluding target date funds. Callan Investments Institute, *2015 Defined*

---

[42] *See* Fidelity Freedom Funds Prospectus, Form N-1A (May 28, 2016), available at https://www.sec.gov/Archives/edgar/data/880195/000137949116004218/filing717.htm.

*Contribution Trends,* at 28 (2015).[43] This provides choice of investment style to participants while maintaining a larger pool of assets in each investment style and avoiding confusion.

173.   A larger pool of assets in each investment style significantly reduces fees paid by participants. By consolidating duplicative investments of the same investment style into a single investment option, the Plan would then have the ability to command lower-cost investments, such as a low-cost institutional share class of the selected mutual fund option.

39.   Fund selections must be the result of a detailed due diligence process that considers factors such as risk, investment return, and expenses of available investment alternatives, and the fiduciary must give "appropriate consideration" to "the role the investment or investment course of action plays . . . in the plan's investment portfolio," 29 C.F.R. §§2550.404a-1(b)(i)-(ii). Fiduciaries cannot discharge their duties "by the simple expedient of including a very large number of investment alternatives in its portfolio and then shifting to the participants the responsibility for choosing among them." *Hecker*, 569 F.3d at 711. Including a large number of alternatives removes the benefit of pooling assets consistent with the size of the Plan. Assembling a haphazard lineup of over 330 duplicative options, proprietary to the Plan's recordkeepers—and shifting to participants the burden to screen those options—does not reflect a prudent investment selection process.

---

[43] Available at https://www.callan.com/research/files/990.pdf.

174.     Within each asset class and investment style deemed appropriate for the participant-directed retirement plan, prudent fiduciaries make a reasoned determination and select a prudent investment option. Unlike Defendants, prudent fiduciaries do not select and retain numerous investment options for a single asset class and investment style. When many investment options in a single investment style are plan options, fiduciaries lose the bargaining power to obtain lower investment management expenses for that style.

175.     Moreover, if a participant puts her assets in each of the funds within a given investment style, as commentators have said they are likely to do,[44] when many actively managed funds are included within the same investment style, this results in those participants effectively having an index return. This is because the investments are spread so broadly over that investment style. Yet the participants will be paying much higher fees for active management than the fees of a passive index fund.

176.     In addition, providing multiple options in a single investment style adds unnecessary complexity to the investment lineup and leads to participant confusion. See, e.g., The Standard, *Fixing Your 403(b) Plan: Adopting a Best Practices Approach,* at 2 ("Numerous studies have demonstrated that when people are given too many choices of anything, they lose confidence or make no decision.");

---

[44] Ian Ayres & Quinn Curtiss, *Beyond Diversification: The Pervasive Problem of Excessive Fees and Dominated Funds in 401(k) Plans*, 124 YALE L.J. 1476, 1481 (2015)("It is well established that some investors naively diversify by spreading their plan investments across all fund offerings.").

Michael Liersch, *Choice in Retirement Plans: How Participant Behavior Differs in Plans Offering Advice, Managed Accounts, and Target-Date Investments,* T. ROWE PRICE RETIREMENT RESEARCH, at 2 (Apr. 2009)("Offering too many choices to consumers can lead to decision paralysis, preventing consumers from making decisions.").[45]

177.  Moreover, having many actively managed funds in the Plan within the same investment style results in the Plan effectively having an index fund return, while paying much higher fees for active management than the fees charged by a passive index fund, which has much lower fees because there is no need for active management and its higher fees.

178.  Defendants provided duplicative investments in every major asset class and investment style, including balanced/asset allocation (29–30 options), fixed income and high yield bond (42–53 options), international (43–46 options), large cap domestic equities (71–75 options), mid cap domestic equities (27 options), small cap domestic equities (14–15 options), real estate (6 options), money market (6 options), sector funds (44 options), stable value (4–5 options), and target date investments (3 fund families). Such a dizzying array of duplicative funds in a single investment style violates the well-recognized industry principle that too many choices harm participants, and can lead to "decision paralysis".

---

[45] Available at
http://www.behavioralresearch.com/Publications/Choice_in_Retirement_Plans_April_2009.pdf.

179.	For illustration purposes, the Plan's 18 large cap domestic blend investments as of December 31, 2014 are summarized below and compared to a single lower-cost alternative that was available to the Plan: the Vanguard Institutional Index Fund-Instl. Plus (VIIIX), which mirrors the market and has an expense ratio of 2 bps.

| Large Cap Blend Investments | Assets | Plan Fee | Lower-Cost Alternative Fee | Plan's Excess Cost |
|---|---|---|---|---|
| Aberdeen US Equity I IS | $80,049 | 96 bps | 2 bps | 4700% |
| CREF Equity Index | $35,286,527 | 37 bps | 2 bps | 1750% |
| CREF Stock Account | $370,987,187 | 46 bps | 2 bps | 2200% |
| Fidelity Disciplined Equity K | $1,297,628 | 39 bps | 2 bps | 1850% |
| Fidelity Growth & Income K | $5,340,927 | 52 bps | 2 bps | 2500% |
| Fidelity Large Cap Core Enhanced Index | $197,668 | 45 bps | 2 bps | 2150% |
| Fidelity Large Cap Stock | $656,804 | 88 bps | 2 bps | 4300% |
| Fidelity Mega Cap Stock | $277,617 | 68 bps | 2 bps | 3300% |
| Fidelity Spartan 500 Index Adv | $13,502,916 | 5 bps | 2 bps | 150% |
| Fidelity Spartan Total Market Index Adv | $4,044,099 | 6 bps | 2 bps | 200% |
| TIAA-CREF Equity Index Instl | $1,015,150 | 5 bps | 2 bps | 150% |
| TIAA-CREF S&P 500 Index Instl | $3,767,349 | 6 bps | 2 bps | 200% |
| VALIC Company I Growth & Income | $363,547 | 185 bps | 2 bps | 9150% |
| VALIC Company I Large Cap Core | $1,752,525 | 184 bps | 2 bps | 9100% |
| VALIC Company I Stock Index | $16,702,484 | 135 bps | 2 bps | 6650% |

| Large Cap Blend Investments | Assets | Plan Fee | Lower-Cost Alternative Fee | Plan's Excess Cost |
|---|---|---|---|---|
| Vanguard Growth & Income Inv | $14,751,676 | 37 bps | 2 bps | 1750% |
| Vanguard Institutional Index Instl | $86,697,433 | 4 bps | 2 bps | 100% |
| Vanguard Total Stock Market Index Inv | $59,129,455 | 17 bps | 2 bps | 750% |
| **Total** | **$615,851,041** | | | |

180. With over *$400 million* held in the CREF Stock Account and the CREF Equity Index Account, these large cap blend options were *23 and 18 times* more expensive than the lower-cost Vanguard option with an expense ratio of 2 bps, respectively.



181. Many other large cap index funds are also available at far lower costs than the Plan's large cap blend funds. Had the amounts invested in the Plan's large cap blend options been consolidated into a single large cap blend investment, such as the Vanguard Institutional Index Fund-Instl. Plus, Plan participants would have saved in excess of $2 million in fees for 2014 alone, and many more millions since 2010.

182. In addition, Defendants selected and retained multiple passively managed index options in the same investment style. Rather than a fund whose investment manager actively selects stocks or bonds to beat an index benchmark, passively managed index funds hold a representative sample of securities in a specific index, such as the S&P 500 index. The sole investment strategy of an index fund is to track the performance of a specific market index. No stock selection or research is needed, unlike investing in actively managed funds. Thus, index fund fees are substantially lower.

183. For example, in the large cap blend investment style, Defendants provided up to *ten* separate index funds that have similar investment strategies designed to generate investment results that correspond to the return of the U.S. equity market and do not involve stock selection.

184. Since index funds merely hold the same securities in the same proportions as the index,[46] having multiple index funds of the same category or investment style in the Plan provides no benefit to participants. As Morningstar

---

[46] Another example of an index is the Dow Jones Industrial Average.

CEO Joe Mansueto recently observed, "[b]asic market indexes are virtually interchangeable." Lewis Braham, *Morningstar Announces Free Use of Its Indexes*, Barron's (Nov. 5, 2016).[47] Including multiple similar index funds in the same investment style hurts participants by diluting the Plan's ability to obtain lower rates for a single index fund of that style because the amount of assets in any one such fund is smaller than the aggregate would be. Moreover, multiple managers holding stocks which mimic the S&P 500 or a similar index would pick the same stocks in the same proportions as the index. Thus, there is no value in offering separate index funds in the same investment style.

185.    Had Defendants combined hundreds of millions of dollars in Plan assets from duplicative index funds into a single index fund, as set forth in ¶179, the Plan would have generated higher investment returns, net of fees, and participants would not have lost millions of dollars of retirement assets.

## VII.    Defendants imprudently and disloyally retained historically underperforming Plan investments.

186.    The excessive fees in the Plan's investments were not justified by superior investment returns. Defendants' failure to conduct appropriate due diligence in selecting and monitoring the Plan's investments resulted in options being retained in the Plan despite years of historical underperformance compared to superior lower-cost alternatives, which caused massive losses to the Plan compared to what those assets would have earned if invested in prudent alternatives.

---

[47] Available at http://www.barrons.com/articles/morningstar-announces-free-use-of-its-indexes-1478322642.

187.    As of September 30, 2014, of the Plan's investment options which had at least a five-year performance history, *sixty-three percent* of those funds—197 out of 315—underperformed their respective benchmarks over the previous 5-year period.[48] These underperforming funds include the following:

| Fund Name | Ticker |
|---|---|
| Alger Mid Cap Growth (Inst) | ALMRX |
| CREF Equity Index | N/A |
| CREF Growth | N/A |
| CREF Inflation-Linked Bond | N/A |
| CREF Money Market | N/A |
| CREF Social Choice | N/A |
| CREF Stock | N/A |
| Fidelity Asset Manager 50% | FASMX |
| Fidelity Asset Manager 60% | FSANX |
| Fidelity Asset Manager 70% | FASGX |
| Fidelity Asset Manager 85% | FAMRX |
| Fidelity Balanced (K) | FBAKX |
| Fidelity Canada | FICDX |
| Fidelity Convertible Securities | FCVSX |
| Fidelity Disciplined Equity (K) | FDEKX |
| Fidelity Dividend Growth (K) | FDGKX |
| Fidelity Equity Dividend Income (K) | FETKX |
| Fidelity Equity-Income (K) | FEIKX |
| Fidelity Export & Multinational (K) | FEXKX |

[48] These results are based on the performance and benchmark for each fund as shown on the Plan's quarterly Plan and Investment Notice, Section II, Part A. This figure excludes 20 funds in the Plan (out of the 335) which did not have 5-year performance histories as September 30, 2014. Nearly half of those funds—8 out of 20—underperformed their benchmarks on a one-year basis and since inception.

| Fund Name | Ticker |
|---|---|
| Fidelity Fifty | FFTYX |
| Fidelity Focused High Income | FHIFX |
| Fidelity Four in One Index | FFNOX |
| Fidelity Freedom K 2015 | FKVFX |
| Fidelity Freedom K 2020 | FFKDX |
| Fidelity Freedom K 2025 | FKTWX |
| Fidelity Freedom K 2030 | FFKEX |
| Fidelity Freedom K 2035 | FKTHX |
| Fidelity Freedom K 2040 | FFKFX |
| Fidelity Freedom K 2045 | FFKGX |
| Fidelity Freedom K 2050 | FFKHX |
| Fidelity Fund (K) | FFDKX |
| Fidelity Global Balanced | FGBLX |
| Fidelity Global Commodity Stock | FFGCX |
| Fidelity Global Strategies | FDYSX |
| Fidelity Growth Strategies (K) | FAGKX |
| Fidelity High Income | SPHIX |
| Fidelity Inflation Protected Bond | FINPX |
| Fidelity Japan | FJPNX |
| Fidelity Large Cap Growth Enhanced Index | FLGEX |
| Fidelity Latin America | FLATX |
| Fidelity Magellan (K) | FMGKX |
| Fidelity Mid Cap Enhanced Index | FMEIX |
| Fidelity Mid-Cap Stock (K) | FKMCX |
| Fidelity NASDAQ Composite Index | FNCMX |
| Fidelity Puritan (K) | FPUKX |
| Fidelity Real Estate Income | FRIFX |
| Fidelity Select Banking | FSRBX |
| Fidelity Select Brokerage & Investment Management | FSLBX |

Case 3:16-cv-02086   Document 38   Filed 12/12/16   Page 108 of 160 PageID #: 738

| Fund Name | Ticker |
|---|---|
| Fidelity Select Communications Equipment | FSDCX |
| Fidelity Select Computers | FDCPX |
| Fidelity Select Consumer Finance | FSVLX |
| Fidelity Select Consumer Staples | FDFAX |
| Fidelity Select Energy | FSENX |
| Fidelity Select Energy Services | FSESX |
| Fidelity Select Environment and Alternative Energy | FSLEX |
| Fidelity Select Financial Services | FIDSX |
| Fidelity Select Gold | FSAGX |
| Fidelity Select Industrial Equipment | FSCGX |
| Fidelity Select Insurance | FSPCX |
| Fidelity Select Materials | FSDPX |
| Fidelity Select Medical Equipment & Systems | FSMEX |
| Fidelity Select Natural Gas | FSNGX |
| Fidelity Select Natural Resources | FNARX |
| Fidelity Select Telecommunications | FSTCX |
| Fidelity Select Utilities | FSUTX |
| Fidelity Select Wireless | FWRLX |
| Fidelity Small Cap Stock | FSLCX |
| Fidelity Spartan 500 Index (Adv) | FUSVX |
| Fidelity Spartan Long Term Treasury Bond Index (Adv) | FLBAX |
| Fidelity Spartan Short Term Treasury Index (Adv) | FSBAX |
| Fidelity Spartan Total Market Index (Adv) | FSTVX |
| Fidelity Stock  Selector All Cap (K) | FSSKX |
| Fidelity Stock  Selector Large Cap Value | FSLVX |
| Fidelity Stock  Selector Small Cap | FDSCX |
| Fidelity Strategic Dividend & Income | FSDIX |
| Fidelity Strategic Income | FSICX |
| Fidelity Value (K) | FVLKX |

Case 3:16-cv-02086   Document 38   Filed 12/12/16   Page 109 of 160 PageID #: 739

| Fund Name | Ticker |
|---|---|
| Fidelity Value Strategies (K) | FVSKX |
| Franklin Small Mid Cap Growth (A) | FRSGX |
| TIAA Real Estate | QREARX |
| TIAA-CREF Equity Index (Inst) | TIEIX |
| TIAA-CREF Growth & Income (Inst) | TIGRX |
| TIAA-CREF Large-Cap Growth Index (Inst) | TILIX |
| TIAA-CREF Large-Cap Value (Inst) | TRLIX |
| TIAA-CREF Large-Cap Value Index (Inst) | TILVX |
| TIAA-CREF Lifecycle 2015 (Inst) | TCNIX |
| TIAA-CREF Lifecycle 2020 (Inst) | TCWIX |
| TIAA-CREF Lifecycle 2025 (Inst) | TCYIX |
| TIAA-CREF Lifecycle 2030 (Inst) | TCRIX |
| TIAA-CREF Lifecycle 2035 (Inst) | TCIIX |
| TIAA-CREF Lifecycle 2040 (Inst) | TCOIX |
| TIAA-CREF Lifecycle 2045 (Inst) | TTFIX |
| TIAA-CREF Lifecycle 2050 (Inst) | TFTIX |
| TIAA-CREF Mid-Cap Growth (Inst) | TRPWX |
| TIAA-CREF Mid-Cap Value (Inst) | TIMVX |
| TIAA-CREF Real Estate Securities (Inst) | TIREX |
| TIAA-CREF S&P 500 Index (Inst) | TISPX |
| TIAA-CREF Social Choice Equity (Inst) | TISCX |
| VALIC Annuity - American Beacon Holland Large Cap Growth (Inv) | N/A |
| VALIC Annuity - Ariel Appreciation (Inst) | N/A |
| VALIC Annuity - SunAmerica 2020 High Watermark | N/A |
| VALIC Annuity - VALIC Company I Asset Allocation | N/A |
| VALIC Annuity - VALIC Company I Broad Cap Value Income | N/A |
| VALIC Annuity - VALIC Company I Capital Conservation | N/A |
| VALIC Annuity - VALIC Company I Core Equity | N/A |

Case 3:16-cv-02086   Document 38   Filed 12/12/16   Page 110 of 160 PageID #: 740

| Fund Name | Ticker |
|---|---|
| VALIC Annuity - VALIC Company I Dividend Value | N/A |
| VALIC Annuity - VALIC Company I Emerging Economies | N/A |
| VALIC Annuity - VALIC Company I Foreign Value | N/A |
| VALIC Annuity - VALIC Company I Global Social Awareness | N/A |
| VALIC Annuity - VALIC Company I Government Securities | N/A |
| VALIC Annuity - VALIC Company I Growth | N/A |
| VALIC Annuity - VALIC Company I Growth & Income | N/A |
| VALIC Annuity - VALIC Company I Inflation Protected | N/A |
| VALIC Annuity - VALIC Company I International Equities Index | N/A |
| VALIC Annuity - VALIC Company I International Government Bond | N/A |
| VALIC Annuity - VALIC Company I Large Cap Core | N/A |
| VALIC Annuity - VALIC Company I Large Capital Growth | N/A |
| VALIC Annuity - VALIC Company I Mid Cap Index | N/A |
| VALIC Annuity - VALIC Company I Mid Cap Strategic Growth | N/A |
| VALIC Annuity - VALIC Company I Money Market I | N/A |
| VALIC Annuity - VALIC Company I NASDAQ-100 Index | N/A |
| VALIC Annuity - VALIC Company I Science & Technology | N/A |
| VALIC Annuity - VALIC Company I Small Cap Aggressive Growth | N/A |
| VALIC Annuity - VALIC Company I Small Cap Index | N/A |
| VALIC Annuity - VALIC Company I Small Cap Special Value | N/A |
| VALIC Annuity - VALIC Company I Small-Mid Growth | N/A |
| VALIC Annuity - VALIC Company I Stock Index | N/A |
| VALIC Annuity - VALIC Company I Value | N/A |
| VALIC Annuity - VALIC Company II Aggressive Growth Lifestyle | N/A |
| VALIC Annuity - VALIC Company II Capital Appreciation | N/A |
| VALIC Annuity - VALIC Company II High Yield Bond | N/A |

111

| Fund Name | Ticker |
|---|---|
| VALIC Annuity - VALIC Company II International Opportunities | N/A |
| VALIC Annuity - VALIC Company II Large Cap Value | N/A |
| VALIC Annuity - VALIC Company II Mid Cap Growth | N/A |
| VALIC Annuity - VALIC Company II Mid Cap Value | N/A |
| VALIC Annuity - VALIC Company II Money Market II | N/A |
| VALIC Annuity - VALIC Company II Small Cap Growth | N/A |
| VALIC Annuity - VALIC Company II Small Cap Value | N/A |
| VALIC Annuity - VALIC Company II Socially Responsible | N/A |
| VALIC Annuity - Vanguard LifeStrategy Conservative Growth | N/A |
| VALIC Annuity - Vanguard LifeStrategy Growth (Inv) | N/A |
| VALIC Annuity - Vanguard LifeStrategy Moderate Growth (Inv) | N/A |
| VALIC Annuity - Vanguard Long-Term Investment-Grade (Inv) | N/A |
| VALIC Annuity - Vanguard Long-Term Treasury (Inv) | N/A |
| VALIC Annuity - Vanguard Wellington (Inv) | N/A |
| VALIC Annuity - Vanguard Windsor II (Inv) | N/A |
| Vanguard Admiral Treasury Money Market (Inv) | VUSXX |
| Vanguard Capital Opportunity (Inv) | VHCOX |
| Vanguard Convertible Securities (Inv) | VCVSX |
| Vanguard Dividend Growth (Inv) | VDIGX |
| Vanguard Emerging Markets Stock Index (Inv) | VEIEX |
| Vanguard Explorer (Inv) | VEXPX |
| Vanguard Extended Market Index (Inv) | VEXMX |
| Vanguard Federal Money Market (Inv) | VMFXX |
| Vanguard FTSE Social Index (Inv) | VFTSX |
| Vanguard Health Care (Inv) | VGHCX |
| Vanguard High-Yield Corporate (Inv) | VWEHX |
| Vanguard Inflation-Protected Securities (Inv) | VIPSX |
| Vanguard Institutional Index (Inst) | VINIX |

Case 3:16-cv-02086   Document 38   Filed 12/12/16   Page 112 of 160 PageID #: 742

| Fund Name | Ticker |
|---|---|
| Vanguard Institutional Index (Inst) | VINIX |
| Vanguard Intermediate-Term Bond Index (Inv) | VBIIX |
| Vanguard Intermediate-Term Investment-Grade (Inv) | VFICX |
| Vanguard International Explorer (Inv) | VINEX |
| Vanguard International Value (Inv) | VTRIX |
| Vanguard LifeStrategy Growth (Inv) | VASGX |
| Vanguard Long-Term Bond Index (Inv) | VBLTX |
| Vanguard Long-Term Treasury (Inv) | VUSTX |
| Vanguard Mid Cap Growth (Inv) | VMGRX |
| Vanguard Mid Cap Index (Inv) | VIMSX |
| Vanguard Morgan Growth (Inv) | VMRGX |
| Vanguard Pacific Stock Index (Inv) | VPACX |
| Vanguard Prime Money Market (Inv) | VMMXX |
| Vanguard REIT Index (Inv) | VGSIX |
| Vanguard Selected Value (Inv) | VASVX |
| Vanguard Short-Term Bond Index (Inv) | VBISX |
| Vanguard Short-Term Federal (Inv) | VSGBX |
| Vanguard Short-Term Investment-Grade (Inv) | VFSTX |
| Vanguard Short-Term Treasury (Inv) | VFISX |
| Vanguard Small Cap Index (Inv) | NAESX |
| Vanguard Small Cap Value Index (Inv) | VISVX |
| Vanguard STAR (Inv) | VGSTX |
| Vanguard Target Retirement 2010 (Inv) | VTENX |
| Vanguard Target Retirement 2015 (Inv) | VTXVX |
| Vanguard Target Retirement 2020 (Inv) | VTWNX |
| Vanguard Target Retirement 2025 (Inv) | VTTVX |
| Vanguard Target Retirement 2030 (Inv) | VTHRX |
| Vanguard Target Retirement 2035 (Inv) | VTTHX |
| Vanguard Target Retirement 2040 (Inv) | VFORX |

| Fund Name | Ticker |
|---|---|
| Vanguard Target Retirement 2045 (Inv) | VTIVX |
| Vanguard Target Retirement 2050 (Inv) | VFIFX |
| Vanguard Total Bond Market Index (Inst) | VBTIX |
| Vanguard Total International Stock Index (Inv) | VGTSX |
| Vanguard Total Stock Market Index (Inv) | VTSMX |
| Vanguard U.S. Growth (Inv) | VWUSX |
| Vanguard Value Index (Inv) | VIVAX |
| Vanguard Wellington (Inv) | VWELX |
| Vanguard Windsor II (Inv) | VWNFX |

188. Had Defendants conducted a prudent investment review process, many of these options that consistently failed to meet performance objectives would have been eliminated from the Plan or replaced. Defendants' failure to do so caused the Plan substantial losses compared to prudent alternative investments that were available to the Plan. Two funds in particular demonstrate the severe harm to the Plan resulting from Defendants' breaches of fiduciary duties: the CREF Stock Account and TIAA Real Estate Account.

## A. CREF Stock Account

189. The CREF Stock Account is one of the largest investment options, by asset size, in the Plan with over $370 million in assets, and has been included in the Plan from 2010 to date and many years prior. In its fund fact sheets and participant disclosures, TIAA-CREF classifies the CREF Stock Account as a domestic equity investment in the large cap blend Morningstar category. This option has consistently underperformed over years, and continues to underperform its

benchmark and lower-cost actively and passively managed investments that were available to the Plan.

190. TIAA-CREF imposed restrictive provisions on the specific annuities that *must* be provided in the Plan. Under these terms, TIAA-CREF required that the CREF Stock Account be offered to Plan participants, in addition to the TIAA Traditional and the CREF Money Market Account. Plan fiduciaries provided these mandatory offerings in the Plan without a prudent process to determine whether they were prudent alternatives and in the exclusive best interest of Plan participants and beneficiaries. TIAA-CREF required the CREF Stock Account to be included in the Plan to drive very substantial amounts of revenue sharing payments to TIAA-CREF for recordkeeping services. The CREF Stock Account paid 24 bps for revenue sharing, which exceeded other TIAA-CREF investments by over 50% (15 bps).

191. As understood in the investment community, passively managed investment options should either be used or, at a minimum, thoroughly analyzed and considered in efficient markets such as large capitalization U.S. stocks. This is because it is difficult and either unheard of, or extremely unlikely, to find actively managed mutual funds that outperform a passive index, net of fees, particularly on a persistent basis. This extreme unlikelihood is even greater in the large cap market because such companies are the subject of many analysts' coverage, while smaller stocks are not as widely covered by analysts and thus are subject to potential inefficiencies in pricing.

192.    Nobel Prize winners in economics have concluded that virtually no investment manager consistently beats the market over time after fees are taken into account. "Properly measured, the average actively managed dollar must underperform the average passively managed dollar, net of costs." William F. Sharpe, *The Arithmetic of Active Management,* 47 FIN. ANALYSTS J. 7, 8 (Jan./Feb. 1991);[49] Eugene F. Fama & Kenneth R. French, *Luck Versus Skill in the Cross-Section of Mutual Fund Returns*, 65 J. FIN. 1915, 1915 (2010)("After costs . . . in terms of net returns to investors, active investment must be a negative sum game.").

193.    To the extent fund managers show any sustainable ability to beat the market, the outperformance is nearly always dwarfed by mutual fund expenses. Fama & French, *Luck Versus Skill in the Cross-Section of Mutual Fund Returns*, at 1931–34; *see also* Russ Wermers, *Mutual Fund Performance: An Empirical Decomposition into Stock-Picking Talent, Style, Transaction Costs, and Expenses*, 55 J. FIN. 1655, 1690 (2000) ("on a net-return level, the funds underperform broad market indexes by one percent per year").

194.    If an individual high-cost mutual fund exhibits market-beating performance over a short period of time, studies demonstrate that outperformance during a particular period is not predictive of whether a mutual fund will perform well in the future. Laurent Barras et al., *False Discoveries in Mutual Fund Performance: Measuring Luck in Estimated Alphas*, 65 J. FIN. 179, 181 (2010); Mark

---

[49] Available at http://www.cfapubs.org/doi/pdf/10.2469/faj.v47.n1.7.

M. Carhart, *On Persistence in Mutual Fund Performance*, J. Fin. 57, 57, 59 (1997)(measuring thirty-one years of mutual fund returns and concluding that "persistent differences in mutual fund expenses and transaction costs explain almost all of the predictability in mutual fund returns"). However, the *worst-performing* mutual funds show a strong, persistent tendency to continue their poor performance. Carhart, *On Persistence in Mutual Fund Performance*, at 57.

195.    Accordingly, investment costs are of paramount importance to prudent investment selection, and a prudent investor will not select higher-cost actively managed funds unless there has been a documented process leading to the realistic conclusion that the fund is likely to be that extremely rare exception, if one even exists, that will outperform its benchmark over time, net of investment expenses.

196.    Moreover, the efficiencies of the large cap market hinder an active manager's ability to achieve excess returns for investors.

> [T]his study of mutual funds does not provide any reason to abandon a belief that securities markets are remarkably efficient. Most investors would be considerably better off by purchasing a low expense index fund, than by trying to select an active fund manager who appears to possess a "hot hand." Since active management generally fails to provide excess returns and tends to generate greater tax burdens for investors, the advantage of passive management holds, a fortiori.

Burton G. Malkiel, Returns from Investing in Equity Mutual Funds 1971 to 1991, 50 J. Fin. 549, 571 (1995).[50]

197.    Academic literature overwhelmingly concludes that active managers consistently underperform the S&P 500 index.

---

[50] Available at http://indeksirahastot.fi/resource/malkiel.pdf.

> Active managers themselves provide perhaps the most persuasive case for passive investing. Dozens of studies have examined the performance of mutual funds and other professional-managed assets, and virtually all of them have concluded that, on average, active managers underperform passive benchmarks ... The median active fund underperformed the passive index in 12 out of 18 years [for the large- cap fund universe] ... The bottom line is that, over most periods, the majority of mutual fund investors would have been better off investing in an S&P 500 Index fund.
> ****
> Most of the dismal comparisons for active managers are for large-cap domestic managers versus the S&P 500 Index.

Robert C. Jones, *The Active Versus Passive Debate: Perspectives of an Active Quant*, ACTIVE EQUITY PORTFOLIO MANAGEMENT, at 37, 40, 53 (Frank J. Fabozzi ed., 1998).

198. Prudent fiduciaries of large defined contribution plans must conduct an analysis to determine whether actively managed funds, particularly large cap, will outperform their benchmark net of fees. Prudent fiduciaries then make a reasoned decision as to whether it is in participants' best interest to offer an actively managed large cap option for the particular investment style and asset class, in light of the higher costs of active management.

199. Defendants failed to undertake such an analysis, or any analysis, when it allowed the actively managed CREF Stock Account to be included and retained in the Plan. This is particularly true given TIAA-CREF's requirement that the CREF Stock Account be provided in the Plan in order to drive revenue to TIAA-CREF. By allowing the Plan to be bound by this requirement, Defendants failed to conduct an independent evaluation of the prudence of this option, which contradicts every

principle of prudent investing because an investment that was no longer prudent could not be removed from the Plan.

200.    Additionally, as detailed above in ¶¶124–126, the 46 bps that the CREF Stock Account charged was comprised of four layers of fees that were each unreasonable compared to the actual services provided by TIAA-CREF to the Plan's participants. Defendant failed to analyze whether these fees were appropriate and reasonable in light of the services provided and given that the Plan invested over *$370 million* in the CREF Stock Account.

201.    Had such an analysis been conducted by Defendants, they would have determined that the CREF Stock Account would not be expected to outperform the large cap index after fees. That is in fact what occurred.

202.    Defendants and TIAA-CREF identified the Russell 3000 Index as the appropriate benchmark to evaluate the fund's investment results, as shown in the excerpt below that was provided to the Plan's participants.[51]

| Investment Name / Benchmark | Morningstar Category | Ticker Symbol | Inception Date |
|---|---|---|---|
| Russell 2000 Index | | | |
| CREF Stock Account | Large Blend | QCSTRX | 07/31/1952 |
| Russell 3000 Index | | | |

---

[51]Available at https://hr.vanderbilt.edu/benefits/FeeDisclosure2015.pdf.

203. The CREF Stock Account did not merely underperform in a single year or two. Historical performance of the CREF Stock Account has been persistently poor for many years compared to this identified benchmark index (Russell 3000 Index), and also as compared to available low-cost index funds. The following two charts compare the investment returns of the CREF Stock Account to its benchmark (the Russell 3000) and two other passively managed index funds in the same investment style for the one-, three-, five-, and ten-year periods ending September 30, 2016. For each comparison, the CREF Stock Account dramatically underperformed the benchmarks and index alternatives. The passively managed index funds used for comparison purposes are the Vanguard Total Stock Market Index Fund (Instl Plus) (VITPX) and the Vanguard Institutional Index (Instl Plus) (VIIIX). Like the CREF Stock Account, these options are large cap blend investments.

Case 3:16-cv-02086   Document 38   Filed 12/12/16   Page 120 of 160 PageID #: 750



**CREF Stock Account
One-, Three-, and Five-Year Investment Returns
Compared to Benchmarks**
(as of Sept. 30, 2016)



**CREF Stock Account
Ten-Year Investment Returns
Compared to Benchmarks**
(as of Sept. 30, 2016)

Case 3:16-cv-02086   Document 38   Filed 12/12/16   Page 121 of 160 PageID #: 751

204.    The CREF Stock Account, with an expense ratio of 46 bps as of

December 31, 2014, was and is dramatically more expensive than far better

performing index alternatives: the Vanguard Total Stock Market Index Fund-Instl

Plus (2 bps) and the Vanguard Institutional Index-Instl Plus (2 bps).

205.    Apart from underperforming passively managed index funds, the fund

also significantly underperformed comparable actively managed funds over the

one-, three-, five-, and ten-year periods ending September 30, 2016. These large cap

alternatives with similar underlying asset allocations to the CREF Stock Account

include the Vanguard PRIMECAP-Adm (VPMAX) and the Vanguard Capital Opp.-

Adm (VHCAX).



**CREF Stock Account
One-, Three-, and Five-Year Investment Returns
Compared to Actively Managed Benchmarks**
(as of Sept. 30, 2016)



**CREF Stock Account**
**Ten-Year Investment Returns**
**Compared to Actively Managed Benchmarks**
**(as of Sept. 30, 2016)**

206. This sustained underperformance went back even further. The CREF Stock Account also had a long history of substantial underperformance compared to these actively managed alternatives over the one-, five-, and ten-year periods ending December 31, 2009.[52]

---

[52] For the Vanguard PRIMECAP-Adm and Vanguard Capital Opportunity Fund-Adm, the investment returns of the investor share class for ten-year performance were used because the admiral share class for each of these funds was not offered until November 12, 2001. The return since inception for the Vanguard PRIMECAP-Adm was 3.23%, and for the Vanguard Capital Opportunity Fund-Adm, 5.89%.

Case 3:16-cv-02086   Document 38   Filed 12/12/16   Page 123 of 160 PageID #: 753



**CREF Stock Account**
**One-Year Investment Returns Compared to**
**Actively Managed Benchmarks**
(as of Dec. 31, 2009)

8%–53%
greater than
CREF return

1 Year

■ CREF Stock Account  ■ VPMAX  ■ VHCAX



**CREF Stock Account**
**Five-Year Investment Returns Compared to**
**Actively Managed Benchmarks**
(as of Dec. 31, 2009)

174%–206%
greater than
CREF return

5 Year

■ CREF Stock Account  ■ VPMAX  ■ VHCAX

Case 3:16-cv-02086   Document 38   Filed 12/12/16   Page 124 of 160 PageID #: 754



CREF Stock Account
Ten-Year Investment Returns Compared to
Actively Managed Benchmarks
(as of Dec. 31, 2009)

3130%–5790% greater than CREF return

- CREF Stock Account
- VPMAX
- VHCAX

207.    Despite the consistent underperformance, the CREF Stock Account, with an expense ratio of 46 bps as of December 31, 2014, was more expensive than better-performing actively managed alternatives: the Vanguard PRIMECAP-Adm (35 bps) and the Vanguard Capital Opp.-Adm (40 bps).

208.    Besides this abysmal long-term underperformance of the CREF Stock Account compared to both index funds and actively managed funds, the fund was recognized as imprudent in the industry. In March 2012, an independent investment consultant, AonHewitt, recognized the imprudence of the CREF Stock Account and recommended to its clients they remove this fund from their retirement plan. AonHewitt, *TIAA-CREF Asset Management*, INBRIEF, at 3 (July

2012).[53] This recommendation was made due to numerous factors, including the historical underperformance, high turnover of asset management executives and portfolio managers, and the fund's over 60 separate underlying investment strategies, greatly reducing the fund's ability to generate excess returns over any substantial length of time. *Id.* at 4–5.

209.    The Supreme Court has recently and unanimously ruled that ERISA fiduciaries have "a continuing duty to monitor investments and remove imprudent ones[.]" *Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1829 (2015). In contrast to the conduct of prudent fiduciaries, Defendants failed to conduct a prudent process to monitor the CREF Stock Account and continue to retain the fund despite its continuing to underperform lower-cost investment alternatives that were readily available to the Plan.

210.    Prudent fiduciaries of defined contribution plans continuously monitor the investment performance of plan options against applicable benchmarks and peer groups to identify underperforming investments. Based on this process, prudent fiduciaries replace those imprudent investments with better performing and reasonably priced options. Under the standards used by prudent independent fiduciaries, the CREF Stock Account would have been removed from the Plan.

211.    Had Defendants removed the CREF Stock Fund and the amounts been invested in any of the actively managed lower-cost alternatives identified in ¶205,

---

[53] Available at http://system.nevada.edu/Nshe/?LinkServID=82B25D1E-9128-6E45-1094320FC2037740.

or the passively managed lower-cost alternatives identified in ¶203, Plan participants would not have lost in excess of $118 million of their retirement savings from the fund being retained in the Plan.[54]

### B. TIAA Real Estate Account

212.   Defendants selected and retained the TIAA Real Estate Account as one of the real estate investment options in the Plan. The fund has far greater fees than are reasonable, has historically underperformed, and continues to consistently underperform comparable real estate investment alternatives, including the Vanguard REIT Index I (VGSNX).

213.   Additionally, as detailed in ¶¶127–128, the 87 bps that the TIAA Real Estate Account charged was comprised of *five* layers of fees that were each unreasonable compared to the actual services provided by TIAA-CREF to the Plan's participants. Defendants failed to analyze whether these fees were appropriate and reasonable in light of the services provided.

214.   With an expense ratio of 87 bps as of December 31, 2014, the TIAA Real Estate Account is over *10 times more expensive* than the Vanguard REIT Index I with an expense ratio of 8 bps.

---

[54] Plan losses have been brought forward to the present value using the investment returns of the lower-cost alternatives to compensate participants who have not been reimbursed for their losses.



215. The TIAA Real Estate Account had a long history of substantial underperformance relative to the Vanguard REIT Index over the one-, five-, and ten-year periods ending December 31, 2009.[55] Despite this, Defendants selected and to this date retain it in the Plan.

---

[55] The return of the investor share class was used for ten-year performance because the institutional share class was not offered until December 2, 2003. The return since inception for the Vanguard REIT Index-I was 5.49%.







**TIAA Real Estate Account**
**Ten-Year Investment Returns Compared to**
**REIT Index Fund (VGSNX)**
**(as of Dec. 31, 2009)**

239% greater than TIAA return

12%

7%

2%

**10 Year**

■ TIAA Real Estate Account    ■ VGSNX

216.   This underperformance occurred for years before 2009 and has continued after 2009 to date. The TIAA Real Estate Account significantly underperformed the Vanguard REIT Index I over the one-, three-, five-, and ten-year periods ending September 30, 2016.



**TIAA Real Estate Account**
**One-, Three-, Five-, and Ten-Year Investment Returns**
**Compared to REIT Index Fund (VGSNX)**
(as of Sept. 30, 2016)

217.    As the Supreme Court unanimously ruled in *Tibble*, prudent fiduciaries of defined contribution plans must continuously monitor plan investment options and replace imprudent investments. *Tibble*, 135 S. Ct. at 1829. In contrast, Defendants failed to conduct such a process and retained the TIAA Real Estate Account as a Plan investment option despite its continued dramatic underperformance and far higher cost compared to available investment alternatives.

218.    Had Defendants removed the TIAA Real Estate Account and amounts been invested in the lower-cost and better-performing Vanguard REIT Index I, Plan

participants would not have lost in excess of $12 million from the fund being retained in the Plan.[56]

## CLASS ACTION ALLEGATIONS

219.    29 U.S.C. §1132(a)(2) authorizes any participant or beneficiary of the Plan to bring an action individually on behalf of the Plan to enforce a breaching fiduciary's liability to the Plan under 29 U.S.C. §1109(a).

220.    In acting in this representative capacity and to enhance the due process protections of unnamed participants and beneficiaries of the Plan, as an alternative to direct individual actions on behalf of the Plan under 29 U.S.C. §1132(a)(2), Plaintiffs seek to certify this action as a class action on behalf of all participants and beneficiaries of the Plan. Plaintiffs seek to certify, and to be appointed as representatives of, the following class:

> All participants and beneficiaries of the Vanderbilt University Retirement Plan and the Vanderbilt University New Faculty Plan from August 10, 2010, through the date of judgment, excluding the Defendants.

221.    This action meets the requirements of Rule 23 and is certifiable as a class action for the following reasons:

a.    The Class includes over 40,000 members and is so large that joinder of all its members is impracticable.

---

[56] Plan losses have been brought forward to the present value using the investment returns of the Vanguard REIT Index I to compensate participants who have not been reimbursed for their losses.

b. There are questions of law and fact common to this Class because the Defendants owed fiduciary duties to the Plan and to all participants and beneficiaries and took the actions and omissions alleged herein as to the Plan and not as to any individual participant. Thus, common questions of law and fact include the following, without limitation: who are the fiduciaries liable for the remedies provided by 29 U.S.C. §1109(a); whether the fiduciaries of the Plan breached their fiduciary duties to the Plan; what are the losses to the Plan resulting from each breach of fiduciary duty; and what Plan-wide equitable and other relief the court should impose in light of Defendants' breach of duty.

c. Plaintiffs' claims are typical of the claims of the Class because each Plaintiff was a participant during the time period at issue in this action and all participants in the Plan were harmed by Defendants' misconduct.

d. Plaintiffs are adequate representatives of the Class because they were participants in the Plan during the Class period, have no interest that is in conflict with the Class, are committed to the vigorous representation of the Class, and have engaged experienced and competent attorneys to represent the Class.

e. Prosecution of separate actions for these breaches of fiduciary duties by individual participants and beneficiaries would create the risk of (A) inconsistent or varying adjudications that would establish incompatible standards of conduct for Defendants in respect to the discharge of their

fiduciary duties to the Plan and personal liability to the Plan under 29 U.S.C. §1109(a), and (B) adjudications by individual participants and beneficiaries regarding these breaches of fiduciary duties and remedies for the Plan would, as a practical matter, be dispositive of the interests of the participants and beneficiaries not parties to the adjudication or would substantially impair or impede those participants' and beneficiaries' ability to protect their interests. Therefore, this action should be certified as a class action under Rule 23(b)(1)(A) or (B).

222.    A class action is the superior method for the fair and efficient adjudication of this controversy because joinder of all participants and beneficiaries is impracticable, the losses suffered by individual participants and beneficiaries may be small and impracticable for individual members to enforce their rights through individual actions, and the common questions of law and fact predominate over individual questions. Given the nature of the allegations, no class member has an interest in individually controlling the prosecution of this matter, and Plaintiffs are aware of no difficulties likely to be encountered in the management of this matter as a class action. Alternatively, then, this action may be certified as a class under Rule 23(b)(3) if it is not certified under Rule 23(b)(1)(A) or (B).

223.    Plaintiffs' counsel, Schlichter, Bogard & Denton LLP, will fairly and adequately represent the interests of the Class and is best able to represent the interests of the Class under Rule 23(g).

a.      Schlichter, Bogard & Denton has been appointed as class counsel in 17 other ERISA class actions regarding excessive fees in large defined contribution plans. As Chief Judge Michael J. Reagan of the Southern District of Illinois recognized in approving a settlement which was reached on the eve of trial after eight years of litigation, resulting in a $62 million monetary recovery and very substantial affirmative relief to benefit the Plans, the firm had shown "exceptional commitment and perseverance in representing employees and retirees seeking to improve their retirement plans," and "demonstrated its well-earned reputation as a pioneer and the leader in the field" of 401(k) plan excessive fee litigation. *Abbott v. Lockheed Martin Corp.*, No. 06-701, 2015 U.S.Dist.LEXIS 93206, at *4–5 (S.D.Ill. July 17, 2015).  In that same case, Judge Reagan recognized that the law firm of "Schlichter, Bogard & Denton has had a humungous impact over the entire 401(k) industry, which has benefited employees and retirees throughout the entire country by bringing sweeping changes to fiduciary practices." *Abbott*, 2015 U.S. Dist. LEXIS 93206, at *9 (internal quotations omitted).

b.      Other courts have made similar findings: "It is clear to the Court that the firm of Schlichter, Bogard & Denton is preeminent in the field" "and is the only firm which has invested such massive resources in this area." *George v. Kraft Foods Global, Inc.*, No. 08-3799, 2012 U.S.Dist.LEXIS 166816 at 8 (N.D. Ill. June 26, 2012).

c. "As the preeminent firm in 401(k) fee litigation, Schlichter, Bogard & Denton has achieved unparalleled results on behalf of its clients." *Nolte v. Cigna Corp.*, No. 07-2046, 2013 U.S.Dist.LEXIS 184622 at 8 (C.D. Ill. Oct. 15, 2013).

d. "Litigating this case against formidable defendants and their sophisticated attorneys required Class Counsel to demonstrate extraordinary skill and determination." *Beesley v. Int'l Paper Co.*, No. 06-703, 2014 U.S.Dist.LEXIS 12037 at *8 (S.D. Ill. Jan. 31, 2014). The court also emphasized that "the law firm of Schlichter, Bogard & Denton is the leader in 401(k) fee litigation." *Id.* at *8 (internal quotations omitted).

e. U.S. District Court Judge Baker acknowledged the significant impact of the firm's work by stating that as of 2013 the nationwide "fee reduction attributed to Schlichter, Bogard & Denton's fee litigation and the Department of Labor's fee disclosure regulations approach *$2.8 billion in annual savings* for American workers and retirees." *Nolte*, 2013 U.S. Dist. LEXIS 184622, at *6 (emphasis added).

f. U.S. District Judge Herndon of the Southern District of Illinois, recognized the firm's extraordinary contributions to the retirement industry: "Schlichter, Bogard & Denton and lead attorney Jerome Schlichter's diligence and perseverance, while risking vast amounts of time and money, reflect the finest attributes of a private attorney general..." *Beesley*, 2014 U.S. Dist. LEXIS 12037, at *8.

136

g. The U.S. District Court Judge G. Patrick Murphy recognized the work of Schlichter, Bogard & Denton as exceptional:

> "Schlichter, Bogard & Denton's work throughout this litigation illustrates an exceptional example of a private attorney general risking large sums of money and investing many thousands of hours for the benefit of employees and retirees. No case had previously been brought by either the Department of Labor or private attorneys against large employers for excessive fees in a 401(k) plan. Class Counsel performed substantial work … investigating the facts, examining documents, and consulting and paying experts to determine whether it was viable. This case has been pending since September 11, 2006. Litigating the case required Class Counsel to be of the highest caliber and committed to the interests of the participants and beneficiaries of the General Dynamics 401(k) Plans."

*Will v. General Dynamics Corp.*, No. 06-698, 2010 U.S.Dist.LEXIS 123349 at 8–9 (S.D.Ill. Nov. 22, 2010).

h. Schlichter, Bogard & Denton handled the only full trial of an ERISA excessive fee case, resulting in a $36.9 million judgment for the plaintiffs that was affirmed in part by the Eighth Circuit. *Tussey v. ABB, Inc.*, 746 F.3d 327 (8th Cir. 2014). In awarding attorney's fees after trial, the district court concluded that "Plaintiffs' attorneys are clearly experts in ERISA litigation." *Tussey v. ABB, Inc.*, No. 06-4305, 2012 U.S.Dist.LEXIS 157428 at 10 (W.D. Mo. Nov. 2, 2012). Following remand, the district court again awarded Plaintiffs' attorney's fees, emphasizing the significant contribution Plaintiffs' attorneys have made to ERISA litigation, including educating the Department of Labor and federal courts about the importance of monitoring fees in retirement plans:

137

"Of special importance is the significant, national contribution made by the Plaintiffs whose litigation clarified ERISA standards in the context of investment fees. The litigation educated plan administrators, the Department of Labor, the courts and retirement plan participants about the importance of monitoring recordkeeping fees and separating a fiduciary's corporate interest from its fiduciary obligations."

*Tussey v. ABB, Inc.*, No. 06-4305, 2015 U.S.Dist.LEXIS 164818 at 7–8 (W.D. Mo. Dec. 9, 2015).

i. In *Spano v. Boeing Co.*, in approving a settlement reached after nine years of litigation which included $57 million in monetary relief and substantial affirmative relief to benefit participants, the court found that "[t]he law firm Schlichter, Bogard & Denton has significantly improved 401(k) plans across the country by bringing cases such as this one, which have educated plan administrators, the Department of Labor, the courts and retirement plan participants about the importance of monitoring recordkeeping fees." No. 06-cv-743, Doc. 587, at 5–6 (S.D.Ill. Mar. 31, 2016) (Rosenstengel, J.) (internal quotations omitted).

j. Recently, in approving a settlement including $32 million plus significant affirmative relief, Chief Judge William Osteen in *Kruger v. Novant Health, Inc.*, No. 14-208, Doc. 61, at 7–8 (M.D.N.C. Sept. 29, 2016) found that "Class Counsel's efforts have not only resulted in a significant monetary award to the class but have also brought improvement to the manner in which the Plans are operated and managed which will result in participants and retirees receiving significant savings[.]"

138

k.     On November 3, 2016, Judge Michael Ponsor of the United States District Court for the District of Massachusetts found that by securing a $30.9 million settlement, Schlichter, Bogard & Denton had achieved an "outstanding result for the class," and "demonstrated extraordinary resourcefulness, skill, efficiency and determination." *Gordan v. Mass Mutual Life Ins., Co.*, No. 14-30184, Doc. 144 at 5 (D. Mass. November 3, 2016).

l.     Schlichter, Bogard & Denton is also class counsel in and handled *Tibble v. Edison International*—the first and only Supreme Court case to address the issue of excessive fees in a defined contribution plan—in which the Court held in a unanimous 9–0 decision that ERISA fiduciaries have "a continuing duty to monitor investments and remove imprudent ones[.]" 135 S. Ct. at 1829. Schlichter, Bogard & Denton successfully petitioned for a writ of certiorari, and obtained amicus support from the United States Solicitor General and AARP, among others. Given the Court's broad recognition of an ongoing fiduciary duty, the *Tibble* decision will affect all ERISA defined contribution plans.

m.     The firm's work in ERISA excessive fee class actions has been featured in the New York Times, Wall Street Journal, NPR, Reuters, and Bloomberg, among other media outlets. *See, e.g.*, Anne Tergesen, *401(k) Fees, Already Low, Are Heading Lower*, WALL ST. J. (May 15, 2016);[57] Gretchen

---

[57] Available at http://www.wsj.com/articles/401-k-fees-already-low-are-heading-lower-1463304601.

Morgenson, *A Lone Ranger of the 401(k)'s*, N.Y. TIMES (Mar. 29, 2014);[58] Liz

Moyer, *High Court Spotlight Put on 401(k) Plans*, WALL ST. J. (Feb. 23,

2015);[59] Floyd Norris, *What a 401(k) Plan Really Owes Employees*, N.Y.

TIMES (Oct. 16, 2014);[60] Sara Randazzo, *Plaintiffs' Lawyer Takes on

Retirement Plans*, WALL ST. J. (Aug. 25, 2015);[61] Jess Bravin and Liz Moyer,

*High Court Ruling Adds Protections for Investors in 401(k) Plans*, WALL ST. J.

(May 18, 2015); [62] Jim Zarroli, *Lockheed Martin Case Puts 401(k) Plans on

Trial*, NPR (Dec. 15, 2014);[63] Mark Miller*, Are 401(k) Fees Too High? The

High-Court May Have an Opinion*, REUTERS (May 1, 2014);[64] Greg Stohr,

*401(k) Fees at Issue as Court Takes Edison Worker Appeal*, BLOOMBERG (Oct.

2, 2014).[65]

---

[58] Available at http://www.nytimes.com/2014/03/30/business/a-lone-ranger-of-the-401-k-s.html?_r=0.

[59] Available at http://www.wsj.com/articles/high-court-spotlight-put-on-401-k-plans-1424716527.

[60] Available at http://www.nytimes.com/2014/10/17/business/what-a-401-k-plan-really-owes-employees.html?_r=0.

[61] Available at http://blogs.wsj.com/law/2015/08/25/plaintiffs-lawyer-takes-on-retirement-plans/.

[62] Available at http://www.wsj.com/articles/high-court-ruling-adds-protections-for-investors-in-401-k-plans-1431974139.

[63] Available at http://www.npr.org/2014/12/15/370794942/lockheed-martin-case-puts-401-k-plans-on-trial.

[64] Available at http://www.reuters.com/article/us-column-miller-401fees-idUSBREA400J220140501.

[65] Available at http://www.bloomberg.com/news/articles/2014-10-02/401-k-fees-at-issue-as-court-takes-edison-worker-appeal.

## COUNT I

## Breach of Fiduciary Duties—29 U.S.C. §1104(a)(1)(A) & (B)

## Locking the Plan into CREF Stock Account and TIAA Recordkeeping

224.    Plaintiffs restate and incorporate the allegations in the preceding paragraphs.

225.    Defendants were required to discharge their duties with respect to the Plan solely in the interest of, and for the exclusive purpose of providing benefits to, Plan participants and beneficiaries, defraying reasonable expenses of administering the Plan, and acting with the care, skill, prudence, and diligence required by ERISA.

226.    Defendants were required to independently assess "the prudence of *each* investment option" for the Plan on an ongoing basis, *DiFelice*, 497 F.3d at 423, and to act prudently and solely in the interest of the Plan's participants in deciding whether to maintain a recordkeeping arrangement, DOL Adv. Op. 97-16A. Defendants were also required to remove investments that were no longer prudent for the Plan, as the Supreme Court recently confirmed. *Tibble*, 135 S. Ct. at 1828–29.

227.    By allowing TIAA-CREF to mandate the inclusion of the CREF Stock Account and Money Market Account in the Plan, as well as the TIAA Traditional Annuity, and to require that it provide recordkeeping for its proprietary options, Defendants committed the Plan to an imprudent arrangement in which certain investments had to be included and could not be removed from the plan *even if they*

141

*were no longer prudent investments*, and prevented the Plan from using alternative recordkeepers who could provide superior services at a lower cost. In so doing, Defendants abdicated its duty to independently assess the prudence of each option in the Plan on an ongoing basis, and to act prudently and solely in the interest of participants in selecting the Plan's recordkeeper. By allowing TIAA-CREF to dictate these terms, Defendants favored the financial interests of TIAA-CREF in receiving a steady stream of revenues from TIAA-CREF's proprietary funds over the interest of participants.

228.    Because Defendants shackled the Plan with the CREF Stock Account and TIAA recordkeeping services without engaging in a reasoned decision-making process as to the prudence of those options, Defendants are liable to make good to the Plan all losses resulting from its breach. 29 U.S.C. §1109(a). As described in detail above, the Plan suffered massive losses from the inclusion of the CREF Stock Account in the Plan compared to what those assets would have earned if invested in prudent alternative investments that were available to the Plan, and also suffered losses from paying TIAA recordkeeping fees that far exceeded market rates. \

229.    Total Plan losses will be determined after complete discovery in this case and are continuing.

230.    Defendants are personally liable under 29 U.S.C. §1109(a) to make good to the Plan any losses to the Plan resulting from the breaches of fiduciary duties alleged in this Count and is subject to other equitable or remedial relief as appropriate.

231.    Each Defendant knowingly participated in the breach of the other

Defendants, knowing that such acts were a breach, enabled the other Defendants to

commit a breach by failing to lawfully discharge its own fiduciary duties, knew of

the breach by the other Defendants and failed to make any reasonable effort under

the circumstances to remedy the breach. Thus, each defendant is liable for the

losses caused by the breach of its co-fiduciary under 29 U.S.C. §1105(a).

## COUNT II

### Prohibited transactions—29 U.S.C. §1106(a)(1)

### Locking the Plan into CREF Stock Account and TIAA Recordkeeping

232.    Plaintiffs restate and incorporate the allegations contained in the

preceding paragraphs.

233.    Section 1106(a)(1) prohibits transactions between a plan and a "party

in interest," and provides as follows:

> [A] fiduciary with respect to a plan shall not cause the plan to engage in a
> transaction, if he knows or should know that such transaction constitutes a
> direct or indirect –
>
> > (A)     sale or exchange, or leasing, of any property between the
> > plan and a party in interest;
> > * * *
> > (C)     furnishing of goods, services, or facilities between the plan
> > and  party in interest;
> > (D)     transfer to, or use by or for the benefit of a party in
> > interest, of any assets of the plan …

29 U.S.C. §1106(a)(1).

234.    Congress defined "party in interest" to encompass "those entities that a

fiduciary might be inclined to favor at the expense of the plan beneficiaries," such as

employers, other fiduciaries, and service providers. *Harris Tr. & Sav. Bank v. Salomon Smith Barney, Inc.,* 530 U.S. 238, 242 (2000); 29 U.S.C. §1002(14)(A)–(C). As a service provider to the Plan, TIAA-CREF is a party in interest. 29 U.S.C. §1002(14)(B).

235.    By allowing the Plan to be locked into an unreasonable arrangement that required the Plan to include the CREF Stock Account and to use TIAA as the recordkeeper for its proprietary products even though the fund was no longer a prudent option for the Plan due to its excessive fees and poor performance, and even though TIAA's recordkeeping fees were unreasonable for the services provided, Defendants caused the Plan to engage in transactions that it knew or should have known constituted an exchange of property between the Plan and TIAA-CREF prohibited by 29 U.S.C. §1106(a)(1)(A), a direct or indirect furnishing of services between the Plan and TIAA-CREF prohibited by 29 U.S.C. §1106(a)(1)(C), and a transfer of Plan assets to TIAA-CREF prohibited by 29 U.S.C. §1106(a)(1)(D). These transactions occurred each time the Plan paid fees to TIAA-CREF in connection with the Plan's investments in the CREF Stock Account and other proprietary options that paid revenue sharing to TIAA.

236.    Total Plan losses will be determined after complete discovery in this case and are continuing.

237.    Under 29 U.S.C. §1109(a), Defendants are personally liable to restore all losses to the Plan resulting from these prohibited transactions, and to provide

restitution of all proceeds of these prohibited transactions, and are subject to other appropriate equitable or remedial relief.

238. Each Defendant knowingly participated in these transactions with knowledge that the transactions were a breach, enabled the other Defendants to cause the Plan to engage in these transactions, and knew of these transactions and failed to make any reasonable effort under the circumstances to remedy or discontinue the transactions. Thus, under 29 U.S.C. §1105(a), each Defendant is liable for restoring all proceeds and losses attributable to these transactions.

## COUNT III

## Breach of Fiduciary Duties—29 U.S.C. §1104(a)(1)(A) & (B)
### Unreasonable Administrative Fees

239. Plaintiffs restate and incorporate the allegations contained in the preceding paragraphs.

240. Defendants were required to discharge its duties with respect to the Plan solely in the interest of, and for the exclusive purpose of providing benefits to Plan participants and beneficiaries, defraying reasonable expenses of administering the Plan, and acting with the care, skill, prudence, and diligence required by ERISA.

241. If a defined contribution plan overpays for recordkeeping services due to the fiduciaries' "failure to solicit bids" from other recordkeepers, the fiduciaries have breached their duty of prudence. *See George,* 641 F.3d at 798–99. Similarly, failing to "monitor and control recordkeeping fees" and "paying excessive revenue

145

sharing" as a result of failures to "calculate the amount the Plan was paying …

through revenue sharing," to "determine whether [the recordkeeper's] pricing was

competitive," and to "leverage the Plan's size to reduce fees," while allowing the

"revenue sharing to benefit" a third-party recordkeeper "at the Plan's expense," is a

breach of fiduciary duties. *Tussey,* 746 F.3d at 336.

242.    Defendants' process for monitoring and controlling the Plan's

recordkeeping fees was a fiduciary breach in that Defendants failed to adequately

monitor the amount of the revenue sharing received by the Plan's recordkeepers,

determine if those amounts were competitive or reasonable for the services provided

to the Plan, or use the Plan's size to reduce fees or obtain sufficient rebates to the

Plan for the excessive fees paid by participants. Moreover, Defendants failed to

solicit bids from competing providers on a flat per-participant fee basis. As the

Plan's assets grew, the asset-based revenue sharing payments to the Plan's

recordkeepers grew, even though the services provided by the recordkeepers

remained the same. This caused the recordkeeping compensation paid to the

recordkeepers to exceed a reasonable fee for the services provided. This conduct was

a breach of fiduciary duties.

243.    By allowing TIAA-CREF, Fidelity, VALIC, and Vanguard to put their

proprietary investments in the Plan without scrutinizing those providers' financial

interest in using funds that provided them a steady stream of revenue sharing

payments, Defendants failed to act in the exclusive interest of participants.

244.    In contrast to the comprehensive plan reviews conducted by similarly situated 403(b) plan fiduciaries which resulted in consolidation to a single recordkeeper and significant fee reductions, Defendants failed to engage in a timely and reasoned decision-making process to determine whether the Plan would similarly benefit from consolidating the Plan's administrative and recordkeeping services under a single provider. Instead, Defendants continued to contract with *four* separate recordkeepers. This failure to consolidate the recordkeeping services until April 2015 eliminated the Plan's ability to obtain the same services at a lower cost with a single recordkeeper. Defendants' failure to "balance the relevant factors and make a reasoned decision as to the preferred course of action—under circumstances in which a prudent fiduciary would have done so"—and, indeed, *did* so—was a breach of fiduciary duty. *George*, 641 F.3d at 796.

245.    Total losses to the Plan will be determined after complete discovery in this case and are continuing.

246.    Defendants are personally liable under 29 U.S.C. §1109(a) to make good to the Plan any losses to the Plan resulting from the breaches of fiduciary duties alleged in this Count and is subject to other equitable or remedial relief as appropriate.

247.    Each Defendant knowingly participated in the breach of the other Defendants, knowing that such acts were a breach, enabled the other Defendants to commit a breach by failing to lawfully discharge its own fiduciary duties, knew of the breach by the other Defendants and failed to make any reasonable effort under

the circumstances to remedy the breach. Thus, each defendant is liable for the losses caused by the breach of its co-fiduciary under 29 U.S.C. §1105(a).

## COUNT IV

### Prohibited transactions—29 U.S.C. §1106(a)(1)

### Administrative Services and Fees

248.    Plaintiffs restate and incorporate the allegations contained in the preceding paragraphs.

249.    As service providers to the Plan, TIAA-CREF, Fidelity, VALIC, and Vanguard are parties in interest. 29 U.S.C. §1002(14)(B).

250.    By causing the Plan to use TIAA-CREF, Fidelity, VALIC, and Vanguard as the Plan's recordkeepers from year to year, Defendants caused the Plan to engage in transactions that Defendants knew or should have known constituted an exchange of property between the Plan and TIAA-CREF, Fidelity, VALIC, and Vanguard prohibited by 29 U.S.C. §1106(a)(1)(A), a direct or indirect furnishing of services between the Plan and TIAA-CREF, Fidelity, VALIC, and Vanguard prohibited by 29 U.S.C. §1106(a)(1)(C), and a transfer of Plan assets to, or use by or for the benefit of TIAA-CREF, Fidelity, VALIC, and Vanguard prohibited by 29 U.S.C. §1106(a)(1)(D). These transactions occurred each time the Plan paid fees to TIAA-CREF, Fidelity, VALIC, and Vanguard and in connection with the Plan's investments in funds that paid revenue sharing to TIAA-CREF, Fidelity, VALIC, and Vanguard.

148

251.    Total losses to the Plan will be determined after complete discovery in this case and are continuing.

252.    Under 29 U.S.C. §1109(a), Defendants are personally liable to restore all losses to the Plan resulting from these prohibited transactions, and to provide restitution of all proceeds from these prohibited transactions, and are subject to other appropriate equitable or remedial relief.

253.    Each Defendant knowingly participated in these transactions with knowledge that the transactions were a breach, enabled the other Defendants to cause the Plan to engage in these transactions, and knew of these transactions and failed to make any reasonable effort under the circumstances to remedy or discontinue the transactions. Thus, under 29 U.S.C. §1105(a), each Defendant is liable for restoring all proceeds and losses attributable to these transactions.

## COUNT V

### Breach of Fiduciary Duties—29 U.S.C. §1104(a)(1)(A) & (B)

**Unreasonable Investment Management Fees,
Unnecessary Marketing and Distribution (12b-1) Fees
and Mortality and Expense Risk Fees, and Performance Losses**

254.    Plaintiffs restate and incorporate the allegations contained in the preceding paragraphs.

255.    Defendants are responsible for selecting prudent investment options, ensuring that those options charge only reasonable fees, and taking any other necessary steps to ensure that the Plan's assets are invested prudently. Defendants had a continuing duty to evaluate and monitor the Plan's investments on an

ongoing basis and to "remove imprudent ones" regardless of how long a fund has been in the plan. *Tibble,* 135 S. Ct. at 1829.

256.    These duties required Defendants to independently assess whether each option was a prudent choice for the Plan, and not simply to follow the recordkeepers' fund choices or to allow the recordkeepers to put their entire investment lineups in the Plan's menus. *DiFelice*, 497 F.3d at 423; *see Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 590, 595–96 (8th Cir. 2009).

257.    In making investment decisions, Defendants were required to consider all relevant factors under the circumstances, including without limitation alternative investments that were available to the Plan, the recordkeepers' financial interest in having their proprietary investment products included in the Plan, and whether the higher cost of actively managed funds was justified by a realistic expectation of higher returns. *Braden*, 588 F.3d at 595–96; *Tatum v. RJR Pension Inv. Comm.*, 761 F.3d 346, 360 (4th Cir. 2014); 29 C.F.R. § 2550.404a-1(b); Restatement (Third) of Trusts ch. 17, intro. note; *id*. § 90 cmt. h(2).

258.    Defendants selected and retained for years as Plan investment options mutual funds and insurance company variable annuities with high expenses and poor performance relative to other investment options that were readily available to the Plan at all relevant times.

259.    Many of these options included unnecessary layers of fees that provided no benefit to participants but significant benefits to TIAA-CREF, including marketing and distribution (12b-1) fees and "mortality and expense risk" fees.

260.    Rather than prudently consolidating the Plan's *over 330* investment options into a core lineup in which prudent investments were selected for a given asset class and investment style, as is the case with most defined contribution plans, Defendants retained multiple investment options in each asset class and investment style until April 2015, thereby depriving the Plan of its ability to qualify for lower cost share classes of certain investments, while violating the well-known principle for fiduciaries that such a high number of investment options causes participant confusion and inaction. In addition, as a fiduciary required to operate as a prudent financial expert, *Katsaros,* 744 F.2d at 279. Defendants knew or should have known that providing numerous actively managed duplicative funds in the same investment style would produce a "shadow index" return before accounting for much higher fees than index fund fees, thereby resulting in significant underperformance. The Plan's investment offerings included the use of mutual funds and variable annuities with retail expense ratios far in excess of other lower-cost options available to the Plan. These lower-cost options included lower-cost share class mutual funds with the identical investment manager and investments, lower-cost insurance company variable annuities and insurance company pooled separate accounts. Nearly all of the Plan's options were the recordkeepers' own proprietary investments. Thus, the use of these funds was tainted by the recordkeepers' financial interest in including these funds in the Plan, which Defendants failed to adequately consider. In so doing, Defendants failed to make investment decisions based solely on the merits of the investment funds and what

was in the interest of participants. Defendants therefore failed to discharge its duties with respect to the Plan solely in the interest of the participants and beneficiaries and for the exclusive purpose of providing benefits to participants and their beneficiaries and defraying reasonable expenses of administering the Plan. This was a breach of fiduciary duties.

261.    Defendants failed to engage in a prudent process for monitoring the Plan's investments and removing imprudent ones within a reasonable period. This resulted in the Plan continuing to offer excessively expensive funds with inferior historical performance compared to superior low-cost alternatives that were available to the Plan. As of September 30, 2014, of the Plan's investment options which had at least a five-year performance history, *sixty-three percent* of those funds—197 out of 315—underperformed their respective benchmarks over the previous 5-year period.

262.    CREF Stock Account: Defendants included and retained the CREF Stock Account despite its excessive cost and historical underperformance compared to both passively managed investments and actively managed investments of the benchmark, the Russell 3000 Index, which Defendants and TIAA told participants was the appropriate benchmark.

263.    TIAA Real Estate Account: Defendants included and retained the TIAA Real Estate Account despite its excessive fees and historical underperformance compared to lower-cost real estate investments.

264.    Had Defendants engaged in a prudent investment review process, it would have concluded that these options were causing the Plan to lose tens of millions of dollars of participants' retirement savings in excessive and unreasonable fees and underperformance relative to prudent investment options available to the Plan, and thus should be removed from the Plan or, at a minimum, frozen to new investments.

265.    Total losses to the Plan will be determined after complete discovery in this case and are continuing.

266.    Defendants are personally liable under 29 U.S.C. §1109(a) to make good to the Plan any losses to the Plan resulting from the breaches of fiduciary duties alleged in this Count and is subject to other equitable or remedial relief as appropriate.

267.    Each Defendant knowingly participated in the breach of the other Defendants, knowing that such acts were a breach, enabled the other Defendants to commit a breach by failing to lawfully discharge its own fiduciary duties, knew of the breach by the other Defendants and failed to make any reasonable effort under the circumstances to remedy the breach. Thus, each defendant is liable for the losses caused by the breach of its co-fiduciary under 29 U.S.C. §1105(a).

Case 3:16-cv-02086   Document 38   Filed 12/12/16   Page 153 of 160 PageID #: 783

# COUNT VI

## Prohibited transactions—29 U.S.C. §1106(a)(1)

## Investment Services and Fees

268.   Plaintiffs restate and incorporate herein the allegations of the preceding paragraphs.

269.   As the Plan's providers of investment services, TIAA-CREF, VALIC, Fidelity, and Vanguard are parties in interest. 29 U.S.C. §1002(14)(B).

270.   By including investment options managed by TIAA-CREF, VALIC, Fidelity, and Vanguard in which nearly all of the Plan's $3.4 billion in assets were invested, Defendants caused the Plan to engage in transactions that Defendants knew or should have known constituted an exchange of property between the Plan and TIAA-CREF, VALIC, Fidelity, and Vanguard prohibited by 29 U.S.C. §1106(a)(1)(A); a direct or indirect furnishing of services between the Plan and TIAA-CREF, VALIC, Fidelity, and Vanguard prohibited by 29 U.S.C. §1106(a)(1)(C); and transfers of the Plan's assets to, or use by or for the benefit of TIAA-CREF, VALIC, Fidelity, and Vanguard prohibited by 29 U.S.C. §1106(a)(1)(D). These transactions occurred each time the Plan paid fees to TIAA-CREF, VALIC, Fidelity, and Vanguard in connection with the Plan's investments in TIAA-CREF, VALIC, Fidelity, and Vanguard investment options.

271.   Total losses to the Plan will be determined after complete discovery in this case and are continuing.

272.    Under 29 U.S.C. §1109(a), Defendants are personally liable to restore all losses to the Plan resulting from these prohibited transactions, and to provide restitution of all proceeds of these prohibited transactions, and are subject to other appropriate equitable or remedial relief.

273.    Each Defendant knowingly participated in these transactions with knowledge that the transactions were a breach, enabled the other Defendants to cause the Plan to engage in these transactions, and knew of these transactions and failed to make any reasonable effort under the circumstances to remedy or discontinue the transactions. Thus, under 29 U.S.C. §1105(a), each Defendant is liable for restoring all proceeds and losses attributable to these transactions.

**COUNT VII**

**Failure to Monitor Fiduciaries**

274.    Plaintiffs restate and incorporate the allegations contained in the preceding paragraphs.

275.    This Count alleges breach of fiduciary duties against Vanderbilt University, Traci Nordberg, and Barbara L. Carroll.

276.    These Defendants have responsibility for controlling and managing the operation and administration of the Plan, including the selection of Plan service providers and investment options.

277.    A monitoring fiduciary must ensure that any monitored fiduciaries are performing their fiduciary obligations, including those with respect to the

investment and holding of plan assets, and must take prompt and effective action to protect the plan and participants when they are not.

278.    To the extent any of these Defendants' fiduciary responsibilities were delegated to another fiduciary, these Defendants' monitoring duty included an obligation to ensure that any delegated tasks were being performed prudently and loyally.

279.    These Defendants breached their fiduciary monitoring duties by, among other things:

a.   failing to monitor their appointees, to evaluate their performance, or to have a system in place for doing so, and standing idly by as the Plan suffered enormous losses as a result of the appointees' imprudent actions and omissions with respect to the Plan;

b.   failing to monitor their appointees' fiduciary process, which would have alerted any prudent fiduciary to the potential breach because of the Plan's excessive administrative and investment management fees and consistently underperforming Plan investments in violation of ERISA;

c.   failing to ensure that the monitored fiduciaries had a prudent process in place for evaluating the Plan's administrative fees and ensuring that the fees were competitive, including a process to identify and determine the amount of all sources of compensation to the Plan's recordkeeper and the amount of any revenue sharing payments; a process to prevent the recordkeeper from receiving revenue sharing that would increase the

recordkeeper's compensation to unreasonable levels even though the services provided remained the same; and a process to periodically obtain competitive bids to determine the market rate for the services provided to the Plan;

d. failing to ensure that the monitored fiduciaries considered the ready availability of comparable and better performing investment options that charged significantly lower fees and expenses than the Plan's investments; and

e. failing to remove appointees whose performance was inadequate in that they continued to maintain imprudent, excessively costly, and poorly performing investments, all to the detriment of Plan participants' retirement savings.

280. Had these Defendants discharged their fiduciary monitoring duties prudently as described above, the losses suffered by the Plan would have been minimized or avoided. Therefore, as a direct result of the breaches of fiduciary duty alleged herein, the Plan, the Plaintiffs, and the other Class members lost tens of millions of dollars of retirement savings.

## JURY TRIAL DEMANDED

281. Pursuant to Fed.R.Civ.P. 38 and the Constitution of the United States, Plaintiffs demand a trial by jury.

## PRAYER FOR RELIEF

For these reasons, Plaintiffs, on behalf of the Plan and all similarly situated Plan participants and beneficiaries, respectfully request that the Court:

- find and declare that the Defendants have breached their fiduciary duties as described above;

- find and adjudge that Defendants are personally liable to make good to the Plan all losses to the Plan resulting from each breach of fiduciary duty, and to otherwise restore the Plan to the position it would have occupied but for the breaches of fiduciary duty;

- determine the method by which Plan losses under 29 U.S.C. §1109(a) should be calculated;

- order the Defendants to pay the amount equaling all sums received by the conflicted recordkeepers as a result of recordkeeping and investment management fees;

- order Defendants to provide all accountings necessary to determine the amounts Defendants must make good to the Plan under §1109(a);

- remove the fiduciaries who have breached their fiduciary duties and enjoin them from future ERISA violations;

- surcharge against Defendants and in favor of the Plan all amounts involved in any transactions which such accounting reveals were improper, excessive and/or in violation of ERISA;

- reform the Plan to include only prudent investments;

- reform the Plan to obtain bids for recordkeeping and to pay only reasonable recordkeeping expenses;

- certify the Class, appoint each of the Plaintiffs as a class representative, and appoint Schlichter, Bogard & Denton LLP as Class Counsel;

- award to the Plaintiffs and the Class their attorney's fees and costs under 29 U.S.C. §1132(g)(1) and the common fund doctrine;

- order the payment of interest to the extent it is allowed by law; and

- grant other equitable or remedial relief as the Court deems appropriate.

December 12, 2016                    Respectfully submitted,

/s/ Jerome J. Schlichter
SCHLICHTER, BOGARD & DENTON, LLP
Jerome J. Schlichter, MO No. 32225*
Michael A. Wolff, MO No. 38207
Troy A. Doles, MO No. 47958*
Heather Lea, MO No. 49872*
James Redd, IV, MO No. 66172*
Stephen M. Hoeplinger, MA No. 676219*
100 South Fourth Street, Ste. 1200
St. Louis, MO 63102
Phone: (314) 621-6115
Fax: (314) 621-5934
   *Admitted *Pro Hac Vice*

*Lead Counsel for Plaintiffs*

William B. Hawkins, III
HAWKINS HOGAN, PLC
205 17th Avenue North, Suite 202
Nashville, TN 37203
Phone: (615) 726-0050
Fax: (315) 726-5177
whawkins@hawkinshogan.com

*Local Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that, on December 12, 2016, the foregoing document was filed electronically. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system, including the below counsel for Defendants. Parties may access this filing through the Court's ECF system.

Anthony J. McFarland (TBPR #9551)
Robert E. Cooper, Jr. (TBPR #10934)
Bass Berry & Sims PLC
150 Third Avenue South
Nashville, TN 37201
Telephone: (615) 742-7250
Fax: (615) 742-2750
amcfarland@bassberry.com
rcooper@bassberry.com

MORGAN, LEWIS & BOCKIUS LLP
Sari M. Alamuddin
Allison N. Powers
77 West Wacker Drive
Chicago, IL 60601
Telephone: (312) 324-1000
Fax: (312) 324-1001
sari.alamuddin@morganlewis.com
allison.powers@morganlewis.com

MORGAN, LEWIS & BOCKIUS LLP
William J. Delany
Abbey M. Glenn
1111 Pennsylvania Ave, NW
Washington, DC 20001
Telephone: (202) 739-3000
Fax: (202) 739-3001
william.delany@morganlewis.com
abbey.glenn@morganlewis.com

Jeremy P. Blumenfeld
1701 Market Street
Philadelphia, PA 19103
Telephone: (215) 963-5000
Fax: (215) 963-5001
jeremy.blumenfeld@morganlewis.com

/s/  Jerome J. Schlichter
Jerome J. Schlichter

160